## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| PHILIP LEE; PAMELA WHITE; PATRICIA VANDUSEN; RONALD ALLIX; AND RANDY WELCH, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br>        v.<br><br>BELVOIR MEDIA GROUP, LLC,<br><br>                    Defendant. | Case No. 4:22-cv-12153-SDK-DRG<br><br>Hon. Shalina D. Kumar |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

## STATEMENT OF ISSUES PRESENTED

1.      Was the limitation period applicable to Plaintiffs' PPPA claim tolled for 101 days between March 10, 2020 and June 20, 2020 pursuant to Executive Orders 2020-58 and 2020-122 issued by the Governor of Michigan and Administrative Orders 2020-3 and 2020-18 issued by the Michigan Supreme Court?

**Plaintiffs' Answer: Yes.**

2.      Are the First Amended Class Action Complaint's factual allegations that Defendant, during the relevant pre-July 31, 2016 time period, disclosed "Plaintiffs' Private Reading Information to data aggregators, data appenders, and/or data cooperatives," as well as "rented or exchanged mailing lists containing Plaintiffs' Private Reading Information to third parties seeking to contact [Defendant's] subscribers, without first obtaining the requisite written consent from Plaintiff" (*see* First Amended Class Action Complaint (ECF No. 16 at ¶¶ 14-18) – allegations which are bolstered by a screenshot of Defendant's data card as it exists today and a recitation of the content and a citation to the location of Defendant's data card in existence during the relevant pre-July 31, 2016 time period, in both of which Defendant admits to disclosing its customers' Private Reading Information – sufficient to plausibly suggest an entitlement to relief under the version of Michigan's Preservation of Personal Privacy Act in effect through July 30, 2016?

**Plaintiffs' Answer: Yes.**

## CONTROLLING AND MOST IMPORTANT AUTHORITY

M.C.L. § 600.5813

Mich. Executive Order 2020-58

Mich. Executive Order 2020-122

*Coulter-Owens v. Time Inc.*, 695 F. App'x 117 (6th Cir. 2017)

*Horton v. GameStop Corp.*, 380 F. Supp. 3d 679 (W.D. Mich. 2018)

*Cain v. Redbox Automated Retail, LLC,*
981 F. Supp. 2d 674 (E.D. Mich. 2013)

*Carter v. DTN Mgmt. Co.*, --- N.W.2d ---, 2023 WL 439760 (Mich. Ct. App. Jan. 26, 2023)

*Linstrom v. Trinity Health-Michigan*, --- N.W.2d ----, 2023 WL 1482428 (Mich. Ct. App. Feb. 2, 2023)

# TABLE OF CONTENTS

INTRODUCTION..................................................................................................... 1

ARGUMENT .......................................................................................................... 6

I.   The Six-Year Limitation Period Governing Plaintiffs' Claims Was Tolled for 101
     Days Pursuant to the COVID-19 Orders.................................................... 6

II.  The FAC Adequately Alleges That Defendant Disclosed Plaintiffs' Private
     Reading Information in Violation of the PPPA Between June 4, 2016 and July
     30, 2016. .................................................................................................. 11

III. Plaintiffs Have Statutory and Article III Standing.................................... 27

CONCLUSION ...................................................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Amark Logistics, Inc. v. UPS Ground Freight, Inc.*,
  2020 WL 248976 (N.D. Ohio Jan. 16, 2020) ................................................. 27

*Blaha v. A.H. Robins & Co.*,
  708 F.2d 238 (6th Cir. 1983) ............................................................................ 6

*Boelter v. Advance Mag. Publishers Inc.*,
  210 F. Supp. 3d 579 (S.D.N.Y. 2016) ........................................................ 6, 13

*Boelter v. Hearst Commc'ns, Inc.*,
  192 F. Supp. 3d 427 (S.D.N.Y. 2016) ...................................................... 1, 6, 9

*Bowles v. Sabree*,
  2022 WL 141666 (E.D. Mich. Jan. 14, 2022) ................................................. 7

*Bownes v. Borroughs Corp.*,
  2021 WL 1921066 (W.D. Mich. May 13, 2021) ............................................. 7

*Browning v. Buko*,
  979 N.W.2d 196 (Mich. 2022) ...................................................................... 10

*Cain v. Redbox Automated Retail, LLC*,
  981 F. Supp. 2d 674 (E.D. Mich. 2013) ........................................................ 21

*Carter v. DTN Mgmt. Co.*,
  2023 WL 439760 (Mich. Ct. App. Jan. 26, 2023) ................................ 8, 10, 11

*China Agritech, Inc. v. Resh*,
  138 S. Ct. 1800 (2018) ..................................................................................... 4

*Coulter-Owens v. Time Inc.*,
  695 F. App'x 117 (6th Cir. 2017) .................................................................... 9

*Cowles v. Bank West*,
  719 N.W.2d 94 (Mich. 2006) ........................................................................... 3

*Directv, Inc. v. Treesh*,
  487 F.3d 471 (6th Cir. 2007) ......................................................................... 28

*Doe v. Michigan State Univ.*,
  989 F.3d 418 (6th Cir. 2021) ......................................................................... 20

*Excel Homes, Inc. v. Locricchio*,
  7 F. Supp. 3d 706 (E.D. Mich. 2014) ............................................................ 28

*Foman v. Davis*,
  371 U.S. 178 (1962) ....................................................................................... 30

*Horton v. GameStop Corp.*,
  380 F. Supp. 3d 679 (W.D. Mich. 2018) ................................................ passim

*Howard v. Onion*,
  2022 WL 2065950 (6th Cir. May 17, 2022) .................................................... 7

*In re: Certified Question: Deacon v. Pandora, Inc.*,
  885 N.W.2d 628 (Mich. 2016) ......................................................................... 9

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) .................................................................................................. 1
*Lin v. Crain Commc'ns, Inc.*,
  2020 WL 2043527 (E.D. Mich. Apr. 27, 2020) ............................................. 29
*Linstrom v. Trinity Health-Michigan*,
  --- N.W.2d ----, 2023 WL 1482428 (Mich. Ct. App. Feb. 2, 2023) .............. 8
*Mackey v. Rising*,
  2021 WL 4034226 (E.D. Mich. Sept. 3, 2021) ............................................... 7
*Moeller v. Am. Media, Inc.*,
  235 F. Supp. 3d 868 (E.D. Mich. 2017) .................................................... 6, 13
*Nashel v. The New York Times*,
  2022 WL 6775657 (E.D. Mich. Oct. 11, 2022) ...................................... 16, 20
*Nat'l Credit Union Admin. Bd. v. Zovko*,
  2016 WL 9778195 (N.D. Ohio July 8, 2016) ................................................. 17
*Perlin v. Time Inc.*,
  237 F. Supp. 3d 623 (E.D. Mich. 2017) .................................................... 6, 13
*Roberts v. Hamer*,
  655 F.3d 578 (6th Cir. 2011) ........................................................................ 28
*Ruppel v. Consumers Union of United States, Inc.*,
  2017 WL 3085365 (S.D.N.Y. June 12, 2017) ................................................. 6
*Smith v. Hilliard*,
  578 F. App'x 556 (6th Cir. 2014) ................................................................... 7
*Straus v. Governor*,
  592 N.W.2d 53 (Mich. 1999) ................................................................... 6, 10
*Taylor et al. v. Belvoir Media Group, LLC*,
  1:22-cv-477-HYJ-RSK (W.D. Mich.) ......................................................... 2, 3
*Wallace v. Kato*,
  549 U.S. 384 (2007) ........................................................................................ 7
*Warth v. Seldin*,
  422 U.S. 490 (1975) ...................................................................................... 29
*Wenkel v. Farm Bureau Gen. Ins. Co. of Michigan*,
  2022 WL 17364773 (Mich. Ct. App. Dec. 1, 2022) ....................................... 9
*Wheaton v. Apple Inc.*,
  2019 WL 5536214 (N.D. Cal. Oct. 25, 2019) .............................................. 21
*Wheaton v. Apple Inc.*,
  (N.D. Cal. Sept. 20, 2019) (def.'s reply in support of mot. to dismiss) ..................... 22
*Zimmerman v. 3M Co.*,
  542 F. Supp. 3d 673 (W.D. Mich. 2021) ..................................................... 12

**Statutes**

M.C.L. § 445.1711 ............................................................................ 1, 25
M.C.L. § 600.5813 .................................................................................... 2
Michigan's Preservation of Personal Privacy Act ....................................passim

**Other Authorities**

Mich. Const. 1963, art. 6, § 5 ................................................................ 10
Mich. Executive Order 2020-58 ..........................................................passim
Mich. Executive Order 2020-122 ........................................................passim
Mich. Supreme Court Administrative Order 2020-3 .............................passim
Mich. Supreme Court Administrative Order 2020-18 ...........................passim

**Rules**

Fed. R. Civ. P. 8 .................................................................... 11, 20, 26, 27
Fed. R. Civ. P. 12(b)(6) ........................................................ 2, 20, 27, 28
M.C.R. § 3.501(F)(1) .............................................................................. 3, 4

Plaintiffs Phillip Lee, Pamela White, Patricia VanDusen, Ronald Allix, and Randy Welch ("Plaintiffs"), individually and on behalf of all others similarly situated, submit this response in opposition to Defendant Belvoir Media Group, LLC's ("Belvoir" or "Defendant") motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 18) (the "Motion" or "Mot.").

## INTRODUCTION

In this putative consumer class action, Plaintiffs allege that Defendant violated Michigan's Preservation of Personal Privacy Act ("PPPA")[1] by disclosing, without their consent, information that identified them as (*inter alia*) subscribers to multiple publications, including health newsletters, published and sold by Belvoir. On behalf of themselves and others similarly situated, Plaintiffs seek to recover $5,000.00, as provided by the PPPA, for each of Defendant's statutory violations.

---

[1]   The PPPA (occasionally referred to in the caselaw as the "Video Rental Privacy Act" or the "VRPA") is found at H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989). In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PPPA] does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case. *See Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. 2018).

Defendant moves to dismiss Plaintiffs' First Amended Class Action Complaint ("FAC") (ECF No. 16) on three grounds: (1) Plaintiffs' PPPA claims were neither tolled pursuant to the Executive and Administrative Orders extending the time to file civil actions for violation of Michigan law due to COVID-19 (Mich. Executive Order Nos. 2020-58 & 2020-122, Mich. Supreme Court Administrative Order Nos. 2020-3 & 2020-18, together, the "COVID-19 Orders"), nor tolled during the pendency of the prior action entitled *Taylor et al. v. Belvoir Media Group, LLC*, 1:22-cv-477-HYJ-RSK (W.D. Mich.), and are therefore time-barred even under the six-year limitation period found in M.C.L. § 600.5813[2]; (2) even if the claim was properly filed within the tolled six-year statute of limitations period, Plaintiffs fail to adequately allege that Defendant disclosed their information to third parties and thus fail to state a claim under Federal Rules of Civil Procedure 12(b)(6); and (3) Plaintiffs lack statutory and Article III standing to sue. Each argument is without merit.

<u>First</u>, the six-year period was tolled for 101 days pursuant to the COVID-19 Orders, thus rendering any disclosures of Plaintiffs' personal information that occurred between at the very latest June 4, 2016 (six years plus 101 days before the date on which this action was initiated) and July 30, 2016 (the last date that the unamended version of

---

[2]   Defendant concedes that "three judges in this District and one judge in the Western District of Michigan agree with Plaintiffs' position" that a six-year statute of limitations applies to PPPA claims. Mot. at PageID.1184 n.14. Nevertheless, Defendant baselessly insists that a three-year limitations period applies. Mot. at PageID.1183.

the PPPA that Plaintiffs invoke in this case was in effect) actionable in this case.

Although Plaintiffs also contend that the limitation period was tolled for an additional 104 days during the pendency of the *Taylor v. Belvoir Media Group, LLC*, 1:22-cv-477 (W.D. Mich.) action (a prior action brought on behalf of the same putative class at issue here (*see* FAC ¶ 1 n.1)) – rendering any disclosures made between **February 21, 2016** (2,395 days prior to the commencement of the instant action on September 12, 2022) and July 30, 2016 actionable in this case – the Court need not reach this additional basis for tolling in order to deny the Motion because the six-year limitation period, with the benefit of tolling pursuant to the COVID-19 Orders (**June 4, 2016** through July 30, 2016), is of a sufficient duration for the Court to conclude that Plaintiffs have adequately stated claims for relief that accrued within that time frame, as discussed further below.

Nonetheless, Plaintiffs note that, as explained in footnote 1 to the FAC, M.C.R. § 3.501(F)(1) expressly provides that "[t]he statute of limitations is tolled as to all persons within the class described in the complaint on the commencement of an action asserting a class action." *Cowles v. Bank West*, 719 N.W.2d 94, 101 (Mich. 2006) (citing M.C.R. § 3.501(F)(1)). Thus, because this action is brought on behalf of the same putative class as the *Taylor* action was brought, the six-year limitation period was tolled "as to [Plaintiffs and all other persons] within [that putative class] on the commencement of [the *Taylor*] action[.]" *See id.*; *see also, e.g.*, *Boelter v. Hearst Commnc'ns Inc.*, 269 F. Supp. 3d 172, 187-89 (S.D.N.Y. 2017) (holding that M.C.R. 3.501(F)(1)

applies in federal court, and that the statute of limitations for the PPPA claims of putative class members is tolled by the filing of a putative class action).

Additionally, the U.S. Supreme Court's decision in *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1806 (2018), which Defendant fixates on in the Motion, has no applicability in this case for several reasons. For one thing, because statutes of limitation and the tolling doctrines that go along with them are matters of state substantive law, *China Agritech*'s holdings are limited to federal causes of action, like the federal securities claims at issue in that case. *Id.* at 1804-05. Moreover, even in that limited context, the decision's holdings are inapplicable unless the prior action was dismissed following a denial of class certification. *Id.* at 1805. Here, the statute in question is a Michigan state statute, not a federal statute, and in any event class certification was not denied in the *Taylor* action. Thus, *China Agritech* is plainly inapplicable here, and certainly cannot override M.C.R. § 3.501(F)(1), as Defendant would have the Court believe in the Motion.

Again, at this stage, the issue need not be resolved to decide the Motion because the FAC adequately states a claim that accrued within the applicable six-year limitation period tolled solely by the COVID-19 Orders, as discussed in detail below.

Second, Plaintiffs adequately state a claim for violation of the PPPA that accrued during the relevant pre-July 31, 2016 time period, i.e., between June 4, 2016 and July 30, 2016. The FAC specifically alleges that, "during the relevant pre-July 31, 2016 time period," Defendant "continuously" and "at least as frequently as once a month,"

"rent[ed], exchang[ed], or otherwise disclos[ed] the Private Reading Information of its entire database [of] its Michigan-based subscribers," inclusive of "Plaintiff's Private Reading Information," to various third parties, including "data aggregators, data appenders, data cooperatives, and list brokers, among others," all without its subscribers' consent. FAC ¶¶ 4, 6, 50-52. And the FAC shoves these allegations across the line of plausibility by attaching a screenshot depicting Defendant's publicly accessible "data card" in existence today, which offers for sale Defendant's customers' Private Reading Information "THROUGH 04/30/2022", by alleging that the same data card also existed throughout the relevant pre-July 31, 2016 time period, and by reciting the content and citing to the location of Defendant's data card in existence during the relevant pre-July 31, 2016 time period. *Id.* ¶¶ 2-3 & Ex. A. Additionally, the FAC alleges various facts concerning Wiland (the entity responsible for appending data to the list offered for sale in the data card described in paragraph 3 of the FAC, which was publicly advertised during the relevant time period) showing that Defendant was systemically transmitting its entire database of customer information to Wiland on a monthly basis during the relevant pre-July 31, 2016 time period, for data appending, prospecting, and enhancement services. *Id.* ¶ 4.  Moreover, the FAC alleges that, "[a]s a result of [Defendant's] practices of disclosing Plaintiff's Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiffs saw a dramatic uptick of junk mail in his mailbox . . . over the same time period." *Id.* ¶ 7; *see also id.* ¶ 1.

Taken together, these factual allegations – which are well-pled and must be

accepted as true at this stage of the proceedings – easily state a claim for relief under the PPPA. Indeed, numerous courts across the country in other PPPA publication cases have overwhelmingly concluded that plaintiffs stated plausible claims for relief based on substantially the same facts as alleged in the FAC. *See, e.g.*, *Horton v. GameStop Corp.*, 380 F. Supp. 3d 679, 682 (W.D. Mich. 2018); *Perlin v. Time Inc.*, 237 F. Supp. 3d 623, 642 (E.D. Mich. 2017); *Moeller v. Am. Media, Inc.*, 235 F. Supp. 3d 868, 873 (E.D. Mich. 2017); *Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 453 (S.D.N.Y. 2016); *Boelter v. Advance Mag. Publishers Inc.*, 210 F. Supp. 3d 579, 590 (S.D.N.Y. 2016).

Third, Plaintiffs have statutory and Article III standing to bring this action in federal court. While Defendant posits that Plaintiffs were not customers to any of its publications, the FAC adequately alleges otherwise. The Court should reject Defendant's attempt to disprove the facts alleged in the FAC at the pleading stage.

The Court should deny Defendant's motion to dismiss in its entirety.

## ARGUMENT

### I. The Six-Year Limitation Period Governing Plaintiffs' Claims Was Tolled for 101 Days Pursuant to the COVID-19 Orders

The governing six-year limitation period was tolled for 101 days, from March 10, 2020, through June 20, 2020, pursuant to the COVID-19 Orders.

Under Michigan law "the Governor's action [in issuing an Executive Order] has the status of enacted legislation." *Straus v. Governor*, 592 N.W.2d 53, 57 (Mich. 1999). "Pursuant to the *Erie* doctrine, state statutes of limitations must be applied by federal

6

courts sitting in diversity." *Blaha v. A.H. Robins & Co.*, 708 F.2d 238, 239 (6th Cir. 1983).

"Just as limitations periods are taken from state law, so are the rules regarding tolling."

*Smith v. Hilliard*, 578 F. App'x 556, 562 (6th Cir. 2014) (citing *Wallace v. Kato*, 549 U.S.

384, 394 (2007)) ("We have generally referred to state law for tolling rules, just as we

have for the length of statute of limitation."). Thus, because the *Erie* doctrine requires

this Court to apply Michigan statute of limitations and tolling rules, and because the

COVID-19 Orders have the same status as enacted legislation under Michigan law, the

Court is compelled to apply the COVID-19 Orders and find that the statute of

limitations was tolled from March 10, 2020, to June 20, 2020.

Courts in both Michigan District Courts have held that the COVID-19 Orders

toll the statute of limitations for Michigan state-law claims. *See Bownes v. Borroughs Corp.*,

2021 WL 1921066, at *2 (W.D. Mich. May 13, 2021) ("the Michigan Supreme Court

tolled the statutes of limitations in Michigan for at least 100 days due to the COVID-

19 pandemic" and thus "filers shall have the number of days to submit their filings on

June 20, 2020, as they had when the exclusion went into effect on March 23, 2020");

*Mackey v. Rising*, 2021 WL 4034226, at *2 (E.D. Mich. Sept. 3, 2021) (same); *Bowles v.

Sabree*, 2022 WL 141666, at *9 (E.D. Mich. Jan. 14, 2022) (same); *see also, e.g., Howard v.

Onion*, 2022 WL 2065950, at *2 (6th Cir. May 17, 2022) (same under Ohio law).

Without citing to any legal authority, Defendant argues that "the COVID-19

Orders allow[] only for the tolling of deadlines that fall within the declared states of

disaster and emergency, which spanned from March 10, 2020 through June 19, 2020."

Mot. at 17, PageID.1180. According to Defendant, "[t]he COVID-19 Orders do not apply to Plaintiffs' claims" because "their deadlines to file their claims fell over two years after the end of the COVID-19 tolling period." Mot. at 18, PageID.1181. The argument is baseless and was recently foreclosed by the Michigan Court of Appeals.

On January 26, 2023, the Michigan Court of Appeals issued a published decision addressing the effect of the Michigan Supreme Court's COVID-19 orders on filing deadlines. *See Carter v. DTN Mgmt. Co.*, --- N.W.2d ---, 2023 WL 439760 (Mich. Ct. App. Jan. 26, 2023) (**Ex. A** hereto). In *Carter*, the defendant argued, and the trial court held, that AO 2020-3 applied only to cases whose filing deadlines expired during the state of emergency, and that the Michigan Supreme Court has no authority to modify or toll the statute of limitations. *Carter*, 2023 WL 439760, at *2-4. The Court of Appeals rejected that argument, holding that the COVID-19 Orders "broadly excluded any day within the state of emergency *'for purposes of determining the deadline* applicable to the commencement of all *civil* and probate case types under MCR 1.108(1).'" *Id.* at *3 (emphasis in *Carter*) (citing AO 2020-18); *see also id.* ("Contrary to the trial court's conclusion, the Supreme Court did not exclude only deadlines that fell during the state of emergency. Rather, it more broadly excluded *any day* within the state of emergency *'for purposes of determining the deadline* applicable to the commencement of *all* civil and probate case types under MCR 1.108(1).'" (citing AO 2020-3, emphasis in *Carter*)). *See also Linstrom v. Trinity Health-Michigan*, --- N.W.2d ----, 2023 WL 1482428, at *6 (Mich. Ct. App. Feb. 2, 2023) (concluding the same in another published case).

The only thing Defendant cites to in support of this argument is the amendment to the PPPA that became effective on July 31, 2016 (after the period at question here), Mot. at 19, PageID.1182, an amendment that the Sixth Circuit, the Michigan Supreme Court, and numerous federal courts have uniformly held does not apply retroactively. *See Coulter-Owens v. Time Inc.*, 695 F. App'x 117, 121 (6th Cir. 2017); *In re: Certified Question: Deacon v. Pandora, Inc.*, 885 N.W.2d 628, 630-31 (Mich. 2016); *Hearst*, 192 F. Supp. 3d at 439-41. Because the amendment to the statute does not apply retroactively, the unamended statute that Plaintiffs invoke here plainly permits the recovery of statutory damages. *See* PPPA § 5(a).

Defendant points out that, in *Wenkel v. Farm Bureau Gen. Ins. Co. of Michigan*, 2022 WL 17364773 (Mich. Ct. App. Dec. 1, 2022), the Michigan Court of Appeals "clarified that it interpreted one of the administrative orders 'as tolling the statute of limitations for the commencement of actions and a concomitant tolling of the filing of responsive pleadings during the state of emergency.'" *Wenkel,* 2022 WL 17364773, at *4. But this statement by the court in *Wenkel* is perfectly consistent with the holdings of *Carter* and *Lindstrom*, as well as the decisions in *Bownes*, *Bowles*, and *Mackey*. Indeed, *Wenkel* further confirms that the COVID-19 Orders "toll[ed] the statute of limitations for the commencement of actions . . . during the [101 days of the] state of emergency," and certainly does not state or even suggest that the COVID-19 Orders only served to toll any "deadlines" that fell within the emergency period, as Defendant contends. *Wenkel*, 2022 WL 17364773, at *4.

Defendant then half-heartedly mounts a constitutional challenge to the COVID-19 Orders, but this too is unavailing. Relying only on a dissenting opinion, Defendant suggests that the Administrative Orders should be held inapplicable for "violating the separation of powers provision of the state constitution." Mot. at 20, PageID.1183 n.13 (citing *Browning v. Buko*, 979 N.W.2d 196 (Mich. 2022) (Viviano, J., dissenting)). But, of course, dissenting opinions do not control; the majority does. And the Michigan Supreme Court majority declined to even consider the appellate court's decision to deny interlocutory appeal to consider the question. *Id.*; *see also id.* at 198 (explaining underlying procedural posture where probate court applied COVID-19 tolling and appellate court declined to grant interlocutory appeal). Moreover, the *Carter* court also specifically rejected the notion that the Administrative Orders are ineffective because the Michigan Supreme Court has no authority to modify or toll the statute of limitations. *Carter* held that "[t]he Supreme Court has constitutional authority to 'establish, modify, amend, and simplify the practice and procedure in all courts of this state.'" *Carter*, 2023 WL 439760, at *4 (citing Mich. Const. 1963, art. 6, § 5). But even if the Michigan Supreme Court's COVID-19 tolling Administrative Order did not apply (and it does), Governor Whitmer separately issued an Executive Order tolling the statute of limitations for all claims due to COVID-19. *See* Mich. Executive Order 2020-58. And, under Michigan law "the Governor's action [in issuing an Executive Order] has the status of enacted legislation." *Straus*, 592 N.W.2d at 57, *see supra*. Simply, there is no basis to decline to apply the COVID-19 Orders here.

10

Here, just like in *Carter*, the six-year limitation period applicable to Plaintiffs' claim was tolled for 101 days from March 10, 2020 through June 20, 2020, such that – even without the benefit of tolling from the prior *Taylor* action – any disclosure of Plaintiffs' Private Reading Information by Defendant between June 4, 2016 and July 30, 2016 is actionable in this case. (Six years is 2,190 days. Six years plus 101 days is 2,291 days. And the 2,291st day prior to September 12, 2022 (the date the original Complaint was filed in this action) was June 4, 2016. *See Pratt v. KSE Sportsman Media, Inc.*, 586 F. Supp. 3d 666, 675 n.6 (E.D. Mich. 2022) (calculating limitation period the same way)). *See, e.g.*, *Carter*, 2023 WL 439760, at *3 ("conclud[ing] that plaintiff's complaint was timely filed," explaining: "On March 10, 2020, plaintiff had 10 months left to file her complaint. Accordingly, she had that same amount of time to file beginning on June 20, 2020.").

## II.   The FAC Adequately Alleges That Defendant Disclosed Plaintiffs' Private Reading Information in Violation of the PPPA Between June 4, 2016 and July 30, 2016

Defendant argues that the FAC "fail[s] to provide sufficient facts from which this Court could draw a plausible inference that [Defendant] violated Plaintiffs' rights under the PPPA in 2016." Mot. at 23, PageID.1186. The argument is without merit. The FAC's allegations more than plausibly demonstrate that Defendant disclosed Plaintiffs' Private Reading Information in violation of the PPPA during the relevant pre-July 31, 2016 time period, i.e., between June 4, 2016 and July 31, 2016.

Review of the FAC is governed by the liberal Rule 8 pleading standard. Plaintiffs

are not required to prove their claim with evidence at this time. They must merely allege facts that plausibly suggest Defendant violated the PPPA. *See, e.g., Zimmerman v. 3M Co.*, 542 F. Supp. 3d 673, 681 (W.D. Mich. 2021).

"The Michigan [PPPA] prohibits a person, and an employee or agent of the person, engaged in the business of selling at retail books or other written materials, from disclosing to any person, other than the customer, a record or information concerning the purchase of those materials by a customer that indicates the identity of the customer." *Boelter*, 269 F. Supp. 3d at 177-78 (quoting PPPA § 2) (cleaned up).

The FAC alleges that during the relevant pre-July 31, 2016 time period, Defendant disclosed the Private Reading Information of its Michigan-based subscribers, including Plaintiffs and all Class members, to various third-parties, including data appenders, data aggregators, list brokers, marketing companies, and many others, including without limitation to Wiland. FAC ¶¶ 1-7, 10, 14-18, 50-53, 55, 70-74. The FAC alleges that, for the duration of the relevant pre-July 31, 2016 time period, Defendant "continuously engaged" in these practices (disclosing Defendant's "entire" database of "all" of its customers' Personal Reading Information to Wiland and other third parties), "at least as frequently as once a month," in order to facilitate list appending (i.e., "enhancement" or "modeling" services), list rentals and exchanges, and data coop services. *Id.* ¶¶ 1-7, 10, 14-18, 50-53, 55, 70-74. The FAC corroborates these allegations by also alleging that Defendant's entire customer database (containing the personal, PPPA-protected data pertaining to all of its customers, including Plaintiffs

and each Class member) was advertised by Defendant for rental and exchange on the open market – including specifically on the websites of data brokers Nextmark and SRDS, Inc. – throughout the relevant pre-July 31, 2016 time-period, and in fact still is advertised on Nextmark's website today. *See id.* ¶¶ 2-3 & Ex. A. Plaintiffs bolster these factual allegations by including a screenshot of the data card currently listed on data-broker Nextmark's website that offers renters, exchanges, and others the Private Reading Information of all of Defendant's subscribers. FAC ¶ 2, *id.* Ex. A. This data card indicates that the data is cumulative of all subscribers, with "COUNTS THROUGH 04/30/2022." *Id.*

Numerous courts across the country, including in this District, have held such factual allegations sufficient to state a claim for a violation of the PPPA. *See, e.g.*, *Horton*, 380 F. Supp. 3d at 682; *Perlin*, 237 F. Supp. 3d at 642; *Moeller*, 235 F. Supp. 3d at 873; *Hearst*, 192 F. Supp. 3d at 453; *Boelter*, 210 F. Supp. 3d at 590.

But the FAC does not stop there. The FAC pushes these allegations across the line of plausibility by alleging that the same or similar data card attached as Ex. A to the FAC also existed throughout the relevant pre-July 31, 2016 time period, and by actually reciting the title, content, and advertised subscriber count appearing on that 2016 data card, and the URL of the website on which it appeared during that time period. *See* FAC ¶ 3 ("For the entire duration of the relevant pre-July 31, 2016 time period, Belvoir offered, through NextMark and other list brokers, including SRDS, Inc., to provide renters access to the mailing list titled 'Belvoir Health Wiland Direct Modeling

13

Masterfile,' which contained the Private Reading Information of all subscribers to all of Belvoir's health newsletters, at a base price of $110.00/M per thousand, (i.e., 11 cents apiece).") & *id.* n.3 ("This data card titled 'Belvoir Health Wiland Direct Modeling Masterfile' was accessible during the relevant pre-July 31, 2016 time period at http://www.srds.com/directnet/dnet?action=recoListDetail&mid=956367&unit=0, and was assigned the ID number 956367 by SRDS."). And the FAC describes in detail how Defendant, pursuant to a contractual relationship with Wiland in effect during the relevant pre-July 31, 2016 time period, was required to, and in fact did, disclose its entire customer database (comprised of Plaintiffs' and all Class members' Private Reading Information) to Wiland "at least as frequently as once a month" for data appending (i.e., "enhancement" or "modeling") and prospecting services. FAC ¶ 4.

Defendant argues that the FAC fails to plausibly demonstrate that Defendant was the source of the Personal Reading Information of its customers that was advertised on the data cards (and transmitted to Wiland and the various other types of recipients alleged in the FAC) during the relevant time period, or that the disclosed data contained the names and addresses of Defendant's customers. Mot. at 26-27, PageID.1188-89. This is simply wrong. The FAC specifically alleges that the customer database offered for rental and exchange during the relevant time period (on Nextmark's and SRDS's websites, among other locations) did contain the *names and addresses* of each of Defendant's customers and was transmitted to Wiland *by Defendant* on a "continuous and systemic basis," at least as frequently as once a month, and that

the advertised lists were advertised on SRDS's and Nextmark's websites on behalf of Defendant, and alleges facts rendering these allegations plausible (such as the meaning of the information in the "channels" field and Defendant's authorization of its trademark logo to be affixed on the data card). FAC ¶¶ 76, 5 ("The lists advertised for sale in the 'data cards' referenced above in paragraphs 2 and 3 (and all of the other 'data cards' advertised by Belvoir between the commencement of the relevant pre-July 31, 2016 time period and the present) include, *inter alia*, the full names and addresses of each person who purchased a subscription to a Belvoir publication and the title of the publication that each of them subscribed to; indeed, the postal-mail envelope logo in the 'channels' field of the data card (which appeared on all of the data cards referenced herein) indicates that the advertised mailing list contains the necessary information (i.e., name and address) for the renters, exchangers, and purchasers of the list to contact the subscribers whose information appears on it via postal mail. And the Personal Reading Information contained on the mailing lists advertised in the data cards referenced herein originates, and throughout the relevant pre-July 31, 2016 time period originated, directly from Belvoir prior to being disclosed to the renters, purchasers, and exchangers of this data; indeed, all of the data cards referenced in the First Amended Complaint (and in existence between the commencement of the relevant pre-July 31, 2016 time period and the present) contained Belvoir's trademarked logo, which Belvoir expressly authorized to be affixed thereon.").

Moreover, the FAC alleges that "[a]s a result of [Defendant]'s practices of

disclosing Plaintiffs' Private Reading Information during the relevant pre-July 31, 2016 time period, as alleged herein, Plaintiffs saw a dramatic uptick of junk mail in their mailboxes over the same time period." FAC ¶ 7; *see also id.* ¶ 1. Taken together, these factual allegations—which are well-pled and must be accepted as true at this stage of the proceedings—more than adequately state a claim for relief under the PPPA.

The recent decision in *Nashel v. The New York Times*, 2022 WL 6775657 (E.D. Mich. Oct. 11, 2022), heavily relied upon by Defendant in the Motion, is readily distinguishable and, in any event, an outlier that was wrongly decided. The plaintiffs in *Nashel* pointed to data cards "published online in 2007 and 2008" to support their allegations that the Defendant disclosed its subscribers' eight years <u>later</u> during the applicable limitation period—and the court in *Nashel* seized on this "timing issue" in its order granting defendant's motion to dismiss. *See Nashel*, 2022 WL 6775657, at *1, 5. In this case, on the other hand, there is no such "timing issue" because the FAC: (1) attaches a copy of the "Belvoir Media Group Elite Masterfile Mailing List" offered for sale in 2022 (with "COUNTS THROUGH 04/30/2022"), *post-dating the relevant pre-July 31, 2016 time period*, FAC ¶ 2 & Ex. A; (2) recites the exact title, contents, and subscriber count, and cites to the precise URL, of Defendant's data card offering its Wiland-enhanced customer list in existence *during the relevant pre-July 31, 2016 time period*, *see id.* ¶ 3; and (3) alleges that Defendant's contract with Wiland in effect during that time period required Defendant to make transmissions of its entire customer database to Wiland at least as frequently as once a month, and that Defendant

did exactly that throughout the relevant pre-July 31, 2016 time period. *See id.* ¶¶ 4, 6, 10, 14-18, 50-53, 55, 70-74, 76. Thus, the factual allegations of the FAC collectively show that Defendant's practices of systematically disclosing all of its customers' Private Reading Information and other data (to third party data appenders, aggregators, renters, and others) were ongoing throughout the relevant pre-July 31, 2016 time period, i.e., between June 4, 2016 and July 30, 2016, and in fact persisted "THROUGH 04/30/2022." *Id.* ¶¶ 1-7, 10, 14-18, 50-53, 55, 70-74, 76 & Ex. A. Therefore, unlike in *Nashel*, where the plaintiff's allegations of 2015-16 disclosures were unsupported by a data card that post-dated that timeframe, here Plaintiffs *have* attached as an exhibit a data card that post-dates the relevant pre-July 31, 2016 time frame, and in fact have alleged facts showing that the same or substantially similar data card existed and was offered online throughout the relevant pre-July 31, 2016 time period.

Defendant attempts to sweep under the rug Plaintiffs' allegations in FAC ¶ 3, which detail the data card that existed during the relevant time period in 2016, asserting: "However, that data card is not reproduced and the link Plaintiffs provide to it does not work." Mot. at 25, PageID.1188. But it makes no difference that the link does not work and that Plaintiffs have not attached a screenshot of the card. Plaintiffs have alleged all of the relevant details of the data card and the location where it existed. This case is at the pleadings stage. At this stage, the Court must consider all of Plaintiffs' factual allegations as true, including those in paragraph 3, and determine whether they, together with all inferences drawn from them, in the light most favorable to Plaintiff,

plausibly suggest an entitlement to relief. *See, e.g.*, *Nat'l Credit Union Admin. Bd. v. Zovko*, 2016 WL 9778195, at \*3 (N.D. Ohio July 8, 2016) ("Defendants complain that the allegations in and documents attached to the [complaint] were not made with firsthand knowledge, and are uncorroborated, unauthenticated and circumstantial . . . Defendants seem to be arguing that, because the [complaint] is not based on admissible evidence, Plaintiff has failed to meet the Rule 9 particularity standard. If this is their argument, it is unsound. The claims in Plaintiff's [complaint] based on fraud and the facts and documents in support of those claims are *allegations*, not evidence. The admissibility of those facts are addressed at an entirely different stage of litigation.").

Defendant also attempts to dispense with paragraph 3 of the FAC by arguing that "the data card is from a third party, not [Defendant], so their allegations attributing any alleged representations on that card to [Defendant] must be disregarded." Mot. at 25, PageID.1188. That is a gross mischaracterization of the FAC's allegations. The FAC alleges that was "publicly advertised by [Defendant] during the relevant pre-July 31, 2016 time period" on Nextmark and SRDS's websites, and that Defendant offered the list for rental and exchange "through Nextmark and other list brokers, including SRDS, Inc.," such that these entities, in maintaining Defendant's data card on their websites, were acting as list brokers who facilitated the rental and exchange of Defendant's list on Defendant's behalf. *See* FAC ¶ 3. Thus, contrary to the Mot., the FAC alleges that the data card was Defendant's and the data advertised on it originated from Defendant. *See id.; see also id.* ¶ 5 ("the Private Reading Information contained on the mailing lists

advertised in the data cards referenced herein originates, and throughout the relevant pre-July 31, 2016 time period originated, directly from [Defendant] prior to being disclosed to the renters, purchasers, and exchangers of this data; indeed, all of the data cards referenced in this First Amended Complaint (and in existence between the commencement of the relevant pre-July 31, 2016 time period and the present) contained Belvoir's trademarked logo, which Belvoir expressly authorized to be affixed thereon.").

Moreover, Plaintiffs pled numerous additional facts establishing (and at least plausibly suggesting) that Defendant was actively and continuously disclosing Plaintiffs' and Class members' (and all of its other customers') Private Reading Information to Wiland on a monthly basis throughout the entire relevant pre-July 31, 2016 period. FAC ¶¶ 1-7, 10, 14-18, 50-53, 55, 70-74, 76.

Indeed, unconstrained by the timing issue related to the data cards identified in *Nashel*, the allegations of the FAC easily state a claim for violation of the PPPA. The FAC specifically alleges that Defendant disclosed its entire subscriber database, including Plaintiffs' and all other Michigan customers' Private Reading Information, to data aggregators and appenders, including Wiland, as well as to numerous other third parties, on at least as frequently as a monthly basis, during the relevant pre-July 31, 2016 period. And because the relevant pre-July 31, 2016 period in this case (even without the benefit of tolling from the pendency of the *Taylor* action) is greater than a month (specifically, from June 4, 2016 through July 30, 2016), it may reasonably be inferred

that Defendant disclosed its subscriber database (comprised of Plaintiffs' and all Class members', and all of its other customers', Private Reading Information) at one of those monthly (or more frequent) intervals during that time.

Further, *Nashel* is an outlier in PPPA jurisprudence and Plaintiffs firmly believe it was wrongly decided. The decision applied a pleading standard far more stringent than Rule 8 imposes, and required specificity that no PPPA plaintiff could ever satisfy. For one, *Nashel* improperly analyzed the plausibility of *the complaint's allegations*. *See Nashel*, 2022 WL 6775657, at *5 (stating that "the data cards make the complaint's allegations merely *possible* rather than plausible"). This was a plain error. On a motion to dismiss pursuant to Rule 12(b)(6), the question is not whether the complaint's allegations are plausible. Instead, the complaint's allegations must be accepted as true, and the question is whether those allegations, viewed together and with all reasonable inferences drawn in the plaintiff's favor, are plausibly suggestive of a claim for relief. *See, e.g.*, *Doe v. Michigan State Univ.*, 989 F.3d 418, 425 (6th Cir. 2021). *Nashel* also recast allegations that were plainly factual in nature (e.g., allegations that defendant systematically disclosed subscriber lists containing the plaintiff's Private Reading Information to specific third parties over a specific period) as "legal conclusions" merely because that underlying conduct happened to give rise to a PPPA claim. *See Nashel*, 2022 WL 6775657, at *5.

Every other court that presided over similar PPPA actions against publishers of written materials, arising from substantially the same allegations as those made here, has

held that these allegations adequately stated a claim under the PPPA—including in a well-reasoned, published decision from the Hon. Gordon J. Quist in *Horton*. *See Horton*, 380 F. Supp. 3d at 682 ("Given that GameStop possessed the *Game Informer* subscription information and that NextMark purported to sell that information, the implication that GameStop disclosed the information to NextMark or other data-mining companies passes the threshold of plausibility"); *see also Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674, 685 (E.D. Mich. 2013) (Rosen, J.).

Defendant cites a non-binding, unpublished decision in *Wheaton v. Apple Inc.*, 2019 WL 5536214 (N.D. Cal. Oct. 25, 2019), Mot. at 27, PageID.1190, but it too is readily distinguishable. The FAC contains many factual allegations concerning disclosures (made by a publisher—pursuant to standard, industry-wide practices—not by a technology company like Apple) that were not alleged in *Wheaton*. *See* FAC ¶ 42. Moreover, in *Wheaton*, the plaintiffs alleged PPPA violations arising from alleged disclosures of music stored on their phones and relied on NextMark data cards advertising the sale of this *sort* of data to bolster those allegations. *Wheaton*, 2019 WL 5536214, at *4. However, the defendant argued that it was not plausible to infer that Apple was responsible for disclosing the data offered for sale on the data cards (neither directly nor indirectly) because that information (the existence of music on a phone), *unlike* the Private Reading Information at issue in a case against a publisher such as here (which is comprised of records concerning the purchases of magazine subscriptions to Defendant's publications); the defendant in *Wheaton* focused on this distinction,

21

explaining that the information there was "not information that would uniquely come from the defendant (as actual lists of the names of who subscribes to a magazine plus their delivery addresses would likely come from the magazine publisher)." *See Wheaton*, (N.D. Cal. Sept. 20, 2019) (def.'s reply in support of mot. to dismiss) (**Ex. B** hereto). Here, on the other hand, Defendant does not deny the reasonableness of inferring that the rental, sale, or exchange of records reflecting customers' purchases of subscriptions to its publications from Defendant would necessarily have originated from Defendant (either directly or indirectly through intermediaries), including during the relevant pre-July 31, 2016 period.

Defendant argues that the version of the Nextmark data card that appears as Ex. A to the FAC does not support Plaintiffs' claim because it references subscriber information from 2022, not from the pre-July 31, 2016 period. Mot. at 8, PageID.1171. This argument fails for several reasons. For one thing, as discussed extensively above, the FAC alleges the precise title, contents, and location of a substantially similar data card advertised by Defendant during the relevant pre-July 31, 2016 period, and alleges facts showing in detail how the existence of that data card in 2016 confirms that Defendant was systematically disclosing its entire subscriber database to Wiland during the relevant pre-July 31, 2016 time period on at least as frequently as a monthly basis. Moreover, Defendant is mistaken regarding the import of the information on the data card shown in Exhibit A. Contrary to its assertion, the data card is *cumulative*, displaying "COUNTS THROUGH 04/30/2022." FAC ¶ 2 & Ex. A. The current data card,

therefore, is consistent with and adds further corroboration to the FAC's allegations concerning the 2016 data card referenced in ¶ 3, as well as to the FAC's allegations that, during the entire relevant pre-July 31, 2016 period, Defendant "continuously" transmitted its customers' Private Reading Information to third party data appenders and aggregators (at least once a month) in order to have it enhanced with additional demographic and personal data about each subscriber to facilitate further disclosures, for more money, to other downstream renters and exchangers. FAC ¶¶ 1-7, 10, 14-18, 50-53, 55, 70-74, 76. Defendant glosses over these factual allegations and the accompanying exhibits in an ill-guided effort to liken this case to *Nashel*.

And while Defendant questions the source of the information in the data card, the data card itself is currently titled "**Belvoir Media Elite Masterfile** Mailing List," *see* FAC ¶ 2 & Ex. A (emphasis added), and during the relevant time period was titled "**Belvoir Health** Wiland Direct Modeling Masterfile," *id.* ¶ 3 (emphasis added) – which more than plausibly establish that the offered data originated from the Defendant. Furthermore, the FAC specifically alleges that "the Personal Reading Information contained on the mailing lists advertised in the data cards referenced herein originates, and throughout the relevant pre-July 31, 2016 time period originated, directly from Belvoir prior to being disclosed to the renters, purchasers, and exchangers of this data; indeed, all of the data cards referenced in this First Amended Complaint (and in existence between the commencement of the relevant pre-July 31, 2016 time period and the present) contained Belvoir's trademarked logo, which Belvoir expressly authorized

to be affixed thereon." FAC ¶ 5. These factual allegations adequately demonstrate that the data advertised on the list was disclosed by Defendant and contained names and addresses of all of its customers. Basic common sense also confirms that Defendant is the only original source of the list containing the names and addresses of its subscribers. *See Horton*, 380 F. Supp. 3d at 682. As the FAC alleges, Nextmark and SRDS are list brokers who advertise on their websites data cards of various publishers, including Defendant, in order to broker sales of the advertised data on behalf of its clients. Thus, Nextmark and SRDS broker sales of Defendant's subscribers' Private Reading Information to third parties on behalf of Defendant. The Nextmark and SRDS data cards are but two examples of many types of disclosures made by Defendant during the relevant period. But the existence of the data card, together with the data card described with specificity in ¶ 3 of the FAC and the other factual allegations of the FAC, confirm the systematic nature of Defendant's disclosures practices during the relevant pre-July 31, 2016 period here.

Finally, Defendant argues that "[t]he third-party data card, titled 'Belvoir Media Group Elite Masterfile Mailing List,' does not specify whether information about a specific Belvoir publication an individual subscribed would be disclosed—a necessary prerequisite of [Private Reading Information] under Plaintiffs' own definition and the PPPA's requirements." Mot. at 25-26, PageID.1188-89. This argument fails for several reasons. First, even if a disclosure by Defendant of "the specific Belvoir publication to which an individual subscribed" was required in order to give rise to an actionable

PPPA claim, the FAC alleges that Defendant did in fact disclose the exact titles of the publications purchased by each of its customers, including Plaintiffs, and nothing in Exhibit A to the FAC demonstrates otherwise. *See* FAC ¶ 5 (alleging data disclosed indicated the "the title of the publication that each of [Defendant's customers] subscribed to"); *id.* ¶ 10 ("To supplement its revenues, Belvoir rents, exchanges, or otherwise discloses all of its customers' information—including their full names, titles of publications subscribed to, and home addresses[.]"). These are well-pled factual allegations and they must be accepted as true at this stage of the litigation.

But more importantly, the premise of Defendant's argument – that a disclosure of a customer's data is only violative of the PPPA if the disclosure indicated the "specific Belvoir publication [to which] an individual subscribed" – is simply wrong as a matter of law. Mot. at 26, PageID.1189. The unamended, pre-July 31, 2016 version of the PPPA invoked in this case provides, in pertinent part:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings shall not disclose to any person, other than the customer, a record or information *concerning the purchase, lease, rental, or borrowing of those materials* by a customer that indicates the identity of the customer.

PPPA § 445.1711, 1988 Mich. Legis. Serv. 378 (emphasis added). This is significant, because even if exact titles were not disclosed by Defendant (the FAC alleges that they were), disclosures of the names and addresses of subscribers to Defendant's publications generally would nonetheless "concern the purchase . . . of [written]

materials" from Defendant and would be actionable just the same as if the specific titles

of publications purchased by each customer were disclosed. In fact, the data card shown

in Ex. A indicates that "area[s] of interest" data is available for each person who appears

on the list, thus further corroborating the FAC's allegations that Defendant disclosed

the titles of the particular publications purchased. But even a disclosure of Defendant's

subscriber list generally (without specific titles or even specific interests) would still

reveal to the recipient of the data that the persons appearing on the list have an interest

in the "area" that the magazine to which the person subscribed touches on. This is

precisely the sort of information the statute was enacted to protect from unauthorized

disclosure.

Notably, Defendant does not deny publicly advertising a data card offering to

rent and exchange all of its subscribers' Private Reading Information to third parties

during the relevant pre-July 31, 2016 time period. Nor does Defendant even deny

systemically disclosing Plaintiffs' and Class members' Private Reading Information to

Wiland, other data appenders and aggregators, or any of the various other types of third

parties specified in the FAC during the relevant time period. Defendant's attack on the

sufficiency of the FAC's allegations is thus an attempt to evade liability under a statute

that Defendant itself knows it violated, on the grounds that Plaintiffs' allegations do

not conclusively prove a violation with hard evidence. That is not the standard that Rule

8 imposes. After accepting the FAC's allegations as true and drawing all reasonable

inferences from them in Plaintiffs' favor, it would be reversible error to dismiss this

case pursuant to Rule 12(b)(6) given Rule 8's low bar.

What Defendant really wants to do is turn the PPPA into a toothless tiger. The crux of this lawsuit is that Defendant *failed to inform* Plaintiffs and the proposed Class members that it would disclose their Private Reading Information to others and *failed to obtain their consent* prior to disclosing that information to others. Plaintiffs and the Class members cannot possibly be expected to allege the exact dates of each disclosure or all of the entities to whom Defendant made these non-consensual, uninformed disclosures, absent a reasonable opportunity for discovery. By demanding such specificity, Defendant asks the Court to adopt a pleading standard no PPPA plaintiff could ever satisfy, emasculating this important consumer protection statute and absolving Defendant of its liability under it in the process. This Court need not go along. The FAC states a claim, and the Motion should be denied.

## III. Plaintiffs Have Statutory and Article III Standing

Defendant also asks the Court to dismiss Plaintiffs' claims pursuant to Rule 12(b)(1). Mot. at 28-30, PageID 1191-93. According to the Motion and a declaration, Plaintiffs did not purchase subscriptions to Defendant's publications prior to July 31, 2016, and, on that basis, move to dismiss the FAC for "lack of statutory standing," as well as lack of Article III standing, pursuant to Rule 12(b)(1). This is completely without merit. Although the Motion says it is moving to dismiss for lack of statutory standing pursuant to Rule 12(b)(1), a motion to dismiss for lack of "statutory standing" is necessarily brought pursuant to Rule 12(b)(6). *See Amark Logistics, Inc. v. UPS Ground*

*Freight, Inc.*, 2020 WL 248976, at \*3 (N.D. Ohio Jan. 16, 2020) ("the statutory standing issue is treated as a failure-to-state-a-claim argument and reviewed under the same standard as a motion under Rule 12(b)(6)"); *Roberts v. Hamer*, 655 F.3d 578, 581 (6th Cir. 2011) ("Where a plaintiff lacks statutory standing to sue, her claim should be dismissed for failure to state a claim upon which relief can be granted, not for lack of subject-matter jurisdiction."). And as previously discussed, the FAC adequately alleges that Plaintiffs did in fact purchase subscriptions to Defendant's publications prior to July 31, 2016, and that Defendant disclosed their Private Reading Information pertaining to those subscriptions to various third parties during the relevant pre-July 31, 2016 period in violation of the PPPA. The declaration submitted by Defendant cannot be considered by the Court in deciding the Motion; instead, the allegations of the FAC must be accepted as true and all reasonable inferences must be drawn in Plaintiffs' favor. *See, e.g.*, *Excel Homes, Inc. v. Locricchio*, 7 F. Supp. 3d 706, 710 (E.D. Mich. 2014); *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). The factual questions concerning Plaintiffs' purchase history are only susceptible to resolution after the parties have had a reasonable opportunity to take discovery. Simply: Plaintiffs have adequately alleged facts to confer them with "statutory standing" to bring their PPPA claims, and the Motion to dismiss on their claims for "lack of statutory standing" should be denied.

Defendant's attempt to recast its statutory standing argument as a motion to dismiss for lack of Article III standing also fails because, at this stage of the litigation, Plaintiffs' standing is properly considered based on the allegations of the operative FAC

as opposed to the substantive merit of their underlying claims for relief. *Warth v. Seldin,* 422 U.S. 490, 498 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."). So for the same reasons Plaintiffs have stated claims for relief, as discussed above, they have Article III standing to pursue their claims in this court.

All of that said, Plaintiffs suspect that Defendant simply searched the wrong addresses and, rather than conferring with Plaintiffs' Counsel on this issue, instead ran to the courthouse with a declaration based on incomplete facts. Nonetheless, Plaintiff Allix puts forth a declaration attesting to his subscribership to *Kitplanes* and *Cleveland Clinic Men's Health Advisor*, prior to July 31, 2016, filed herewith as **Ex. C**. As for the other Plaintiffs, the allegations of the FAC support their standing, but if discovery reveals that they are mistaken as to the timing of their subscriptions or otherwise, the appropriate remedy is to grant leave to amend to substitute in new class representatives. *See, e.g., Lin v. Crain Commc'ns, Inc.,* 2020 WL 2043527, at *1 (E.D. Mich. Apr. 27, 2020) ("The Court finds Lin properly sought leave in good faith to add two more plaintiffs who were subscribers during the class period. Courts not only may, but should, respond to the pre-certification mooting of a class representative's claims by permitting substitution of a new class representative.") (quotations omitted).

## III.    CONCLUSION

For the foregoing reasons, the Motion should be denied. And Defendant argues that any dismissal in this action should be with prejudice. But "[R]ule 15(a) declares that

29

leave to amend 'shall be freely given when justice so requires'; this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). If any part of the FAC is dismissed, Plaintiffs respectfully request leave to amend to afford them an opportunity to cure any deficiencies in the FAC identified by the Court.

Dated: February 27, 2023          Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com

Frank S. Hedin
Arun G. Ravindran
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
fhedin@hedinhall.com
aravindran@hedinhall.com

Joseph I. Marchese (P85862)
Philip L. Fraietta (P85228)
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
jmarchese@bursor.com
pfraietta@bursor.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2023, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com
