# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| PHILLIP LEE; PAMELA WHITE; PATRICIA VANDUSEN; RONALD ALLIX; and RANDY WELCH, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BELVOIR MEDIA GROUP, LLC,<br><br>Defendant. | Case No. 4:22-cv-12153-SDK-DRG<br><br>Hon. Shalina D. Kumar<br><br>Magistrate Judge David R. Grand |

## PLAINTIFFS' SUR-REPLY IN FURTHER OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS

Plaintiffs submit this sur-reply in further opposition to the motion to dismiss filed by Defendant Belvoir Media Group, LLC, for the limited purpose of responding to the new argument made by Defendant for the first time in its reply brief (ECF No. 23) concerning the decision in *Bozung v. Christianbook, LLC*, 1:22-cv-00304-HYJ-RSK (W.D. Mich. March 6, 2023), which was issued after the filing of Plaintiffs' opposition brief. *See* ECF No. 23-2, PageID.1447-1461.

In *Bozung*, the district court dismissed the plaintiff's complaint without prejudice for failure to state a claim pursuant to Rule 12(b)(6).[1] Although the court found that "Bozung has sufficiently alleged that Christianbook disclosed the product selections of its customers to a third party," the court found that "Bozung fails to

---

[1] By way of background, in the motion to dismiss filed by the defendant in *Bozung*, the defendant had argued that the then-operative complaint's "allegations utterly fail to state a remotely plausible claim for relief." *Bozung*, ECF No. 19 at 18, PageID.1158 (attached as **Exhibit 1** hereto). Defendant claimed the complaint's allegations "underscore[] how utterly devoid of merit Plaintiff's claim against Christianbook is," and accused plaintiff of filing the case "without regard to whether there is actually a factual basis for pursuing such claims against Christianbook." *Id.* at 19 n.7, PageID.1159. And the defendant said that "[i]t is unsurprising that Plaintiff's allegations are so sparse:"

> Christianbook values its customers, and takes great care to protect their personal information, rigorously ensuring that its data protection practices are top-line and compliant with the most restrictive data protection statutes across the many jurisdictions in which it operates.

*Id.* at 11 n.5, PageID.1151.

1

allege, beyond a mere possibility, that Christianbook's conduct occurred during the relevant [pre-July 31, 2016] time period." *Bozung*, at pageID.1460.

*Bozung* was wrongly decided because the court failed to, as it was required, accept as true all of the well-pled factual allegations of the plaintiff's complaint. For instance, even though the complaint in *Bozung* alleged that the defendant had advertised, during the relevant time period, all of its customers' (including the plaintiff's and all class members') purchase-related data for rental or exchange in a 2016 data card, even though the complaint alleged that this 2016 data card was substantially the same as the data card in existence in 2022 when the case was filed, and even though the complaint actually recited, verbatim, the title, contents, subscriber count, and pricing information advertised in the 2016 data card (as well as the precise URL at which the data card was accessible in 2016), *see Bozung*, ECF No. 11 at 4 (attached as **Exhibit 2** hereto), the *Bozung* court nevertheless found that these allegations "amount to 'naked assertion[s] devoid of 'further factual enhancement' that do not suffice to state a claim." *Bozung*, at PageID.1456 (citing *Iqbal*, 556 U.S. at 678 & *Twombly*, 550 U.S. at 557). And because "the link [to the 2016 data card] is [currently] broken," the court concluded that the plaintiff had made these allegations "without any apparent basis for doing so," leaving "the reader of Bozung's complaint . . . to speculate about what information was advertised in the card from 2016. *Id.* at PageID.1456. This was clear legal error. On a motion to

dismiss, courts "must construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). And "at this early stage of the proceedings, a plaintiff is not required to set out detailed factual allegations." *El-Hallani v. Huntington Nat. Bank*, 623 F. App'x 730, 735 (6th Cir. 2015) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.")). "Until discovery has begun, the plaintiff simply may not have access to all the facts." *El-Hallani*, 623 F. App'x at 735. Such was precisely the case in *Bozung* (and here as well). The plaintiff in *Bozung* alleged the facts available to him that were suggestive of the defendant's liability, and the court was required to accept them as true and draw all reasonable inferences from them in his favor.

As another example, the *Bozung* court also failed to accept as true the plaintiff's allegations that, in 2016, the defendant was engaged in the same practices of disclosing its entire customer database to third parties as it remains engaged in today, as shown by the screenshot of the defendant's 2022 data card that the plaintiff attached to his complaint. *See Bozung*, at PageID.1455. In refusing to credit these allegations – which, as previously mentioned, were bolstered by allegations reciting the precise details of defendant's data card from 2016 advertising the rental and exchange of the same type of customer data – the court stated: "While that may be

3

*possible*, it is far from *plausible.* It is far more likely that Christianbook disclosed the data possessed by NextMark more recently. Without more facts, the half-decade time gap between NextMark's 2022 datacard and the alleged violation makes Bozung's allegations too speculative to infer that Christianbook disclosed Bozung's information before July 31, 2016." *Id.* This too was plain legal error. "The truth of [the plaintiff's] allegations is for down the road." *Rudd v. City of Norton Shores, Michigan*, 977 F.3d 503, 520 (6th Cir. 2020). "Often, defendants' conduct has several plausible explanations. Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage." *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011); *see also El-Hallani*, 623 F. App'x at 735 ("[T]he mere existence of an 'eminently plausible' alternative, lawful explanation for a defendant's allegedly unlawful conduct is not enough to dismiss an adequately pled complaint because pleadings need only be 'plausible, not probable.'") (citing *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 613 (6th Cir. 2012)); *see also 16630 Southfield Ltd. P'ship,* 727 F.3d at 505 ("[I]f a plaintiff's claim is plausible, the availability of other explanations—even more likely explanations—does not bar the door to discovery.").

As yet a third example, the court refused to credit any allegation made by the plaintiff "on information and belief," finding that such allegations are "not sufficient" and must be "'ignore[d].'" *Bozung*, at PageID.1457 (quoting *16630*

4

*Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013)).

Here again, the court clearly erred. Just earlier this week, another court of this District denied a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) where the defendant had argued "that [the plaintiff's] . . . allegations are implausible because Plaintiff has made various allegations upon 'information and belief.'" *Apodaca v. Newrez LLC*, 2023 WL 2465773, at *12 (E.D. Mich. Mar. 10, 2023). In rejecting this argument, Judge Cox adopted the reasoning of the Second Circuit's decision in *Arista Records, LLC v. Doe 4*, 603 F.3d 110, 120 (2d Cir. 2010), which addressed this issue as follows:

> The *Twombly* plausibility standard, which applies to all civil actions, *see Iqbal*, 129 S.Ct. at 1953, does not prevent a plaintiff from "pleading facts alleged 'upon information and belief'" where the facts are peculiarly within the possession and control of the defendant, *see, e.g.*, *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008), or where the belief is based on factual information that makes the inference of culpability plausible, *see Iqbal*, 129 S.Ct. at 1949 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

*Apodaca*, 2023 WL 2465773, at *13 (quoting *Arista Records*, 603 F.3d at 120). Such is precisely the case in any PPPA case, including *Bozung* and the instant matter. As Plaintiffs explained in opposition to Defendant's motion to dismiss, this case concerns Defendant's uninformed, nonconsensual disclosures of Private Reading Information to third parties in 2016 – and although Plaintiffs here, like the plaintiff

5

in *Bozung*, have ample factual basis for alleging that such disclosures occurred on a massive scale during the relevant pre-July 31, 2016 time period, the precise identities of the third party recipients of this data, and the precise dates on which it was disclosed, are within the exclusive possession of the defendants and certain third-party data companies retained by them during the relevant time period. *See* ECF No. 19, PageID.1258 ("The crux of this lawsuit is that Defendant *failed to inform* Plaintiffs and the proposed Class members that it would disclose their Private Reading Information to others and *failed to obtain their consent* prior to disclosing that information to others. Plaintiffs and the Class members cannot possibly be expected to allege the exact dates of each disclosure or all of the entities to whom Defendant made these non-consensual, uninformed disclosures, absent a reasonable opportunity for discovery.").

Viewed as a whole, the allegations of the complaint in *Bozung* (like the allegations of the FAC here) – including those made both on information and believe and not on information and belief – easily "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" occurring during the relevant pre-July 31, 2016 time period. *See Iqbal*, 129 S.Ct. at 1949; *see also, e.g.*, *Apodaca*, 2023 WL 2465773, at *13 (denying defendant's motion to dismiss and rejecting argument that allegations made "on information and belief" cannot give rise to a plausible claim for relief, noting that "the factual allegations in

6

Plaintiff's Complaint that are not stated 'upon information and belief' make it plausible that Defendant obtained a forced-place insurance policy for Plaintiff because it receives some type of incentive or 'kick-back' to do so"). Indeed, better-reasoned decisions, from courts that correctly accepted as true the plaintiffs' well-pled factual allegations, have denied motions to dismiss PPPA complaints comprised of allegations far less robust than those made by Plaintiffs in this case, as further explained in Plaintiffs' opposition to Defendant's motion to dismiss. *See, e.g.*, *Horton v. GameStop Corp.*, 380 F. Supp. 3d 679 (W.D. Mich. 2018); *Briscoe v. NTVB Media Inc.*, Case No. 4:22-cv-10352, ECF No. 41 (E.D. Mich. Mar. 3, 2023) (report and recommendation).

Notably, discovery in *Bozung* commenced prior to a decision on the defendant's motion to dismiss. During the brief period of discovery that occurred prior to the court's order granting the defendant's motion to dismiss, the parties exchanged initial disclosures, exchanged written discovery requests, and issues subpoenas to third parties. Through these efforts, the plaintiff in *Bozung* obtained evidence from the defendant and relevant third parties corroborating the allegations of the complaint, including evidence showing that the defendant had transferred the plaintiff's (and class members') Personal Reading Information to third parties during the relevant pre-July 31, 2016 time period at issue in that case, pursuant to contracts between the defendant and various data companies then in effect. Thus, on March

14, 2023, the plaintiff in *Bozung* filed a motion for relief from judgment pursuant to Rules 60(b) and 59(e) and for leave to file an amended complaint pursuant to Rule 15(a) that includes numerous new detailed allegations concerning the evidence that he obtained during that brief period of discovery. A copy of the motion for relief from judgment and leave to amend filed by the plaintiff in *Bozung* (and the proposed amended complaint accompanying that motion) are attached hereto as **Exhibit 3**.

Indeed, the revelations during discovery in *Bozung* thus demonstrate how the *Twombly* and *Iqbal* pleading standard is being abused by PPPA defendants, including by the Defendant in this case. The discovery quickly obtained by the plaintiff in *Bozung* – which is likely only the tip of the iceberg of the evidence concerning that defendant's disclosure practices – not only bolsters the central allegations made by the plaintiff in that case (and sheds significant light on the numerous other ways in which the defendant there had disclosed PPPA-protected information, pertaining to all of its customers, including the plaintiff and class members, during the relevant pre-July 31, 2016 time period), but it also underscores the plausibility of the allegations made by the Plaintiffs in this case – which, in terms of the FAC's central allegations concerning the Defendant's disclosures of protected customer information (which, as the FAC alleges, were part of industry-wide practices in effect at the time), largely overlap with the allegations made by the plaintiff in *Bozung*. In other words, contrary to what the defendant had argued in its

8

motion to dismiss in *Bozung*, it is now clear the FAC did not "utterly fail to state a remotely plausible claim for relief," *Bozung*, ECF No. 19 at PageID.1158, and that the plaintiff's PPPA claim against the defendant was not "utterly devoid of merit." *Id.* at 19 n.7, PageID.1159. Rather, contrary to what the defendant had argued in its motion, it is now clear that there is "a factual basis for . . . such claims against Christianbook." *Id.* Should this case progress past the pleading stage, Plaintiffs are confident that a reasonable period of discovery, even as brief as the period afforded to the plaintiff in *Bozung* prior to the court's order dismissing the case, will reveal similar evidence to corroborate the FAC's allegations that Defendant disclosed all of its customers' (including Plaintiffs' and all Class members') PPPA-protected information during the relevant pre-July 31, 2016 time period.

In any event, the decision in *Bozung* turned on factual allegations materially distinguishable from those in this case. After refusing to consider the plaintiff's allegations concerning the 2016 data card, the court in *Bozung* found that "[t]he primary factual support for Bozung's assertion that Christianbook violated the PPPA is an image of NextMark's datacard from 2022, six years *after* the relevant time period," and on that basis found that the plaintiff had failed to adequately allege a claim for violation of the PPPA that accrued between December 21, 2015 and July 30, 2016 (i.e, the "relevant pre-July 31, 2016 time period" at issue in that case). *See Bozung*, at PageID.1455 ("Without more facts, the half-decade time gap between

9

NextMark's 2022 datacard and the alleged violation makes Bozung's allegations too speculative to infer that Christianbook disclosed Bozung's information before July 31, 2016."). Here, however, the factual allegations of the FAC go far beyond was alleged in *Bozung*, including by describing in detail the disclosure practices in which Defendant was engaged during the relevant pre-July 31, 2016 time period at issue. Specifically, the FAC alleges that, "during the relevant pre-July 31, 2016 time period," Defendant "continuously" and "at least as frequently as once a month," "rent[ed], exchang[ed], or otherwise disclos[ed] the Private Reading Information of its entire database [of] its Michigan-based subscribers," inclusive of "Plaintiff's Private Reading Information," to various third parties, including "data aggregators, data appenders, data cooperatives, and list brokers, among others," all without its subscribers' consent. FAC ¶¶ 4, 6, 50-52. And the FAC shoves these allegations across the line of plausibility by attaching a screenshot depicting Defendant's publicly accessible "data card" in existence today, which offers for sale Defendant's customers' Private Reading Information "THROUGH 04/30/2022", by alleging that the same data card also existed throughout the relevant pre-July 31, 2016 time period, and by reciting the content and citing to the location of Defendant's data card in existence during the relevant pre-July 31, 2016 time period. Id. ¶¶ 2-3 & Ex. A. Additionally, the FAC alleges various facts concerning Wiland (the entity responsible for appending data to the list offered for sale in the data card described

in paragraph 3 of the FAC, which was publicly advertised during the relevant time period) showing that Defendant was systemically transmitting its entire database of customer information to Wiland on a monthly basis during the relevant pre-July 31, 2016 time period, for data appending, prospecting, and enhancement services. Id. ¶ 4. Moreover, the FAC alleges that, "[a]s a result of [Defendant's] practices of disclosing Plaintiff's Private Reading Information during the relevant pre-July 31, 2016 time period, Plaintiffs saw a dramatic uptick of junk mail in his mailbox…over the same time period." *Id.* ¶ 7; *see also id*. ¶ 1. Thus, even if the Court finds *Bozung*'s reasoning persuasive, the factual allegations of the FAC are nonetheless sufficient to state a claim for relief, and Defendant's motion to dismiss should still be denied.

Accordingly, for the foregoing reasons, the Court should decline to adopt *Bozung*'s reasoning here. The Motion should be denied, and the parties should be afforded a reasonable opportunity to take discovery. To the extent Defendant's motion to dismiss is granted in whole or any part, Plaintiffs respectfully request leave to file an amended complaint to cure any deficiencies that the Court identifies in the operative FAC.

Dated: March 16, 2023         Respectfully submitted,

                                 */s/ E. Powell Miller*
                                 E. Powell Miller (P39487)
                                 **THE MILLER LAW FIRM, P.C.**
                                 950 W. University Drive, Suite 300
                                 Rochester, MI 48307
                                 Tel: 248-841-2200
                                 epm@millerlawpc.com

Joseph I. Marchese
Philip L. Fraietta (P85228)
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
jmarchese@bursor.com
pfraietta@bursor.com

Frank S. Hedin
Arun G. Ravindran
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
fhedin@hedinhall.com
aravindran@hedinhall.com

*Counsel for Plaintiffs and the Putative Class*

# INDEX OF EXHIBITS
## To Plaintiffs' Sur-Reply in Opposition to Defendant's Motion to Dismiss

1    *Bozung v Christianbook, LLC* Brief in Support of Defendant
     Christianbook, LLC's Motion to Dismiss First Amended Class Action
     Complaint

2    *Bozung v Christianbook, LLC* First Amended Class Action Complaint
     Jury Trial Demanded

3    *Bozung v Christianbook, LLC* Plaintiff's Motion for Relief from
     Judgment Pursuant to Fed. R. Civ. P. 59(e) & Fed. R. Civ. P. 60(b) and
     for Leave to File Second Amended Complaint Pursuant to Fed. R. Civ.
     P. 15(a) and Proposed Second Amended Complaint

# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

_____

TIMOTHY BOZUNG, individually and on
behalf of all others similarly situated,

        Plaintiff,

        v.

CHRISTIANBOOK, LLC f/k/a CHRISTIAN
BOOK DISTRIBUTORS CATALOG, LLC,

        Defendant.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)

Hon. Hala Y. Jarbou
Case No. 22-cv-00304-HYJ-RSK

**ORAL ARGUMENT REQUESTED**

# BRIEF IN SUPPORT OF DEFENDANT CHRISTIANBOOK, LLC'S
## MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ............................................................................... 4

      A.     Plaintiff's Allegations. ........................................................... 4

      B.     The PPPA. ............................................................................. 8

PROCEDURAL BACKGROUND ...................................................................... 10

LEGAL STANDARDS ...................................................................................... 11

ARGUMENT ..................................................................................................... 12

   I.    Plaintiff Fails to State a Plausible Claim for Violations of the PPPA. ................ 12

      A.     Plaintiff Pleads No Facts Supporting His Conclusory Allegations That Christianbook Disclosed His or Anyone Else's PPPA-Protected Information in the Pre-July 2016 Period He Targets. .............. 13

      B.     Even if Plaintiff Had Plausibly Pled That Christianbook Disclosed Customer Information in the Pre-July 2016 Time Period, He Pleads No Facts Supporting That Such Disclosures Contained the Type of Information Prohibited by the PPPA. ..................................... 17

   II.   Plaintiff's Claim is Untimely Under Section 5805's Three-Year Limitations Period. ............................................................................. 19

      A.     Section 5805 Applies Because Plaintiff Expressly Seeks to Recover For "Injury to a Person.".......................................... 20

      B.     The Privacy Rights Enshrined in the PPPA Are Encompassed By the Traditional Michigan Common-Law Right to Privacy. ..................... 21

      C.     Plaintiff's Complaint is Time-Barred Under Section 5805. .................... 23

      D.     Section 5813 Forecloses Alleged PPPA Breaches Pre-Dating March 31, 2016. ................................................................... 24

CONCLUSION................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                      **Page(s)**

*Arbre Farms Corp. v. Great Am. E&S Ins.*,
   2021 WL 81780 (W.D. Mich. Jan. 11, 2021) ................................................24, 25

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..........................................................................................11, 12

*Asset Mgmt. One LLC v. U.S. Bank Nat. Ass'n*,
   569 F. App'x 438 (6th Cir. 2014) .............................................................................24

*Atlantis Grp., Inc. v. Alizac Partners*,
   1991 WL 319384 (W.D. Mich. Aug. 27, 1991) .......................................................18

*Barry v. Ally Fin., Inc.*,
   2021 WL 2936636 (E.D. Mich. July 13, 2021) .......................................................16

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ...............................................................................16, 17, 18, 19

*Cataldo v. U.S. Steel Corp.*,
   676 F.3d 542 (6th Cir. 2012) ...................................................................................11

*Cooper v. Team Wellness (Mental Health) Servs. Supervisor*,
   2018 WL 7360647 (6th Cir. Oct. 11, 2018) ............................................................21

*D'Ambrosio v. Marino*,
   747 F.3d 378 (6th Cir. 2014) ...................................................................................11

*Daniel v. DTE Energy*,
   2012 WL 12925071 (E.D. Mich. Aug. 30, 2012) ...................................................21

*Derderian v. Genesys Health Care Sys.*,
   689 N.W.2d 145 (Mich. Ct. App. 2004) ..................................................................21

*Dimond Rigging Co., LLC v. BDP Int'l, Inc.*,
   914 F.3d 435 (6th Cir. 2019) ...................................................................................23

*U.S. ex rel. Dingle v. BioPort Corp.*,
   270 F. Supp. 2d 968 (W.D. Mich. 2003) .................................................................23

*Doe v. Mills*,
   536 N.W.2d 824 (Mich. Ct. App. 1995) ..................................................................23

*Gamino-Ramirez v. Hoornstra*,
   2018 WL 10394898 (W.D. Mich. Feb. 22, 2018) .............................................12, 17

*Green v. Lansing Automakers Fed. Credit Union*,
    2019 WL 3812108 (Mich. Ct. App. Aug. 13, 2019)....................................................21

*Hanson Cold Storage Co. v. Chizek Elevator & Transp., Inc.*,
    205 F. Supp. 3d 920 (W.D. Mich. 2016) ...............................................................11

*Lin v. Crain Commc'ns Inc.*,
    2020 WL 248445 (E.D. Mich. Jan. 16, 2020).........................................................20

*Krassick v. Archaeological Inst. of Am.*,
    2022 WL 2071730 (W.D. Mich. June 9, 2022). ....................................3, 19, 21, 23

*Lindke v. Tomlinson*,
    31 F.4th 487 (6th Cir. 2022) .......................................................................11, 12

*Mays v. Int'l Mkt. Place, Inc.*,
    2021 WL 4932057 (Mich. Ct. App. Oct. 21, 2021)................................................23

*Moeller v. Am. Media, Inc.*,
    235 F. Supp. 3d 868 (E.D. Mich. 2017).........................................................20, 22

*National Sand, Inc. v. Nagel Construction, Inc.*,
    451 N.W.2d 618 (Mich. Ct. App. 1990) ..............................................................20

*Pahssen v. Boyce Hydro LLC, et al.*,
    2021 WL 5755611 (E.D. Mich. March 12, 2021) ...................................................1

*Rayfield v. Grand Rapids, City of*,
    373 F. Supp. 3d 962 (W.D. Mich. 2018) ..............................................................24

*S.E.C. v. Tambone*,
    597 F.3d 436 (1st Cir. 2010) ..............................................................................12

*Smith v. Asphalt Specialists, Inc.*,
    1997 WL 33344052 (Mich. Ct. App. Oct. 17, 1997)............................................21

*Taylor v. U.S.*,
    161 Fed. Appx. 483 (W.D. Mich. 2005)...............................................................6

*Wheaton v. Apple Inc.*,
    2019 WL 5536214 (N.D. Cal. Oct. 25, 2019)......................................................18

## Statutes

2016 Mich. Pub. Acts 92.............................................................................8, 9

Class Action Fairness Act ...............................................................................11

Mich. Comp. Laws § 445.1712...........................................................8, 9, 10, 17, 18

iii

Mich. Comp. Laws § 600.5805 .......................................................................................19

Mich. Comp. Laws § 600.5813 .......................................................................................19

**Other Authorities**

1988 Mich. Legis. Serv. 378 No. 5331 ............................................................................8

Fed. R. Civ. P. 12(b)(1) .............................................................................................1, 25

Fed. R. Civ. P. 12(b)(6) .................................................................................11, 12, 25

S. REP. 599, 6, 1988 U .................................................................................................22

## PRELIMINARY STATEMENT

Defendant Christianbook, LLC ("Christianbook" or the "Company") is a limited liability company based in Peabody, Massachusetts that has grown over four decades into one of the leading online sellers of Christian books, Bibles, gifts, DVDs, CDs, church supplies, and other Christian-themed products to customers across the United States. The crux of Plaintiff's claim against Christianbook is that he was a Christianbook customer, that he purchased a video from Christianbook on an unspecified date over six years ago, and that Christianbook disclosed certain of his allegedly personal information to unnamed third-party data aggregators, resulting in Plaintiff receiving "a barrage of unwanted junk mail." ECF No. 11, PageID.582-583 ¶ 1. Plaintiff claims (individually and on behalf of a purported class of similarly-situated individuals) that this alleged conduct violated Michigan's Preservation of Personal Privacy Act ("PPPA"). But, as with Plaintiff's original Complaint, his Amended Complaint still fails to state a claim upon which relief can be granted and must be dismissed. There are two independent bases for dismissal:[1]

---

[1] In addition, Plaintiff alleges diversity as the sole basis for federal jurisdiction, but he does not allege any facts regarding the membership and corresponding citizenship of Christianbook—a limited liability company—warranting dismissal under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. For this reason, the Court ordered Plaintiff to show cause as to why it should not dismiss his case for lack of subject matter jurisdiction. ECF No. 14, PageID.1121-1122. On July 13, Plaintiff filed a purported response to the Court's order to show cause where he pled no facts regarding the citizenship of Christianbook's members, and instead asserted that "the Court need only consider Defendant's principal place of business and the State under whose laws it is organized" to determine whether subject matter jurisdiction exists over his class action case. ECF No. 17, PageID.1127. But Plaintiff concedes that the Sixth Circuit has never endorsed this view, all the while ignoring multiple federal court decisions in this Circuit expressly requiring a class action plaintiff to spell out the citizenship information for each member of a limited liability company to show subject matter jurisdiction. *See, e.g.*, *Pahssen v. Boyce Hydro LLC, et al.*, 2021 WL 5755611, at *2 (E.D. Mich. March 12, 2021) (directing plaintiff "to provide the members of Defendant LLCs and explain whether this Court has subject matter jurisdiction"). Accordingly, because Christianbook is a limited liability company, Plaintiff must allege the citizenship of each member of Christianbook in order to establish complete diversity between Plaintiff and Christianbook and invoke diversity jurisdiction. Plaintiff has not done this, and dismissal is required.

***First***, Plaintiff pleads no facts that plausibly support a claim that Christianbook disclosed his or anyone else's personal information in violation of the PPPA on or before July 30, 2016, which is the time period Plaintiff alleges his and the purported class's PPPA claims accrued.[2] Plaintiff claims that "documented evidence confirms" that Christianbook disclosed his personal information prior to July 30, 2016, but this "documented evidence" is nothing more than a screenshot purporting to show that "a list broker" is marketing access to a so-called Christianbook "Catalog Buyers Mailing List" that apparently contains unidentified information about Christianbook buyers as of ***February 28, 2022***—not as of July 30, 2016.  Plaintiff does not claim that his or any other pre-July 30, 2016 Christianbook customer's data is included in this 2022 "mailing list," thus conceding that this "mailing list" by itself does not plausibly support that Christianbook disclosed his or any other putative class members' information during the relevant pre-July 30, 2016 time period.  Plaintiff fails to allege a connection between this "list broker" advertising a so-called "Catalog Buyers Mailing List" and any alleged disclosure of Plaintiff's PPPA-protected information by Christianbook; he asserts no allegations about the origins of the purported "Catalog Buyers Mailing List" or whether Christianbook itself disclosed any customer information to the "list broker"; and he alleges no facts plausibly supporting any inference that Christianbook disclosed the type of information prohibited by the PPPA.

Plaintiff tries to remedy these pleading defects at least in part by claiming now—for the first time—that Christianbook "publicly advertised" the "same rates" from the 2022 "datacard"

---

[2] Plaintiff inconsistently identifies the "relevant . . . time period" for his and his putative class members' claims as "pre-July 31, 2016" and "pre-July 30, 2016."  *See, e.g.*, ECF No. 11, PageID.587, ¶ 11 (Plaintiff purchased *The Drop Box* "during the relevant pre-July 30, 2016 time period"); *id.*, PageID.601, ¶ 48 (referring to "relevant pre-July 31, 2016 time period").  Plaintiff's claim is untimely regardless of whether it allegedly accrued on July 30, 2016 or July 31, 2016. For the sake of consistency, unless directly quoting from the Amended Complaint, Defendant will refer to the relevant time period as pre-July 30, 2016.

2

during the "relevant pre-July 31, 2016 time period," but he provides no documentation of Christianbook or anyone else ever "publicly advertis[ing]" this purported customer data during this time period. Instead, he buries a link to a website in a footnote in his Amended Complaint that he claims shows this information was "accessible" during the "relevant pre-July 31, 2016 time period," but this link leads not to a "datacard" of Christianbook customer data, but a dead end error page. Given the complete lack of allegations even plausibly supporting an alleged violation of the PPPA, it is clear that Plaintiff's claim is based on pure conjecture and must be dismissed.

*Second*, Plaintiff's claims are time-barred. Christianbook recognizes that this Court—applying various Michigan federal and state court decisions—found that a six-year statute of limitations governs PPPA claims because this is a "statutory cause of action [that] does not define a statute of limitations and . . . does not have a traditional common-law counterpart." *Krassick v. Archaeological Inst. of Am.*, 2022 WL 2071730, at *4 (W.D. Mich. June 9, 2022). Christianbook respectfully submits that the precedents on which this Court relied in *Krassick* have too narrowly construed the concept of "traditional common-law counterpart" when determining whether to apply Michigan's three-year statute of limitations. Plaintiff's allegations and the documents attached to the Amended Complaint confirm that, far from conjuring a new right unrecognized by Michigan common law, the Michigan legislature enacted the PPPA to "preserve" a "personal privacy" right traditionally recognized under Michigan common law. ECF No. 11-4, PageID.619. Because the privacy rights codified in the PPPA encompass traditional "personal privacy" rights recognized under Michigan common law, Michigan's three-year statute of limitations applies to Plaintiff's PPPA claims. Plaintiff complains of alleged PPPA violations taking place *before* July 30, 2016, and, under the three-year limitations period, any such claims must have been brought by July 30, 2019—at the latest. But Plaintiff did not file his Complaint until March 31, 2022,

rendering his claims untimely by nearly three years.

Plaintiff has now had two opportunities to plead sufficient facts to survive dismissal, and failed to do so. The Amended Complaint does not meaningfully address, much less cure, the numerous pleading defects identified in Christianbook's original motion to dismiss. Rather, Plaintiff's claim against Christianbook is indistinguishable from claims his counsel has alleged in nine other cookie-cutter cases filed in this Court over the last four months. Plaintiff, like the plaintiffs in those cases, seeks to shoehorn allegedly years'-old PPPA violations into a long-outdated version of the PPPA. But Plaintiff, like the plaintiffs in those cases, relies on purported customer data from 2022 allegedly disclosed in a 2022 "mailing list" as "evidence" that his PPPA-protected data was wrongfully disclosed prior to July 30, 2016. If Plaintiff actually had a good-faith basis to bring a PPPA claim against Christianbook, he would have made that clear by adding further factual support to his Amended Complaint, but he failed to do so.

For each of these independent reasons, addressed more fully below, Plaintiff's claim fails as a matter of law, the Amended Complaint must be dismissed with prejudice, and Christianbook should be awarded its attorney's fees and costs.

## FACTUAL BACKGROUND

### A.   Plaintiff's Allegations.

Plaintiff alleges that, at some unidentified point before July 30, 2016, he purchased a video called *The Drop Box* from Christianbook. ECF No. 11, PageID.587 ¶ 11. Plaintiff alleges that Christianbook—a Delaware limited liability company with its principal office in Peabody, MA— "did business under the name 'Christian Book Distributors Catalog, LLC'" during this time period. *Id.*, PageID.588-589, ¶ 12. Christian Book Distributors Catalog, LLC, just like its successor Christianbook, was a limited liability company with its principal office in Peabody, MA. ECF No.

11-3, PageID.616. The crux of Plaintiff's purported class action Amended Complaint is that Christianbook then disclosed information about that purchase to "data aggregators, data appenders, data cooperatives, and list brokers," which he contends was done in violation of the PPPA. ECF No. 11, Page ID.582 ¶ 1; *see also id.*, PageID.604-605 ¶¶ 62-67. Specifically, he alleges that "[d]ocumented evidence confirms" that, prior to July 30, 2016,[3] Christianbook "rented, exchanged, and/or otherwise disclosed detailed information" about that purchase, and about the purchases of other Christianbook customers, including what Plaintiff calls "Private Reading, Listening and Viewing information," which he defines as "full names, the titles of written materials, sound recordings, or video recordings purchased, and home addresses." *Id.*, PageID.582-584 ¶¶ 1-2; *id.*, PageID.586 ¶ 7; *see also id.*, PageID.605 ¶¶ 64-68. According to Plaintiff, he has "[a]s a result" of that purported disclosure "received a barrage of unwanted junk mail." *Id.*, PageID.583 ¶ 1.

The "[d]ocumented evidence" that Plaintiff claims "confirms" that Christianbook disclosed his Private Reading, Listening, and Viewing Information is in a single apparent screenshot of what appears to be a website for "a list broker," NextMark, Inc. ("NextMark").[4] Plaintiff alleges this

---

[3] As discussed further below (*infra*, pp. 8-10), Plaintiff presumably ties Christianbook's purported violations of the PPPA to some unspecified date prior to July 30, 2016 because, effective July 31, 2016, the Michigan legislature amended the PPPA in several ways that arguably makes it more difficult for plaintiffs to prevail on their potential claims. Michigan courts, however, have held that these amendments *do not* apply retroactively, so the (more lenient) pre-amendment version of the PPPA applies to conduct on or before July 30, 2016. *See* ECF No. 11, PageID.583 ¶ 1 n.2 (citing cases).

[4] In almost all of the other "cognate" cases filed by the same class action firm representing Plaintiff and reassigned to this Court on July 6, 2022, a version of this same NextMark "mailing list" tailored to the specific defendant in each case and purportedly containing that defendant's customers' data as of 2021 or 2022 is attached as "documented evidence" of that defendant's alleged PPPA violation. *See Meahl v. The Nation Company, LLC*, No. 22-cv-00402, ECF No. 1, PageID.2-3 ¶ 2; *Bracy v. The Parable Group, LLC*, No. 22-cv-00403, ECF No. 1, PageID.2-3 ¶ 2; *Taylor v. Active Media Interest Media, Inc.*, No. 22-cv-00447, ECF No. 1, PageID.2-3 ¶ 2; *Taylor v. Belvoir Media Group, LLC*, No. 22-cv-00477, ECF No. 1, PageID.2-3 ¶ 2; *Fotis, et al. v. This Old House Ventures, LLC*, No. 22-cv-00549, ECF No. 1, PageID.2-3 ¶ 2; *Prestel v. Christianity Today Int'l*, No. 22-cv-00551, ECF No. 1, PageID.2-3 ¶ 2; *Kochanski v. American City Business*

screenshot shows that NextMark "offers to provide renters access to the mailing list titled 'Christianbook Catalog Buyers Mailing List'," which allegedly "contains the Private Reading, Listening, and Viewing Information of 3,264,000 of Christianbook's U.S. customers[.]" *Id.*, PageID.583 ¶ 2. In its "mailing list," copied at paragraph 2 of the Amended Complaint and attached as Exhibit A, NextMark purports to "count" Christianbook buyers "through" February 28, 2022, and claims to market various information concerning Christianbook customers from the previous twenty-four months. *See id.* The NextMark screenshot does not itself indicate what a potential purchaser of the "Christianbook Catalog Buyers Mailing List" will receive, what customer information NextMark compiles on the purported mailing list, whether such information identifies the purchases made by individual Christianbook customers, or even how NextMark obtained that information. *See* ECF No. 11-2, PageID.614. Nor does the Amended Complaint allege any facts whatsoever about these critical pieces of information.[5] Conceding that any information about Plaintiff or his pre-2016 purchase could not possibly be compiled as part of a "datacard" purporting to contain Christianbook customer data from February 28, 2022, Plaintiff now baldly asserts that the "same 'datacard,' with the same rates" as the 2022 "datacard" was "publicly advertised . . . during the relevant pre-July 31, 2016 time period" by a predecessor entity to Christianbook called "Christian Book Distributors, LLC." *See* ECF No. 11, PageID.585 ¶ 4. Plaintiff does not embed a screenshot of this "publicly advertised" "pre-July 31, 2016" data in his

---

*Journals, Inc.*, No. 22-cv-00582, ECF No. 1, PageID.2-3 ¶ 2; *Moore v. Columbia Books, Inc.*, No. 22-cv-00583, ECF No. 1, PageID.2-3 ¶ 2. These complaints are public records properly subject to judicial notice on a motion to dismiss. *See, e.g.*, *Taylor v. U.S.*, 161 Fed. Appx. 483, 486-87 (W.D. Mich. 2005) (holding that it was proper to take judicial notice of complaints that "contained similar facts" and "similar claims filed against similar Defendants" on a motion to dismiss).

[5] It is unsurprising that Plaintiff's allegations are so sparse: Christianbook values its customers, and takes great care to protect their personal information, rigorously ensuring that its data protection practices are top-line and compliant with the most restrictive data protection statutes across the many jurisdictions in which it operates.

Amended Complaint or attach a copy of it to his Amended Complaint. Instead, he includes a hyperlink to the purported 2016 "datacard" in a footnote that, instead of opening the "datacard" Plaintiff claims was "accessible" during the pre-July 31, 2016 time period, actually directs one to a dead end error page with the message, "Oops, This Page Could Not Be Found!"

Plaintiff seeks to assert his PPPA claim on behalf of a putative class of similarly situated individuals, which he defines as "all Michigan residents who, at any point during the relevant pre-July 30, 2016 time period, had their Private Reading, Listening, and Viewing Information disclosed to third parties by Christianbook without consent (the 'Class')."[6] ECF No. 11, PageID.601 ¶ 51. He claims that "individual joinder" is "impracticable" given the proposed Class's numerosity, but admits he does not know "[t]he precise number of Class members and their identities[.]" *Id.*, PageID.602 ¶ 52. Plaintiff also contends that common questions of fact and law would predominate over individualized ones, but then proceeds to list questions concerning individualized inquiries, such as, *e.g.*, "whether Christianbook obtained consent before disclosing to third parties Plaintiff's and the Class's Private Reading, Listening, and Viewing Information[.]" *Id.*, PageID.602 ¶ 53. And, according to Plaintiff, his claims are typical of those of the proposed Class, where Christianbook allegedly acted "uniform[ly]" towards him and the proposed Class. *Id.*, PageID. 602 ¶ 54. For largely this same reason, Plaintiff claims he would adequately represent the Class, where "his interests do not conflict" with those of the Class, and where he has retained "competent counsel." *Id.*, PageID.603 ¶ 55. Finally, Plaintiff contends a class action would be appropriate to achieve "consistent adjudication of the liability issues" and

---

[6] Plaintiff has not yet filed a motion to certify the proposed Class; Christianbook intends to oppose any such motion, as class treatment of Plaintiff's claims would not be appropriate.

because "[e]ach individual Class member may lack the resources" necessary to pursue similar claims on their own. *Id.*, PageID.603 ¶ 56.

### B. The PPPA.

Plaintiff attempts to craft allegations regarding purported pre-July 30, 2016 conduct because Plaintiff seeks relief under the PPPA as enacted in 1988, rather than the amended version effective post-July 30, 2016. *See id.*, PageID.583 ¶ 1 n.2. As enacted in 1988, the PPPA reflected an effort to codify certain privacy rights "with respect to the purchase, rental, or borrowing of certain materials." *See* H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West). These "materials" included "written materials, sound recordings, and video recordings," and the PPPA provided that a customer's "selections made" of such materials could not be disclosed by "a retailer, lender, or renter of such items," unless such disclosure was to a customer itself. *See* Privacy: Sales, Rentals of Videos, etc., House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989. The PPPA thus reflected an effort to "preserve personal privacy" rights by codifying an express cause of action to ensure protection of "the purchase, rental, or borrowing of written materials, sound recordings, and video recordings." *See id.* By doing so, the Michigan legislature clearly signaled its intent for the PPPA to apply to disclosures of personal information that had been historically encompassed by common-law causes of action for invasion of privacy.

In 2016, the Michigan legislature amended the statute in several key ways. First, it clarified that "a civil action for a violation of those prohibitions may only be brought by a customer who has suffered actual damages as a result of the violation." S.B. 490, 2016 Mich. Pub. Acts 92. Thus, whereas violations of the pre-amendment PPPA could result in plaintiffs receiving "actual damages, including damages for emotional distress, or $5,000.00, whichever is greater," Mich.

Comp. Laws § 445.1715 (effective through July 30, 2016), the post-amendment PPPA requires plaintiffs to show "actual damages." *See* Mich. Comp. Laws § 445.1715 (effective July 31, 2016).

Second, the legislature amended Mich. Comp. Laws § 445.1712 "to clarify" that the PPPA does "not prohibit disclosing information if it is incident to the ordinary course of business of the person disclosing the information[.]" S.B. 490, 2016 Mich. Pub. Acts 92. And third, it importantly changed that same section to read:

> (1) Subject to subsection (2) and except as provided in section 3 or as otherwise provided by law, a person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings shall not knowingly disclose to any person, other than the customer, a record or information that personally identifies the customer as having purchased, leased, rented, or borrowed those materials from the person engaged in the business.
>
> (2) This section does not apply to the disclosure of a record or information that has been aggregated or has been processed in a manner designed to prevent its association with an identifiable customer.

*See* Mich. Comp. Laws § 445.1712 (effective July 31, 2016) (footnote omitted).

Thus, the 2016 amendments made it more difficult for plaintiffs to succeed on their PPPA claims in at least three ways: (1) by removing a plaintiff's ability to recover statutory damages, forcing them to prove actual damages; (2) by clarifying that disclosures "incident to the ordinary course of business of the person disclosing the information" are not prohibited by the statute; and (3) by circumscribing the type of disclosures prohibited by the PPPA—*i.e.*, from those "disclos[ing] . . . a record or information ***concerning*** the purchase . . . of [certain] materials by a customer that ***indicates the identity*** of the customer," Mich. Comp. Laws § 445.1712 (effective through July 30, 2016) (emphasis added), to those "disclos[ing] . . . a record or information that ***personally identifies the customer as having purchased, leased, rented, or borrowed [certain]***

*materials*," Mich. Comp. Laws § 445.1712 (effective July 31, 2016) (emphasis added). With its more forgiving pleading requirements, potential statutory awards, and more expansive universe of actionable disclosures, the pre-amendment PPPA is more favorable to potential plaintiffs than the current version of the PPPA.

### PROCEDURAL BACKGROUND

Plaintiff filed an initial class action Complaint on March 31, 2022, which he served on Christianbook on April 19. On June 10, 2022, Christianbook moved to dismiss the Complaint on the grounds that Plaintiff failed to allege sufficient facts to support a claim for relief and that it was untimely under Michigan's operative three-year statute of limitations. On June 15, the Court *sua sponte* entered an order reminding Plaintiff of his "opportunity" to file an amended complaint to "cure the allegedly inadequate pleading." ECF No. 10, PageID.580. Plaintiff could either file an amended complaint by July 1, or leave his initial pleading as is and respond to Christianbook's motion to dismiss by July 8. *See id.*, PageID.581. Plaintiff chose to file an amended complaint, and did so on July 1.

On July 6, this case and nine other "cognate cases" filed by the same law firm representing this Plaintiff and involving the same PPPA allegations Plaintiff presents here were reassigned to Honorable Hala Y. Jarbou "in the interests of judicial economy and to conserve judicial resources." ECF No. 13, PageID.1119. Two days later, this Court entered another *sua sponte* order, this one requiring Plaintiff by July 15 to show cause as to why the Court should not dismiss his case for lack of subject matter jurisdiction. ECF No. 14, PageID.1121-1122. On July 13, Plaintiff filed a response to the Order to Show Cause, arguing that the Court should "discharge" the order to show cause because "the Court need only consider Defendant's principal place of business and the State under whose laws it is organized" to decide whether subject matter jurisdiction exists over a class

10

action filed pursuant to the Class Action Fairness Act.  ECF No. 17, PageID.1127.  Plaintiff admits that there is no controlling Sixth Court authority endorsing the standard he advances, yet he pleads no facts regarding the citizenship of Christianbook's members, claiming that "[m]embership information for LLCs is not readily available to Plaintiff or his counsel," and instead asks the Court to "compel" Christianbook to disclose this information.  *Id.*, PageID.1128-1130.

## LEGAL STANDARDS

Dismissal under Rule 12(b)(6) is appropriate where a plaintiff fails to plead "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Lindke v. Tomlinson*, 31 F.4th 487, 495-96 (6th Cir. 2022).  "This plausibility standard requires the plaintiff to plead 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  It is therefore not enough to plead "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  Nor must this Court "accept as true legal conclusions or unwarranted factual inferences" and "conclusory allegations" at the motion to dismiss stage.  *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014) (quoting *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 275-76 (6th Cir. 2010)).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[,]'" nor will "conclusory allegations or legal conclusions masquerading as factual allegations . . . suffice."  *Id.*

Moreover, where, as here, "the allegations in the complaint affirmatively show that the claim is time-barred . . . dismissing the claim under Rule 12(b)(6) is appropriate."  *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012); *Hanson Cold Storage Co. v. Chizek Elevator &*

11

*Transp., Inc.*, 205 F. Supp. 3d 920, 927 (W.D. Mich. 2016) (granting motion to dismiss on statute of limitations grounds).

## ARGUMENT

Plaintiff's Amended Complaint is subject to dismissal for two independent reasons. First, Plaintiff's Amended Complaint is plagued by the same fatal defects as his original Complaint, and Plaintiff's failure to allege sufficient facts to support his PPPA claim requires dismissal with prejudice under Rule 12(b)(6). Second, Plaintiff's PPPA claim is time-barred under Michigan's three-year statute of limitations, which applies because the PPPA codifies a right to privacy broadly encompassed by a traditional common-law right to privacy. These infirmities entitle Christianbook to dismissal with prejudice.

## I.   Plaintiff Fails to State a Plausible Claim for Violations of the PPPA.

Rule 12(b)(6)'s plausibility standard demands that Plaintiff "plead 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Lindke*, 31 F.4th at 496-97 (affirming dismissal where plaintiff failed to "factually describe the actions [defendant] took" and made "purely conclusory" allegations). It is therefore not enough to plead "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Where, as here, naked assertions, conclusory averments, and contradictory allegations are all a plaintiff pleads, the claim must fail. *See, e.g.*, *Gamino-Ramirez v. Hoornstra*, 2018 WL 10394898, at *2 (W.D. Mich. Feb. 22, 2018) ("contradict[ory]" averments render "allegations implausible"); *see also S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) ("If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." (citing *Twombly*, 550 U.S. at 555)).

Plaintiff's allegations boil down to this: Christianbook violated the PPPA "[b]y renting, exchanging, and/or otherwise disclosing Plaintiff's Private Reading, Listening, and Viewing Information" in addition to "other categories of individualized data and demographic information such as age, gender, ethnicity, and religion" "during the relevant pre-July 30, 2016 time period[.]" ECF No. 11, PageID.582-583 ¶ 1; *id.*, PageID.584 ¶ 3; *id.*, PageID.586 ¶ 7. Plaintiff likewise claims that Christianbook "rent[s], exchang[es], or otherwise disclos[es]" his and other class members' "Private Reading, Listening, and Viewing Information" "rather than selling" it in order to "disclose the information time and time again to countless third parties" (*id.*, PageID.587 ¶ 8) and reap "handsome[]" "profits." *Id.*, PageID.587 ¶ 10. Plaintiff claims these allegations are supported by "[d]ocumented evidence" in the form of a screenshot purportedly demonstrating that NextMark "offers to provide renters access to the mailing list titled 'Christianbook Catalog Buyers Mailing List', which contains the Private Reading, Listening, and Viewing Information of 3,264,000 of Christianbook's U.S. Customers[.]" *Id.*, PageID.583-584 ¶ 2. For multiple reasons, these allegations utterly fail to state a remotely plausible claim for relief.

## A. Plaintiff Pleads No Facts Supporting His Conclusory Allegations That Christianbook Disclosed His or Anyone Else's PPPA-Protected Information in the Pre-July 2016 Period He Targets.

Plaintiff fails to state a plausible PPPA claim for two related, though independently fatal reasons: (1) Plaintiff pleads no facts in support of his conclusory allegation that Christianbook disclosed any customer information at all during the pre-July 30, 2016 period of which he complains, and (2) he utterly fails to provide any factual support for the allegation that *his* information has been disclosed at all.

*First*, the "[d]ocumented evidence" that Plaintiff contends "confirms" that Christianbook violated the PPPA during the "relevant pre-July 30, 2016 timeframe" (*id.*, PageID.583-584 ¶¶ 2-

13

3) "confirms" nothing of the sort.  Such "evidence" is nowhere to be found in the Amended Complaint, as Plaintiff alleges no facts plausibly supporting that Christianbook disclosed his or anyone else's data in the "relevant pre-July 30, 2016 timeframe."  Plaintiff's only support for these allegations is the NextMark screenshot purportedly marketing a so-called "Christianbook Catalog Buyers Mailing List."  *See id.*, PageID. 583-84  ¶¶ 2-3; *id.*, PageID.599-601 ¶¶ 43-50 (citing only Exhibit A).  But this "mailing list" expressly states that it contains customer "counts through 02/28/2022"—nearly ***six years after*** the pre-July 30, 2016 period in which Plaintiff alleges Christianbook disclosed his and the purported Class's data.  Even taking as true that the NextMark 2022 "mailing list" contains Christianbook customer information protected by the PPPA—and Plaintiff alleges no facts plausibly supporting that it does—what Christianbook may or may not have disclosed to NextMark in 2022 says nothing about Christianbook's treatment of customer data during the pre-July 30, 2016 period in which Plaintiff alleges his PPPA claim accrued.[7]

Plaintiff admits as much in his Amended Complaint, as he now alleges that Christian Book Distributors, LLC—a predecessor to Christianbook—"publicly advertised" the "same rates" in the 2022 "datacard" during the "pre-July 31, 2016 time period."  *See id.*, PageID.585 ¶ 4.  But this

---

[7] As noted *supra*, pp. 5-6, n.4 in all but one of the ten "cognate" cases filed by the attorneys representing Plaintiff that have been reassigned to this Court, a version of this NextMark "mailing list" purportedly containing PPPA-protected customer data circa 2021/2022 is cited as "documented evidence" confirming pre-July 30, 2016 disclosures of customer data.  Without addressing whether these NextMark mailing lists plausibly support the existence of PPPA violations in those cases, it is telling that the *only* factual support this Plaintiff alleges for Christianbook violating the PPPA in 2016 is a version of the 2022 mailing list his attorneys relied upon as support for the PPPA claims they have brought in at least eight other cases they filed in this Court over the last four months.  This underscores how utterly devoid of merit Plaintiff's claim against Christianbook is.  Indeed, it appears that Plaintiff's attorneys have shoehorned Christianbook into one of the template PPPA complaints they have strategically pursued in this Court without regard to whether there is actually a factual basis for pursuing such claims against Christianbook.

new allegation does not plausibly support that Christianbook disclosed Plaintiff's or any other putative class member's data during the pre-July 30, 2016 time period.

Most conspicuously, Plaintiff does not attach the "datacard" that Christianbook allegedly "publicly advertised" during the pre-July 30, 2016 time period, or any other document supporting any inference that the "same rates" from the 2022 "datacard" were actually disclosed in the pre-July 30, 2016 time period. While Plaintiff includes a hyperlink to the purported 2016 "datacard" in a footnote in his Amended Complaint, that hyperlink opens a web page with the message, "Oops, This Page Could Not Be Found!" and not the "datacard" Plaintiff claims was "accessible" during the relevant time period." This hyperlink is the only support Plaintiff asserts to support his allegation that Christianbook advertised customer data during the pre-July 30, 2016 time period. If Plaintiff actually had any document supporting that Christianbook advertised this "datacard" during the pre-July 30, 2016 time period, he presumably would have attached it as an exhibit to his Amended Complaint. But he has not, and instead continues to rely on the 2022 NextMark "mailing list" to "confirm" that Christianbook violated the PPPA during the pre-July 30, 2016 time period, even though he admits this "mailing list" does not contain information from the pre-July 30, 2016 time period. Plaintiff alleges no facts that support extending any inferences about the 2022 "mailing list" to Christianbook's 2016 practices, when a materially different version of the PPPA was in force.[8] Such allegations about what "*might*" have occurred in 2016, "without any

---

[8] Indeed, Plaintiff's speculation about Christianbook's pre-July 30, 2016 conduct is patently unreasonable in light of the PPPA's 2016 amendments, which significantly curtailed what counts as a prohibited disclosure. *See supra*, pp. 8-10. Simply put, certain disclosures that the PPPA countenances now, in 2022, would have violated the pre-amendment PPPA that governed prior to July 30, 2016. Without conceding that Christianbook has ever disclosed customer data to NextMark or anyone else, the simple fact is that a hypothetical disclosure of customer data in 2022, permissible under the current PPPA, could have violated the version of the PPPA that governed prior to July 30, 2016.

factual basis in the pleadings to support that speculative possibility, fail[] to satisfy *Twombly*, which limits claimants to *plausible* claims, not just *possible* ones." *See Barry v. Ally Fin., Inc.*, 2021 WL 2936636, at *5 (E.D. Mich. July 13, 2021).

Moreover, even if Plaintiff had alleged facts supporting an inference that Christianbook "publicly advertised" the "same rates" from the 2022 "mailing list" during the pre-July 30, 2016 time period, his Amended Complaint would still lack sufficient facts plausibly supporting that this hypothetical disclosure violated the PPPA. Plaintiff does not identify the information underpinning the "rates" Christianbook allegedly "publicly advertised" in 2016, much less whether this information is covered by the PPPA or even reflects Plaintiff's PPPA-protected information. In short, even if Christianbook publicized "rate" information during the 2016 time period—and Plaintiff has put forward no facts plausibly suggesting that it did—Plaintiff's failure to allege any facts at all about the customer information reflected in that "rate" information, and whether such information was PPPA-protected is fatal to his PPPA claim.

*Second*, and relatedly, Plaintiff provides no factual support—through Exhibit A or otherwise—for his speculative allegation that Christianbook actually disclosed *his* information at all. In fact, Exhibit A affirmatively contradicts this allegation. Specifically, Exhibit A shows that the NextMark mailing list contains Christianbook customer information about "buyers" within, at most, the twenty-four months preceding February 28, 2022—*i.e.*, data concerning "buyers" between February 28, 2020 and February 28, 2022. *See* ECF. No. 11-2, PageID.614. Plaintiff alleges that he purchased *The Drop Box* "during the relevant pre-July 30, 2016 time period[,]" ECF No. 11, PageID.587 ¶ 11—multiple years before the two-year window of buyer information that Exhibit A purports is reflected in the mailing list. Plaintiff's own allegations thus foreclose any inference that the only fact he marshals as support of his PPPA claim—*i.e.*, NextMark's 2022

16

"mailing list"—evidences disclosure of *his* personal information.[9]  Far from supporting Plaintiff's speculative allegation that Christianbook disclosed Plaintiff's information, Exhibit A renders that allegation implausible.  *See Gamino-Ramirez*, 2018 WL 10394898, at *2 ("if the plaintiff's pleading 'internally contradict[s] verifiable facts central to his claims, that makes his allegations implausible'" (quoting *Bailey v. City of Ann Arbor*, 860 F.3d 382, 387 (6th Cir. 2017)).  For this reason, too, Plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible," and his Amended Complaint must be dismissed.  *See Twombly*, 550 U.S. at 570.[10]

> **B.     Even if Plaintiff Had Plausibly Pled That Christianbook Disclosed Customer Information in the Pre-July 2016 Time Period, He Pleads No Facts Supporting That Such Disclosures Contained the Type of Information Prohibited by the PPPA.**

Plaintiff also fails to plead any facts that plausibly support his allegation that Christianbook disclosed the type of information prohibited from disclosure under the PPPA.  The pre-amendment PPPA prevented "a person . . . engaged in the business of selling at retail . . . video recordings" from "disclos[ing] to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer."  Mich. Comp. Laws § 445.1712 (effective through July 30, 2016).  This command could not be clearer:

---

[9] Moreover, it is too great an inferential leap to assume that simply because NextMark "offers to provide renters access to the mailing list titled 'Christianbook Catalog Buyers Mailing List'" (ECF No. 11, PageID.583 ¶ 2), that this necessarily means *Christianbook* was the one "renting, exchanging, or otherwise disclosing" that information," *id.*, PageID.584 ¶ 3.  Plaintiff pleads no facts in support of that allegation.

[10] Plaintiff's claim that Christianbook "rent[s], exchang[es], or otherwise disclos[es]" his and other class members' "Private Reading, Listening, and Viewing Information" "rather than selling it" so that it can reap "handsome[]" "profits" suffers from the same pleading defect (ECF No. 11, PageID.587 ¶¶ 8-10)—*i.e.*, Plaintiff pleads no facts remotely suggesting that Christianbook has done anything of the sort.  Plaintiff alleges no facts supporting that Christianbook rented his or anyone else's PPPA-protected data at any point—much less during the relevant pre-July 30, 2016 time period—and alleges no facts regarding any supposed "profits" Christianbook reaped by these alleged practices.

where a disclosure does not identify either the "identity of the customer" or the specific "materials" purchased, then there is no violation. *See Wheaton v. Apple Inc.*, 2019 WL 5536214, at *4 (N.D. Cal. Oct. 25, 2019) ("Under the unamended []PPPA, to hold [a defendant] liable, the information disclosed must indicate a customer's identity in connection with their [video] selection."). Thus, without disclosure of a customer's *selections and their identities*, there is no PPPA violation.

Here, although Plaintiff has alleged in a conclusory manner that Christianbook's purported disclosures indicated "the fact that he purchased *The Drop Box*[,]" in addition to his "name and address," ECF No. 11, PageID.605 ¶ 68, he pleads no "further factual enhancement" that support these "naked assertion[s]," *see Twombly*, 550 U.S. at 557. Indeed, the only factual support Plaintiff provides for these assertions is Exhibit A, which nowhere indicates that the allegedly disclosed information identifies the "particular . . . materials" purchased, ECF No. 11, PageID.599 ¶ 44, or even what type of information is included with the purported "mailing list" at all, let alone that the mailing list contains the "identity of the customer," *see* Mich. Comp. Laws § 445.1712 (effective through July 30, 2016). Moreover, NextMark itself confirms that it does not sell "mailing lists."[11] Even assuming that Plaintiff had pled any facts supporting that Christianbook disclosed his PPPA-protected information and that the NextMark "mailing list" contained this information—and he has not—NextMark's unambiguous confirmation that it does not sell "mailing lists" further negates any inference that Plaintiff or any other putative class member's PPPA-protected information was disclosed.

---

[11] *See* NextMark – FAQs, https://www.nextmark.com/company/faq/. Plaintiff selectively references NextMark's website by citing to and attaching the Christianbook "mailing list" to his Amended Complaint. ECF No. 11-2, PageID.614. As Plaintiff has incorporated references to NextMark's website into his Amended Complaint, the Court may take judicial notice of this content from NextMark's website. *See Atlantis Grp., Inc. v. Alizac Partners*, 1991 WL 319384, at *1 n.2 (W.D. Mich. Aug. 27, 1991).

* * *

In short, Plaintiff's Amended Complaint has "not nudged [his] claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, and it should be dismissed, with prejudice, for three independently sufficient reasons. *First*, Plaintiff provides no factual support for his allegations that Christianbook made PPPA-prohibited disclosures in the pre-July 30, 2016 period, which he defines as the period in which his and the putative Class's claims accrued. *Second*, the only factual support Plaintiff does provide—*i.e.*, NextMark's 2022 "mailing list"—contradicts any inference that his data was disclosed at all. *Third*, Plaintiff's allegations that Christianbook disclosed the type of information prohibited by the PPPA are insufficient to state a claim, where they are nothing more than conclusory assertions untethered to factual allegations.

## II.     Plaintiff's Claim is Untimely Under Section 5805's Three-Year Limitations Period.

Even if Plaintiff had otherwise set forth allegations sufficient to state a claim for a violation of the PPPA (he has not), his Amended Complaint is untimely under the three-year limitations period in Mich. Comp. Laws § 600.5805(2) ("Section 5805"), and should be dismissed. Christianbook recognizes that this Court recently held that the six-year statute of limitations in Mich. Comp. Laws § 600.5813 ("Section 5813") applies to PPPA claims because the PPPA sets forth a "statutory cause of action [that] does not define a statute of limitations and . . . does not have a traditional common-law counterpart." *Krassick*, 2022 WL 2071730, at *4. Christianbook respectfully submits that the precedents on which this Court relied in *Krassick* have too narrowly construed the concept of "traditional common-law counterpart" when determining whether to apply Michigan's three-year statute of limitations. As Plaintiff's own allegations confirm, and the legislative history surrounding the enactment of the PPPA and Congress's enactment of the federal precursor to the PPPA make clear, the "right to privacy in [one's] reading materials" (*id.* at *3)

19

enshrined in the PPPA is a "personal privacy" right the Michigan legislature sought to "preserve"—*not* to invent—through the legislative process. *See* ECF No. 11-4, PageID.619. Because the PPPA provides a mechanism for Michigan residents to vindicate privacy rights long recognized by the Michigan common law, the PPPA constitutes an "action[] to recover damages . . . for injury to a person," and is thus subject to Section 5805's three-year limitations period. Under Section 5805, Plaintiff had until July 30, 2019 to file a complaint seeking to recover for the injuries he allegedly incurred by July 30, 2016—a deadline he missed by nearly three years.

A. **Section 5805 Applies Because Plaintiff Expressly Seeks to Recover For "Injury to a Person."**

Section 5805 provides a three-year limitations period for "all actions to recover damages . . . for injury to a person, and "Michigan courts "take[] an expansive view of what constitutes 'injuries to person.'" *See National Sand, Inc. v. Nagel Construction, Inc.*, 451 N.W.2d 618, 621-22 (Mich. Ct. App. 1990). Plaintiff's own allegations confirm that he is pursuing a PPPA claim against Christianbook to recover for alleged "injur[ies] to a person." He pleads that Christianbook's alleged disclosures "put[] consumers, especially the more vulnerable members of society, at risk of serious harm from scammers." ECF No. 11, PageID.600 ¶ 46. He claims that he and members of the purported Class "suffered invasions of their . . . privacy," *id.*, PageID.607 ¶ 75, indicating that he is seeking to recover for "injury to a person." Courts consistently recognize that the "nature" of a PPPA claim, such as Plaintiff's, is to vindicate personal injuries to one's long-recognized privacy rights. *See, e.g.*, *Moeller v. Am. Media, Inc.*, 235 F. Supp. 3d 868, 873 (E.D. Mich. 2017) (noting "Michigan Legislature recognized subscribers' [common-law] right to privacy in their personal reading information, and through the enactment of the PPPA, 'define[d] the injury' and 'articulate[d] the chain of causation that gives rise to the injury.'"); *Lin v. Crain Commc'ns Inc.*, 2020 WL 248445, at *2 (E.D. Mich. Jan. 16, 2020) (PPPA seeks to "'preserve

20

personal privacy with respect to the purchase, rental, or borrowing' of written materials, sound recordings, and video recordings" so as to "address[] many concerns related to an 'unwarranted invasion of privacy'" (citations omitted)). Thus, the "statutorily protected right to privacy" Plaintiff seeks to vindicate in his Amended Complaint (*e.g.*, ECF No. 11, PageID.602 ¶ 54) falls within the expansive contours of Section 5805's "injury to a person" provision.

### B. The Privacy Rights Enshrined in the PPPA Are Encompassed By the Traditional Michigan Common-Law Right to Privacy.

This Court, based on its consideration of applicable Michigan state and federal cases,[12] has considered whether the "injury" for which the PPPA was enacted to provide recovery "was . . . the result of a traditional tort" such that Section 5805's three-year statute of limitations applied, and has found that it is not. *Krassick*, 2022 WL 2071730, at *3. Christianbook respectfully argues that Plaintiff's PPPA claim—as he himself has framed it, consistent with the Michigan legislative history contemporaneous with adoption of the PPPA—far from being a new right unrecognized

---

[12] Christianbook acknowledges that in *Krassick*—yet another PPPA case filed by the attorneys representing this Plaintiff and alleging violations of the pre-amendment version of the PPPA—the parties presented the issue of what limitations period governs PPPA claims, invoked various state and federal case law authorities relevant to this issue, and that the Court considered these authorities in determining that Section 5813's six-year limitations period applied. *Krassick*, 2022 WL 2071730, at *3-5. Christianbook will not belabor here this Court's analysis of these authorities, but submits that there is ample precedent under both Michigan appellate-level state courts and federal courts applying Section 5805's three-year limitations period to common-law invasion of privacy claims akin to Plaintiff's PPPA claim. *See, e.g.*, *Derderian v. Genesys Health Care Sys.*, 689 N.W.2d 145, 159-160 (Mich. Ct. App. 2004) (false light invasion of privacy claim subject to "general 'injury to person' limitation period"); *Green v. Lansing Automakers Fed. Credit Union*, 2019 WL 3812108, at *5 (Mich. Ct. App. Aug. 13, 2019) (noting parties "rightfully" "agree[d] that the 3-year statute of limitations for personal injury suits" applied to "invasion of privacy, unlawful instruction claim"); *Smith v. Asphalt Specialists, Inc.*, 1997 WL 33344052, at *4 (Mich. Ct. App. Oct. 17, 1997) ("The period of limitation applicable to a claim of invasion of privacy is three years."); *see also Cooper v. Team Wellness (Mental Health) Servs. Supervisor*, 2018 WL 7360647, at *2 (6th Cir. Oct. 11, 2018) ("The statute of limitations for the invasion of privacy . . . in Michigan is three years."); *Daniel v. DTE Energy*, 2012 WL 12925071, at *4 (E.D. Mich. Aug. 30, 2012) ("With respect to invasion of privacy causes of action, 'the period of limitations is 3 years . . . .'").

by Michigan common law, is encompassed by traditional rights to privacy long-recognized by Michigan common law.

The "right to privacy in . . . personal-reading information" codified in the PPPA "is grounded in an interest 'traditionally regarded as providing a basis for a lawsuit in English or American courts[,]'" and "the common law ha[s] long recognized [such] a right to personal privacy," which "encompass[es] [an] individual's control of information concerning his or her person." *See Moeller*, 235 F. Supp. 3d at 873 (citations omitted). The Michigan legislature was explicit on this point when it proposed adoption of the PPPA, stating that "[t]he bill would create a new public act to *preserve* personal privacy with respect to the purchase, rental, or borrowing of written materials, sound recordings, and video recordings." ECF No. 11-4, PageID.619. To "preserve" a right is to protect and maintain an existing right, not to create a new right.[13] The legislative history surrounding Congress's adoption of the Video Privacy Protection Act—the federal precursor to the PPPA—likewise confirms that the statutory privacy rights Congress sought to codify grew out of long-recognized traditional common-law rights to privacy. Indeed, Plaintiff says as much in his Amended Complaint, highlighting Senator Leahy's statement at the time he promulgated this legislation that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our homes. And it protects the selection of books that we choose to read." ECF No. 11, PageID.591 ¶ 20.[14]

---

[13] *Preserve*, Merriam-Webster Dictionary, *available at* https://www.merriam-webster.com/dictionary/preserve (defining "preserve" as "to keep safe from injury, harm, or destruction: protect" or "maintain").

[14] This is consistent with other legislative history surrounding adoption of the Video Privacy Protection Act. *Accord* S. REP. 599, 6, 1988 U.S.C.C.A.N. 4342-1, 4342–6 (quoting 134 Cong.Rec. S5400–01 (May 10, 1988)) ("There is no denying that the computer age has revolutionized our world. Over the past 20 years we have seen remarkable changes in the way each one of us goes about our lives. Our children learn through computers. We bank by machine. We watch movies in our living rooms. These technological innovations are exciting and as a

Michigan courts have likewise held that the invasion of privacy tort "is based on a common-law right to privacy" that protects, among other things, "public disclosure of embarrassing private facts about the plaintiff" and "publicity that places the plaintiff in a false light in the public eye." *Doe v. Mills*, 536 N.W.2d 824, 828 (Mich. Ct. App. 1995); *see also Mays v. Int'l Mkt. Place, Inc.*, 2021 WL 4932057, at *9 (Mich. Ct. App. Oct. 21, 2021) ("Michigan has long recognized the common-law tort of invasion of privacy."), *appeal denied*, 971 N.W.2d 651 (Mich. 2022). The "right to privacy in [one's] reading materials" (*Krassick*, 2022 WL 2071730, at *3) mirrors the long-held common-law right Michigan residents enjoy to be free from "public disclosure of . . . [their] private facts" and "publicity that places [them] in a false light in the public eye." Viewed against this backdrop, the PPPA simply reflects the Michigan legislature's effort to step in and codify a right already anchored in Michigan's traditional common-law right to privacy, thus bringing the PPPA within the ambit of Section 5805's three-year statute of limitations.

## C. Plaintiff's Complaint is Time-Barred Under Section 5805.

Since Section 5805 applies to claims under the PPPA, Plaintiff was required to file his Complaint within three years of his alleged injury. Plaintiff specifically alleges that Christianbook disclosed his information at some unspecified date "during the relevant pre-July 30, 2016 time period[.]" ECF No. 11, PageID.582-583 ¶ 1. Plaintiff was therefore required to bring his claims by July 30, 2019 at the latest. Plaintiff did not file his initial Complaint until March 31, 2022—nearly three years after expiration of his PPPA claims. Plaintiff's Amended Complaint should therefore be dismissal as untimely. *See, e.g.*, *Dimond Rigging Co., LLC v. BDP Int'l, Inc.*, 914

---

nation we should be proud of the accomplishments we have made. Yet, as we continue to move ahead, we must protect time honored values that are so central to this society, particularly our right to privacy."). The Court may take notice of these congressional statements on a motion to dismiss. *See U.S. ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972-73 (W.D. Mich. 2003).

F.3d 435, 441 (6th Cir. 2019) ("Dismissal of a complaint because it is barred by the statute of limitations is proper when 'the statement of the claim affirmatively shows that the plaintiff can prove no set of facts that would entitle him to relief.'" (citation omitted)); *Rayfield v. Grand Rapids, City of*, 373 F. Supp. 3d 962, 974 (W.D. Mich. 2018) ("If the allegations . . . show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim[.]" (quoting *Jones v. Bock*, 549 U.S. 199, 215 (2007)), *aff'd sub nom. Rayfield v. City of Grand Rapids, Michigan*, 768 F. App'x 495 (6th Cir. 2019).

### D.  Section 5813 Forecloses Alleged PPPA Breaches Pre-Dating March 31, 2016.

Even if Section 5813's six-year period applied to Plaintiff's claims, Plaintiff cannot bring claims premised on the entire pre-July 30, 2016 time period.  As noted, Plaintiff did not file his initial Complaint until March 31, 2022, which means any alleged PPPA violation that occurred before March 31, 2016 would be untimely.  Plaintiff's Amended Complaint is therefore subject to dismissal to the extent it complains of alleged PPPA violations occurring before March 31, 2016.

### III.  Dismissal of Plaintiff's Amended Complaint Should Be With Prejudice.

Plaintiff's Amended Complaint should be dismissed with prejudice.  Plaintiff has now made two attempts to articulate a cognizable PPPA claim—and in fashioning his Amended Complaint, had the benefit of Christianbook's first motion to dismiss as a roadmap to cure his numerous pleading deficiencies—yet still failed to do so.  Plaintiff can do nothing to any further amended complaint that would cure his pleading deficiencies, making amendment futile.  *See Asset Mgmt. One LLC v. U.S. Bank Nat. Ass'n*, 569 F. App'x 438, 443 (6th Cir. 2014) (dismissal with prejudice proper where plaintiff "could prove no set of facts in support of its allegations that would entitle it to relief" rendering amendment futile).  Indeed, the Amended Complaint is filled with "inescapabl[e]" legal deficiencies (*see supra*, pp. 12-18), about which Plaintiff can do nothing to "save [his]complaint from dismissal."  *Arbre Farms Corp. v. Great Am. E&S Ins.*, 2021 WL

81780, at *4 (W.D. Mich. Jan. 11, 2021), *aff'd sub nom. Arbre Farms Corp. v. Great Am. E&S Ins. Co.*, 2021 WL 5095533 (6th Cir. Nov. 2, 2021).  "Amendment would be futile" for those reasons, too, meaning "the complaint must be dismissed with prejudice."  *Id.*

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should dismiss Plaintiff's Amended Complaint, with prejudice, for failure to state a claim under Rule 12(b)(6).

Dated:  July 15, 2022

Respectfully submitted,

*/s/ Matthew J. Boettcher*
Matthew J. Boettcher
Mboettcher@plunkettcooney.mom
Patrick C. Lannen
Plannen@plunkettcooney.com
Plunkett Cooney, PC
38505 Woodward Ave., Ste. 100
Bloomfield Hills, MI 48304
Tel.:  (248) 901-4035
Fax:  (248) 901-4040

Jennifer L. Chunias
JChunias@goodwinlaw.com
Timothy Bazzle
TBazzle@goodwinlaw.com
Goodwin Procter LLP
100 Northern Avenue
Boston, Massachusetts 02210
Tel.:  (617) 570-1000
Fax.:  (617) 523-1231

*Attorneys for the Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on July 15, 2022, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court by using the CM/ECF system, which caused it to be served on all counsel of record.

*/s/ Matthew J. Boettcher*
Matthew J. Boettcher

## LOCAL RULE 7.1(d) CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies pursuant to Local Civil Rule 7.1(d) that, on July 15, 2022, counsel emailed Plaintiff's counsel to ascertain whether Plaintiff will oppose Christianbook, LLC's Motion to Dismiss.  Plaintiff's counsel asked the undersigned for Christianbook's grounds for dismissal, and the undersigned stated that Christianbook is moving for dismissal under Rule 12(b)(6) for failure to state a claim.  Plaintiff's counsel did not respond to the undersigned, and did not indicate whether Plaintiff would oppose the motion.

## LOCAL RULE 7.2(b)(ii) CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies pursuant to Local Civil Rule 7.2(b)(ii) that this Brief in Support of Defendant Christianbook, LLC's Motion to Dismiss contains 8,463 words, excluding the parts of the document that are exempted by Local Civil Rule 7.2(b)(i).  This word count was generated using Microsoft Word version 2180.

Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| TIMOTHY BOZUNG, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTIANBOOK, LLC f/k/a CHRISTIAN BOOK DISTRIBUTORS CATALOG, LLC,<br><br>Defendant. | Case No. 1:22-cv-00304-PLM-SJB<br><br>HONORABLE PAUL L. MALONEY<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiff Timothy Bozung ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## <u>INTRODUCTION</u>

1.      Defendant Christianbook, LLC f/k/a Christian Book Distributors Catalog, LLC ("Christianbook") rented, exchanged, and/or otherwise disclosed detailed information about Plaintiff's *The Drop Box* video purchase to data aggregators, data appenders, data cooperatives, and list brokers, among others – including, without limitation, NextMark, Experian, Alterian, and Carney Direct

Marketing – which in turn disclosed his information to aggressive advertisers, political organizations, and non-profit companies. As a result, Plaintiff has received a barrage of unwanted junk mail. By renting, exchanging, and/or otherwise disclosing Plaintiff's Private Reading, Listening, and Viewing Information (defined below) during the relevant pre-July 30, 2016 time period,[1] Christianbook violated Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[2]

2. Documented evidence confirms these facts. For example, a list broker, NextMark, offers to provide renters access to the mailing list titled "Christianbook Catalog Buyers Mailing List", which contains the Private Reading, Listening, and Viewing Information of 3,264,000 of Christianbook's U.S. customers at a base price

---

[1]     The statutory period for this action is six years. *See* M.C.L. § 600.5813.

[2]     In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case. *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. Sept. 28, 2018).

of "$95.00/M [per thousand]," (i.e., 9.5 cents apiece), as shown in the screenshot below:



See **Exhibit A** hereto.

3.     Notably, the Nextmark datacard confirms that the persons on the mailing list "are active Christians . . . from many denominations."  It goes on to state, "[t]hey are actively involved in their churches and are frequent contributors to charitable offers."  And, in bold typeface, the datacard notes, "**Ethnic & Religious enhancements are available!!  Please inquire for segment options.**"

3

4. The same "datacard," with the same rates shown above, was also publicly advertised by Defendant during the relevant pre-July 31, 2016 time period, with a slightly different title. Throughout the relevant pre-July 31, 2016 time period, NextMark and other list brokers, including SRDS, Inc., offered to provide renters access to the mailing list titled "Christian Book Distributors (CBD) Catalog Buyers," which contained the Private Reading, Listening, and Viewing Information of 1,407,451 customers of Christianbook (which at the time was known as Christian Book Distributors, LLC, as explained further below in paragraph 12) at a base price of $95.00/M per thousand, (i.e., 9.5 cents apiece).[3]

5. By renting, exchanging, or otherwise disclosing the Private Reading, Listening, and Viewing Information of its Michigan-based customers during the relevant pre-July 30, 2016 time period, Christianbook violated the PPPA. Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

---

[3] This datacard titled "Christian Book Distributors (CBD) Catalog Buyers" was accessible during the relevant pre-July 31, 2016 time period at http://www.srds.com/directnet/dnet?action=recoListDetail&mid=611115&unit=0, and was assigned the ID number 611115 by SRDS.

PPPA § 2.

6.      Accordingly, Plaintiff brings this First Amended Class Action Complaint against Christianbook for its intentional and unlawful disclosure of its customers' Private Reading, Listening, and Viewing Information in violation of the PPPA.

## NATURE OF THE CASE

7.      To supplement its revenues, Christianbook rents, exchanges, or otherwise discloses all of its customers' information—including their full names, the titles of written materials, sound recordings, or video recordings purchased, and home addresses (collectively "Private Reading, Listening, and Viewing Information"), as well as myriad other categories of individualized data and demographic information such as age, gender, ethnicity, and religion—to data aggregators, data appenders, data cooperatives, and other third parties – including, without limitation, NextMark, Experian, Alterian, and Carney Direct Marketing – without the written consent of its customers.  During the relevant pre-July 31, 2016 time period, Christianbook (then known as Christian Book Distributors, LLC) likewise rented, exchanged, or otherwise disclosed all of its customers' Private Reading, Listening, and Viewing Information to data aggregators, data appenders, data cooperatives, and other third parties – including, without limitation, NextMark, Experian, Alterian, and Carney Direct Marketing – without the written consent of its

5

customers.

8.    By renting, exchanging, or otherwise disclosing – rather than selling – its customers' Private Reading, Listening, and Viewing Information, Christianbook is able to disclose the information time and time again to countless third parties.

9.    Christianbook's disclosure of Private Reading, Listening, and Viewing Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.

10.    While Christianbook profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Private Reading, Listening, and Viewing Information and other individualized information, it does so at the expense of its customers' statutory privacy rights (afforded by the PPPA) because Christianbook does not obtain its customers' written consent prior to disclosing their Private Reading, Listening, and Viewing Information.

## **PARTIES**

11.    Plaintiff Timothy Bozung is a natural person and citizen of the State of Michigan and resides in Hudsonville, Michigan.  Plaintiff was a purchaser of *The Drop Box* video, including during the relevant pre-July 30, 2016 time period.  *The Drop Box* video is sold by Christianbook.  While residing in, a citizen of, and present in Michigan, Plaintiff purchased *The Drop Box* video directly from Christianbook.

6

Prior to and at the time Plaintiff purchased *The Drop Box*, Christianbook did not notify Plaintiff that it discloses the Private Reading, Listening, and Viewing Information of its customers, and Plaintiff has never authorized Christianbook to do so. Furthermore, Plaintiff was never provided any written notice that Christianbook rents, exchanges, or otherwise discloses its customers' Private Reading, Listening, and Viewing Information, or any means of opting out. Since purchasing *The Drop Box*, and during the relevant pre-July 30, 2016 time period, Christianbook disclosed, without the requisite consent or prior notice, Plaintiff's Private Reading, Listening, and Viewing Information to data aggregators, data appenders, and/or data cooperatives, who then supplement that information with data from their own files. Moreover, during that same period, Christianbook rented or exchanged mailing lists containing Plaintiff's Private Reading, Listening, and Viewing Information to third parties seeking to contact Christianbook customers, without first obtaining the requisite written consent from Plaintiff or even giving him prior notice of the rentals, exchanges, and/or other disclosures.

12. Defendant Christianbook, LLC is a Delaware corporation with its headquarters and principal place of business in Peabody, Massachusetts. Christianbook does business throughout Michigan and the entire United States. Christianbook is the seller of various book titles such as *The Holy Bible*, as well as various video titles such as *The Drop Box*. During the relevant pre-July 31, 2016

7

time period, Defendant did business under the name "Christian Book Distributors Catalog, LLC". On or about January 25, 2019, Christian Book Distributors Catalog, LLC merged into Christianbook, LLC. *See* **Exhibit B** hereto (filing with the Secretary of the Commonwealth for the Commonwealth of Massachusetts dated January 25, 2019 indicating that Christian Book Distributors Catalog, LLC "has merged out of existence into Christianbook, LLC (with Christianbook, LLC being the survivor)").

## JURISDICTION AND VENUE

13.   This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

14.   The Court has personal jurisdiction over Christianbook because Plaintiff's claims arose in substantial part from actions and omissions in Michigan, including from Plaintiff's purchase of *The Drop Box* in Michigan, Christianbook's direction of such *The Drop Box* video into Michigan, and Christianbook's failure to obtain Plaintiff's written consent in Michigan prior to disclosing his Private Reading, Listening, and Viewing Information, including his residential address in Michigan, to another person, the effects of which were felt from within Michigan by a citizen

8

and resident of Michigan. Personal jurisdiction also exists over Christianbook in Michigan because Christianbook conducts substantial business within Michigan, such that Christianbook has significant, continuous, and pervasive contacts with the State of Michigan.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this judicial District, Christianbook does substantial business in this judicial District, and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

16.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of written materials, sound recordings, and video recordings offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

17.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from

9

disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988

Mich. Legis. Serv. 378 (West).

 18. Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2 (emphasis added).

 19. Michigan's protection of reading and audiovisual information reflects

the "gut feeling that people ought to be able to read books and watch films without

the whole world knowing," and recognizes that "[b]ooks and films are the

intellectual vitamins that fuel the growth of individual thought.  The whole process

of intellectual growth is one of privacy—of quiet, and reflection.  This intimate

process should be protected from the disruptive intrusion of a roving eye."  S. Rep.

No. 100–599, at 6 (Statement of Rep. McCandless).

 20. As Senator Patrick Leahy recognized in proposing the Video and

Library Privacy Protection Act (later codified as the Video Privacy Protection Act,

18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of

movies that we watch with our family in our own homes.  And it protects the

selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

21.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities . . . reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id.*

22.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit C**).

23.     Despite the fact that thousands of Michigan residents have purchased Christianbook's written materials and video recordings, Christianbook disregarded its legal responsibility by systematically violating the PPPA.

### *The Private Information Market:*
### *Consumers' Private Information Has Real Value*

24.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being

defined by the existing data on themselves."[4]

25.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[5]

26.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[6]

27.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about

---

[4]     **Exhibit D**, The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited July 30, 2021).

[5]     *See* **Exhibit E**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited July 30, 2021).

[6]     **Exhibit F**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at*: https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021).

consumers.  Data aggregators then profit by selling this "extraordinarily intrusive"

information in an open and largely unregulated market.[7]

28.     The  scope  of  data  aggregators'  knowledge  about  consumers  is

immense: "If you are an American adult, the odds are that [they] know[] things like

your age, race, sex, weight, height, marital status, education level, politics, buying

habits, household health worries, vacation dreams—and on and on."[8]

29.     Further, "[a]s use of the Internet has grown, the data broker industry

has  already  evolved  to  take  advantage  of  the  increasingly  specific  pieces  of

information about consumers that are now available."[9]

30.     Recognizing  the  serious  threat  the  data  mining  industry  poses  to

consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-

Partisan  Privacy  Caucus  sent  a  letter  to  nine  major  data  brokerage  companies

---

[7]     *See* **Exhibit G**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

[8]     **Exhibit H**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer  Genome*,  N.Y.  Times  (June  16,  2012),  *available  at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N12061 6S.pdf (last visited July 30, 2021).

[9]     **Exhibit I**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive  Officer,  Acxiom  (Oct.  9,  2012)  *available  at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

seeking information on how those companies collect, store, and sell their massive collections of consumer data.[10]

31.     In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[11]

32.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[12] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Christianbook share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within

---

[10]     *See* **Exhibit J**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

[11]     *Id.*

[12]     *See* **Exhibit K**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

the reach of fraudulent telemarketers" and other criminals.[13]

33.     Information disclosures like those made by Christianbook are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[14]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[15] Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

34.     Thus, information disclosures like Christianbook's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers

---

[13]     **Exhibit L**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at*: http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

[14]     *Id.*

[15]     **Exhibit M**, *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at*     https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 1, 2022).

from a host of scam artists."[16]

35.     Christianbook is not alone in jeopardizing its customers' privacy and well-being in exchange for increased revenue: disclosing customer's purchase information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry and other direct-to-consumer industries.

36.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

37.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

38.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[17]  As a result,

---

[16]     *See id.*

[17]     *See* **Exhibit N**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited July 30, 2021).

81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[18]

39.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

40.     In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.[19]

41.     These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace:  consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.[20]

---

[18]     *Id.*

[19]     *See* **Exhibit O**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

[20]     *See* **Exhibit P**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research

42.  Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[21]

### Christianbook Unlawfully Rents, Exchanges, And Discloses Its Customers' Private Reading, Listening, and Viewing Information

43.  Christianbook maintains a vast digital database comprised of its customers' Private Reading, Listening, and Viewing Information.  Christianbook discloses its customers' Private Reading, Listening, and Viewing Information to data aggregators and appenders, who then supplement that information with additional sensitive private information about each Christianbook customer, including his or her age, gender, ethnicity, and religion.  (*See, e.g.*, **Exhibit A**).

44.  Christianbook then rents and/or exchanges its mailing lists—which include its customers' Private Reading, Listening, and Viewing Information identifying which individuals purchased particular written materials and particular audiovisual materials, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other

---

254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

[21]  *See* **Exhibit Q**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibit A**).

45.     Christianbook also discloses its customers' Private Reading, Listening, and Viewing Information to data cooperatives, who in turn give Christianbook access to their own mailing list databases.

46.     As a result of Christianbook's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from Christianbook that identify Christianbook's customers by their most intimate details such as their age, gender, ethnicity, and religion.  Christianbook's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

47.     Christianbook does not seek its customers' prior consent, written or otherwise, to any of these disclosures and its customers remain unaware that their Private Reading, Listening, and Viewing Information and other sensitive information is being rented and exchanged on the open market.

48.     Consumers can purchase Christianbook's written and audiovisual materials through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer makes a purchase, Christianbook never required the individual to read or affirmatively agree to any terms of service,

privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period. Consequently, during the relevant pre-July 31, 2016 time period, Christianbook uniformly failed to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Private Reading, Listening, and Viewing Information.

49.     As a result, Christianbook disclosed its customers' Private Reading, Listening, and Viewing Information – including their reading, listening, and viewing habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[22] – to anybody willing to pay for it.

50.     By and through these actions, Christianbook has intentionally disclosed to third parties its Michigan customers' Private Reading, Listening, and Viewing Information without consent, in direct violation of the PPPA.

## CLASS ACTION ALLEGATIONS

51.     Plaintiff seeks to represent a class defined as all Michigan residents who, at any point during the relevant pre-July 30, 2016 time period, had their Private Reading, Listening, and Viewing Information disclosed to third parties by Christianbook without consent (the "Class"). Excluded from the Class is any entity

---

[22]     **Exhibit R**, *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 30, 2021).

in which Defendant has a controlling interest, and officers or directors of Defendant.

52. Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

53. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether Christianbook is a "retailer or distributor" of written materials or sound or video recordings; (b) whether Christianbook obtained consent before disclosing to third parties Plaintiff's and the Class's Private Reading, Listening, and Viewing Information; and (c) whether Christianbook's disclosure of Plaintiff's and the Class's Private Reading, Listening, and Viewing Information violated the PPPA.

54. The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the PPPA) as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Private Reading, Listening, and Viewing Information.

55.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

56.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CAUSE OF ACTION**
**Violation of Michigan's Preservation of Personal Privacy Act**
**(PPPA § 2)**

22

57.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

58.    Plaintiff brings this claim individually and on behalf of members of the Class against Defendant Christianbook.

59.    As a company that sells written materials and sound and video recordings directly to consumers, Christianbook is engaged in the business of selling written materials, sound recordings, or video recordings at retail.  *See* PPPA § 2.

60.    By purchasing *The Drop Box* video and other videos, Plaintiff purchased video recording directly from Christianbook.  *See* PPPA § 2.

61.    Because Plaintiff purchased a video recording directly from Christianbook, he is a "customer" within the meaning of the PPPA.  *See* PPPA § 1.

62.    At various times during the pre-July 30, 2016 time period, Christianbook disclosed Plaintiff's Private Reading, Listening, and Viewing Information, which identified him as a purchaser of *The Drop Box* video and other video recording titles, in at least three ways.

63.    First, Christianbook disclosed mailing lists containing Plaintiff's Private Reading, Listening, and Viewing Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Christianbook.

64.     Second, Christianbook disclosed mailing lists containing Plaintiff's Private Reading, Listening, and Viewing Information to data cooperatives, who in turn gave Christianbook access to their own mailing list databases.

65.     Third, Christianbook rented and/or exchanged its mailing lists containing Plaintiff's Private Reading, Listening, and Viewing Information— enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

66.     Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and Christianbook was able to increase its profits gained from the mailing list rentals and/or exchanges.

67.     By renting, exchanging, or otherwise disclosing its customer lists, during the relevant pre-July 30, 2016 time period, Christianbook disclosed to persons other than Plaintiff records or information concerning his purchase of video recordings from Christianbook.  *See* PPPA § 2.

68.     The information Christianbook disclosed indicates Plaintiff's name and address, as well as the fact that he purchased *The Drop Box*.  Accordingly, the records or information disclosed by Christianbook indicated Plaintiff's identity.  *See* PPPA § 2.

69.     Plaintiff and the members of the Class never consented to

24

Christianbook disclosing their Private Reading, Listening, and Viewing Information to anyone.

70. Worse yet, Plaintiff and the members of the Class did not receive notice before Christianbook disclosed their Private Reading, Listening, and Viewing Information to third parties.

71. Christianbook's disclosures of Plaintiff's and the Class's Private Reading, Listening, and Viewing Information during the relevant pre-July 30, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

72. Christianbook's disclosures of Plaintiff's and the Class's Private Reading, Listening, and Viewing Information during the relevant pre-July 30, 2016 time period were not made to collect payment for their purchases.

73. Christianbook's disclosures of Plaintiff's Private Reading, Listening, and Viewing Information during the relevant pre-July 30, 2016 time period were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase Christianbook's revenue. Accordingly, Christianbook's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

74. By disclosing Plaintiff's and the Class's Private Reading, Listening,

and Viewing Information during the relevant pre-July 30, 2016 time period, Christianbook violated Plaintiff's and the Class's statutorily protected right to privacy in their reading habits. *See* PPPA § 2.

75. As a result of Christianbook's unlawful disclosure of their Private Reading, Listening, and Viewing Information, Plaintiff and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the PPPA). On behalf of himself and the Class, Plaintiff seeks: (1) $5,000.00 per Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B. For an order declaring that Defendant's conduct as described herein violated the Preservation of Personal Privacy Act, PPPA;

C. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D. For an award of $5,000 to Plaintiff and each Class member, as provided by the Preservation of Personal Privacy Act, PPPA § 5(a);

26

E.     For prejudgment interest on all amounts awarded; and

F.     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: July 1, 2022          Respectfully submitted,

**TIMOTHY BOZUNG**,

_/s/ E. Powell Miller_

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com
ssa@millerlawpc.com

Frank S. Hedin
Arun G. Ravindran
HEDIN HALL LLP
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801
fhedin@hedinhall.com
aravindran@hedinhall.com

Joseph I. Marchese
Philip L. Fraietta
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019

27

Tel: 646.837.7150
Fax: 212.989.9163
jmarchese@bursor.com
pfraietta@bursor.com

*Counsel for Plaintiff and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I, E. Powell Miller, an attorney, hereby certify that on July 1, 2022, I served

the above and foregoing *Plaintiff's First Amended Complaint* on all counsel of

record by filing it electronically with the Clerk of the Court using the CM/ECF filing

system.

*/s/ E. Powell Miller*
E. Powell Miller
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste 300
Rochester, MI 48307
Tel: 248.841.2200

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| TIMOTHY BOZUNG, individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>     v.<br><br>CHRISTIANBOOK, LLC f/k/a CHRISTIAN BOOK DISTRIBUTORS CATALOG, LLC,<br><br>            Defendant. | Case No. 1:22-cv-00304-HYJ-RSK<br><br>Honorable Hala Y. Jarbou<br><br>**PLAINTIFF'S MOTION**<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S MOTION FOR RELIEF FROM
JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e)
& FED. R. CIV. P. 60(b) AND FOR LEAVE TO FILE SECOND
AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 15(a)**

1

Plaintiff, individually and on behalf of all others similarly situated, files this Motion for Relief From Judgment pursuant to Federal Rules of Civil Procedure 59(e) and 60(b), and for Leave to File a Second Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a):

1.  On March 6, 2023, the Court issued its Order granting Defendant's Motion to Dismiss, ECF No. 52, and entered a Judgment dismissing the Complaint without prejudice. ECF No. 53.

2.  Plaintiff has uncovered additional factual information that further bolsters the central allegations that Defendant disclosed its Michigan customers' Private Reading, Listening, and Viewing Information during the relevant time period, and allowing the case to proceed will prevent manifest injustice.

3.  Attached as Exhibit 1 is Plaintiff's Second Amended Class Action Complaint ("SAC"), which includes the additional allegations referenced above, and which Plaintiff seeks leave to file in conjunction with this Motion.

4.  On March 10, 2023, counsel for Plaintiff made contact with counsel for Defendant regarding concurrence in this Motion. On March 13, 2023, counsel for Defendant informed counsel for Plaintiff that Defendant does not assent to Plaintiff's Motion.

WHEREFORE, Plaintiff requests that the Court grant Plaintiff relief from judgment pursuant to Fed. R. Civ. P. 59(e) and/or Fed. R. Civ. P. 60(b), and leave to

file the proposed Second Amended Complaint, attached hereto as Exhibit 1, pursuant to Federal Rule of Civil Procedure 15(a).

Dated: March 14, 2023

Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com

Joseph I. Marchese
Philip L. Fraietta (P85228)
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
jmarchese@bursor.com
pfraietta@bursor.com

Frank S. Hedin
Arun G. Ravindran
**HEDIN HALL LLP**
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
fhedin@hedinhall.com
aravindran@hedinhall.com

*Counsel for Plaintiff and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 14, 2023, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| TIMOTHY BOZUNG, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTIANBOOK, LLC f/k/a CHRISTIAN BOOK DISTRIBUTORS CATALOG, LLC,<br><br>Defendant. | Case No. 1:22-cv-00304-HYJ-RSK<br><br>Honorable Hala Y. Jarbou<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR RELIEF
FROM JUDGMENT PURSUANT TO FED. R. CIV. P. 59(e)
& FED. R. CIV. P. 60(b) AND FOR LEAVE TO FILE SECOND
AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 15(a)**

1

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED.................................................................. ii

MOST CONTROLLING AUTHORITIES ............................................................ iii

TABLE OF AUTHORITIES ...................................................................... iv

INTRODUCTION ..................................................................................1

BACKGROUND ...................................................................................1

LEGAL STANDARD..............................................................................3

ARGUMENT .....................................................................................6

    I.    Plaintiff's Newly Discovered Evidence Warrants Altering or Amending the Court's Order and Judgment Under Rule 59(e) or Setting Aside the Order and Judgment Under Rule 60(b)........................................................ 6

    II.   Justice Requires Permitting Plaintiff to file his Proposed SAC .................. 14

CONCLUSION ..................................................................................17

i

## STATEMENT OF ISSUES PRESENTED

1.     Whether Plaintiff has demonstrated that newly discovered evidence warrants altering or amending, or setting aside, the Judgment pursuant to Fed. R. Civ. P. 59(e) and/or Fed. R. Civ. P. 60(b)?

   Plaintiff Answers: Yes

2.     Whether Plaintiff has demonstrated that, to prevent manifest injustice, the Court should alter or amend, or set aside, its Judgment pursuant to Fed. R. Civ. P. 59(e) and/or Fed. R. Civ. P. 60(b)?

   Plaintiff Answers: Yes.

3.     Whether, pursuant to Fed. R. Civ. P. 15, Plaintiff should be granted leave to file his proposed Second Amended Complaint, which alleges facts arising from his newly discovered evidence that satisfy the pleading standard imposed by Rule 8 and the Supreme Court's decisions in *Iqbal* and *Twombley*, where Plaintiff has not unduly delayed in seeking the proposed amendment or otherwise acted in bad faith or for any dilatory motive, and where Defendant will not suffer any undue prejudice from the proposed amendment?

   Plaintiff Answers: Yes.

## MOST CONTROLLING AUTHORITIES

Fed. R. Civ. P. 59(e)

Fed. R. Civ. P. 60(b)

Fed. R. Civ. P. 15

*In re Ferro Corp. Derivative Litig.*, 511 F.3d 611 (6th Cir. 2008)

*Hahn v. Star Bank*, 190 F.3d 708 (6th Cir. 1999)

*Thiel v. Baby Matters, L.L.C.*, 2013 WL 5913394 (E.D. Mich. Oct. 31, 2013)

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)....................................................................13

*Boelter v. Hearst Commc'ns, Inc.*,
  269 F. Supp. 3d 172 (S.D.N.Y. 2017) ................................................12

*Briscoe v. NTVB Media Inc.*,
  Case No. 4:22-cv-10352-FKB-KGA, ECF No. 41 (E.D. Mich. Mar. 3, 2023) ...13

*Coulter-Owens v. Time, Inc.*,
  308 F.R.D 524 (E.D. Mich. 2015) ....................................................12

*Cutsinger v. Humphrey*,
  2015 WL 6750786 (E.D. Mich. Nov. 5, 2015)....................................16

*Duggins v. Steak N' Shake, Inc.*,
  195 F.3d 828 (6th Cir. 1999) ..........................................................16

*Foman v. Davis*,
  371 U.S. 178 (1962)............................................................... 15, 17

*Griggs v. Schmauss*,
  2019 WL 111108 (W.D. N.Y. Jan. 4, 2019).......................................14

*Hahn v. Star Bank*,
  190 F.3d 708 (6th Cir. 1999) ................................................iii, 5, 14, 15

*Horton v. GameStop Corp.*,
  380 F. Supp. 3d 679 (W.D. Mich. 2018) ............................................13

*In re Ferro Corp. Derivative Litig.*,
  511 F.3d 611 (6th Cir. 2008) ............................................................4

*Lin v. Crain Communications Inc.*,
  2020 WL 248445 (E.D. Mich. Jan. 16, 2020) ....................................13

*Marks v. Shell Oil Co.*,
  830 F.2d 68 (6th Cir. 1987) ..............................................................5

*Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc.*,
  970 F.3d 133 (2nd Cir. 2020) ..........................................................3

*Michigan Flyer LLC v. Wayne Cnty. Airport Auth.*,
  860 F.3d 425 (6th Cir. 2017) ............................................................4

*Morse v. McWhorter*,
  290 F.3d 795 (6th Cir. 2002) ............................................................4

*Piper v. Talbots, Inc.*,
  507 F. Supp. 3d 339 (D. Mass. 2020) ................................................13

*Ruotolo v. City of New York*,
   514 F.3d 184 (2nd Cir. 2008) .................................................................3
Stokes v. Williams,
   475 F.3d 732 (6th Cir. 2007) ..................................................................4
*Taylor v. Burton*,
   2022 WL 3754102 (W.D. Mich. Aug. 25, 2022) ....................................4
*Thiel v. Baby Matters, L.L.C.*,
   2013 WL 5913394 (E.D. Mich. Oct. 31, 2013)................................5, 15
*United States v. Allstate Ins. Co.*,
   2023 WL 2186428 (E.D. Mich. Feb. 23, 2023).......................................4
*Zagorski v. Mays*,
   907 F.3d 901 (6th Cir. 2018) ..................................................................4

## Rules

Fed. R. Civ. P. 15 ......................................................................... 1, 4, 5
Fed. R. Civ. P. 15(a) ............................................................. 5, 6, 14, 17
Fed. R. Civ. P. 26(a)(1)..........................................................................11
Fed. R. Civ. P. 59 ...............................................................................4, 5
Fed. R. Civ. P. 59(b) ................................................................................4
Fed. R. Civ. P. 59(e) ..................................................................... passim
Fed. R. Civ. P. 59(e)(2)..........................................................................14
Fed. R. Civ. P. 59(e)(4)..........................................................................14
Fed. R. Civ. P. 60 ...............................................................................4, 5
Fed. R. Civ. P. 60(b) ..................................................................... passim
Fed. R. Civ. P. 60(b)(2)..........................................................................14
Fed. R. Civ. P. 60(b)(6)............................................................................5

**INTRODUCTION**

On March 6, 2023, the Court issued its Order granting Defendant's Motion to Dismiss, ECF No. 52, and it entered a Judgment dismissing the Complaint without prejudice for failure to "plead sufficient factual allegations" (ECF No. 51, PageID.1596). ECF No. 53. However, in the course of formal discovery conducted by Plaintiff prior to the Court's Order of dismissal, Plaintiff obtained new evidence from Christianbook and relevant third parties that add strong support for Plaintiff's PPPA claim.

Accordingly, Plaintiff respectfully requests that the Court alter or amend, or set aside, its Order and Judgment pursuant to Rule 59(e) and/or Rule 60(b), and grant Plaintiff leave pursuant to Rule 15 to file a Second Amended Complaint ("SAC") in the form attached hereto as **Exhibit 1**, in which he alleges new facts concerning this newly discovered evidence that address the issues identified by the Court in its Order of dismissal.

**BACKGROUND**

On March 31, 2022, Plaintiff initiated this action by filing the Class Action Complaint. ECF No. 1. On June 10, 2022, Defendant filed a Motion to Dismiss Plaintiff's Complaint. ECF No. 8.

On July 1, 2022, Plaintiff filed his First Amended Complaint ("FAC"). ECF No. 11. Thereafter, Defendant filed a Motion to Dismiss Plaintiff's FAC, ECF Nos.

18-19; Plaintiff filed his Response, ECF No. 24; and Defendant filed its Reply, ECF No. 26. In its Motion to Dismiss, Defendant argued that the FAC's "allegations utterly fail to state a remotely plausible claim for relief." ECF No. 19 at 18, PageID.1158. Defendant claimed the FAC's allegations "underscore[] how utterly devoid of merit Plaintiff's claim against Christianbook is," and accused Plaintiff of filing the case "without regard to whether there is actually a factual basis for pursuing such claims against Christianbook." *Id.* at 19 n.7, PageID.1159. And Defendant said that "[i]t is unsurprising that Plaintiff's allegations are so sparse:"

> Christianbook values its customers, and takes great care to protect their personal information, rigorously ensuring that its data protection practices are top-line and compliant with the most restrictive data protection statutes across the many jurisdictions in which it operates.

*Id.* at 11 n.5, PageID.1151.

However, while Defendant's Motion to Dismiss was under submission before the Court, the parties exchanged initial disclosures, and formal discovery commenced. During the brief period of discovery that occurred prior to the Court's entry of the Order and Judgment, Plaintiff served written discovery requests to Christianbook and subpoenaed the third parties identified in Christianbook's initial disclosures for documents, ESI, and information relevant to Plaintiff's claims. Through these efforts, Plaintiff recently obtained new evidence from Christianbook and relevant third parties that add strong support for Plaintiff's PPPA claim and will

enable Plaintiff to cure the issues identified by the Court in its order of dismissal by way of an amended complaint, as discussed in further detail below.

On March 6, 2023, this Court issued an Order granting Defendant's Motion to Dismiss without prejudice, ECF No. 52, and entered a Judgment. ECF No. 53.

For the reasons stated below, the Court should alter or amend its March 6, 2023 Order and Judgment pursuant to Rule 59(e), or set aside the Order and Judgment pursuant to Rule 60(b), in light of new evidence recently discovered by Plaintiff in the course of this litigation, and to prevent the manifest injustice that Plaintiff would otherwise suffer should the Judgment stand as entered.

Additionally, the Court should grant Plaintiff leave to file his proposed SAC (Ex. 1 hereto) pursuant to Rule 15. Indeed, justice requires affording Plaintiff an opportunity to add factual allegations concerning the newly discovered evidence he obtained during discovery, which would cure the issues identified by the Court in its order of dismissal.

## LEGAL STANDARD

"It is well established that '[a] party seeking to file an amended complaint post[-]judgment must first have the judgment vacated or set aside pursuant to Fed. R. Civ. P. 59(e) or 60(b).'" *Metzler Inv. Gmbh v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 142 (2nd Cir. 2020) (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2nd Cir. 2008)); *see also Taylor v. Burton*, 2022 WL 3754102, at *1 (W.D.

3

Mich. Aug. 25, 2022) ("Generally, a complaint cannot be amended after entry of judgment unless the party seeking amendment satisfies the requirements of Rule 59 or 60[] in addition to the requirements of Rule 15."); *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 624 (6th Cir. 2008) (citation omitted)). Here, Plaintiff satisfies the requirements of Rule 59(e) and also Rule 60(b).

A "court may grant a Rule 59(e) motion to alter or amend if there is: (1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *United States v. Allstate Ins. Co.*, 2023 WL 2186428, at *1 (E.D. Mich. Feb. 23, 2023) (citing *Michigan Flyer LLC v. Wayne Cnty. Airport Auth.*, 860 F.3d 425, 431 (6th Cir. 2017)). Similarly, a party against whom a final judgment or order has been entered may petition the Court to set them aside under Rule 60(b), which requires a showing of: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud, misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief. Fed. R. Civ. P. 60(b); *see also Zagorski v. Mays*, 907 F.3d 901, 904 (6th Cir. 2018) (quoting *Stokes v. Williams*, 475 F.3d 732, 735 (6th Cir. 2007)) ("The

4

'catchall' provision in Rule 60(b)(6) vests courts with a deep reservoir of equitable power to vacate judgments 'to achieve substantial justice' in the most 'unusual and extreme situations.'").

If the Court finds in Plaintiff's favor pursuant to Rule 59 or Rule 60, the next step in the analysis is whether Plaintiff should be permitted to file his proposed SAC (attached hereto as Ex. 1). Rule 15 mandates that leave to amend a pleading be "freely given when justice so requires," *Hahn v. Star Bank*, 190 F.3d 708, 715 (6th Cir. 1999) (quoting Rule 15(a)), thereby establishing a "liberal policy of permitting amendments to ensure the determination of claims on their merits." *Thiel v. Baby Matters, L.L.C.*, 2013 WL 5913394, at *2 (E.D. Mich. Oct. 31, 2013) (citing *Marks v. Shell Oil Co.*, 830 F.2d 68, 69 (6th Cir. 1987)); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).

As detailed below, Plaintiff recently discovered new, previously unavailable evidence during the discovery process in this case, and that new evidence is the basis for the new allegations that Plaintiff has made in his proposed SAC. Given Plaintiff's recent discovery of this new evidence, which came shortly before the Court entered its Order granting Christianbook's Motion to Dismiss the FAC, it would be manifestly unjust to deprive Plaintiff an opportunity to allege these new facts in an amended pleading. The Court should thus set aside or alter or amend the Judgment entered in this case pursuant to Rules 59(e) or 60(b). Likewise, under the

circumstances presented, justice requires affording Plaintiff leave to file his proposed SAC pursuant to Rule 15(a).

The Motion should be granted. The Order and Judgment should be amended or set aside, and Plaintiff should be granted leave to file his proposed SAC (attached hereto as Ex. 1).

## **ARGUMENT**

### I.   **Plaintiff's Newly Discovered Evidence Warrants Altering or Amending the Court's Order and Judgment Under Rule 59(e) or Setting Aside the Order and Judgment Under Rule 60(b)**

In light of Plaintiff's newly discovered evidence and to prevent manifest injustice, the Judgment entered by the Court should be set aside pursuant to Rule 60(b), or altered or amended pursuant to Rule 59(e), to afford Plaintiff the opportunity to seek leave to amend his complaint pursuant to Rule 15.

Prior to the Court's entry of judgment in this case, a brief period of discovery occurred, during which Plaintiff obtained documents, ESI, and information from Christianbook and relevant third parties revealing that Christianbook rented, exchanged, and/or otherwise disclosed detailed information about Plaintiff's *The Drop Box - The DVD* video purchase to data aggregators, data appenders, data cooperatives, and list brokers, among others – including, without limitation, to

█████████████████████████████████████████████████

█████████████████████████████████████████████████

6



████████ and to various downstream renters and exchangers of such data – which in turn disclosed Plaintiff's information to aggressive advertisers, political organizations, and non-profit companies. Ex. 1, ¶ 1.

Specifically, discovery has revealed that Christianbook ████████████

████ throughout the relevant pre-July 31, 2016 time period for, *inter alia*, ████

*Id.* ¶ 6. ████████████████████

(throughout the relevant pre-July 31, 2016 time period) to ████████████ contained, *inter alia*, the following information for each of Christianbook's customers: the ████████████

*See id.*

In fact, discovery thus far already revealed that Christianbook █████████
███████████████████████████████████████████████████████
████████ during the relevant pre-July 31, 2016 time period. In response to a
subpoena issued by Plaintiff's counsel, █████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████ including during the
relevant pre-July 31, 2016 time period. *Id.* ¶ 7. █████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████ *Id.* Discovery has likewise revealed that, during the relevant pre-
July 31, 2016 time period, Christianbook █████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████ *Id.*

In addition to obtaining the personal and transactional data of prospective
customers from the Data Companies in return for transmitting all of its customers'
Private Reading, Listening, and Viewing Information to the Data Companies,
Christianbook also received back from the Data Companies "enhanced" lists to

which additional personal, demographic, and behavioral information had been appended by the Data Companies pertaining to each customer appearing on Christianbook's lists. *Id.* ¶ 8. Christianbook then "rented" or "exchanged" these lists on the open market, to anyone interested in renting them (for money) or exchanging for them (whereby Christianbook would receive lists of prospective customers from the entities on the other side of the transaction). *Id.* During the relevant pre-July 31, 2016 time period, Christianbook ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ *Id.* During the relevant pre-July 31, 2016 time period, the ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ *Id.* ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ including throughout the pre-July 31, 2016 time period. *Id.*

Moreover, discovery has revealed that, during the relevant pre-July 31, 2016 time period, Christianbook ██████████████████████████████████

*Id.* ¶ 9. And

, still during the relevant

pre-July 31, 2016 time period, the

*Id.*

during the relevant time period,

███████████████████████████████████████████

████████████ *Id.*

Additionally, discovery to date has shown that, pursuant to Christianbook's

██████████████████████████████████ in effect during the relevant pre-

July 31, 2016 time period, ████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

including throughout the pre-July 31, 2016 time period, ████████████

████████████████████████████ *Id.* ¶ 10. And discovery

has shown that Christianbook ████████████████████████████

████████████████████████████ during the relevant pre-July

31, 2016 time period for additional ████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████ *Id.* ¶ 11.

Indeed, the initial disclosures Defendant made to Plaintiff in this litigation

pursuant to Rule 26(a)(1) ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

████████████████  *Id.* ¶ 12. Christianbook's data

sharing practices were consistent with industry-wide data sharing practices that

sellers of written and audio-visual materials engaged in, without their customers'

consent, during the relevant pre-July 31, 2016 time period. *See Boelter v. Hearst*

*Commc'ns, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. 2017) (granting plaintiff's motion

for summary judgment and describing similar data sharing practices during the same

time period); *Coulter-Owens v. Time, Inc.*, 308 F.R.D 524, 528-29 (E.D. Mich. 2015)

(certifying Michigan class under PPPA and describing defendant's similar data

sharing practices).

Plaintiff makes these new factual allegations in his proposed SAC based upon

evidence that was not, and could not reasonably have been, discovered by Plaintiff

any sooner than during the discovery process in this litigation. Indeed, the new facts

that Plaintiff has alleged in the proposed SAC concern matters that were within the

exclusive knowledge of Christianbook and its business affiliates prior to their

discovery by Plaintiff in the course of formal discovery in this case – including such

matters as Christianbook's customer data transmission practices, its contractual

relationships with data companies, and its actual transmissions of data to third parties during the relevant pre-July 31, 2016 time period. By any reasonable measure, the proposed SAC's allegations concerning this newly discovered information readily satisfy Rule 8, as interpreted by the Supreme Court in *Twombly* and *Iqbal*, and easily clear even the heightened bar for stating a claim that Plaintiff believes the Court incorrectly applied in granting Christianbook's Motion to Dismiss the FAC. *See, e.g.*, *Horton v. GameStop Corp.*, 380 F. Supp. 3d 679 (W.D. Mich. 2018); *Briscoe v. NTVB Media Inc.*, Case No. 4:22-cv-10352-FKB-KGA, ECF No. 41 (E.D. Mich. Mar. 3, 2023); *see also, e.g.*, *Piper v. Talbots, Inc.*, 507 F. Supp. 3d 339, 344 (D. Mass. 2020) (analyzing a claim under Virginia's version of the PPPA – and citing and relying on the reasoning in *Horton* – the court concluded that the plaintiffs had stated a claim by showing that NextMark offered to sell information from the defendant corporation to other parties).

The revelations during discovery here thus underscore Defendant's abuse of the *Twombly* and *Iqbal* pleading standard at the motion to dismiss stage. The discovery Plaintiff has obtained thus far here – which is likely only the tip of the iceberg – not only bolsters the central allegations made by Plaintiff in the FAC, but it also sheds significant light on the numerous other ways in which Christianbook disclosed PPPA-protected information, pertaining to <u>all</u> of its customers (Plaintiff and Class members included), during the relevant pre-July 31, 2016 time period. In

other words, contrary to what Christianbook had argued in its Motion to Dismiss, it is now clear the FAC <u>did not</u> "utterly fail to state a remotely plausible claim for relief," ECF No. 19 at 18, PageID.1158, and that Plaintiff's PPPA claim against Christianbook <u>is not</u> "utterly devoid of merit." *Id.* at 19 n.7, PageID.1159. Rather, contrary to what Christianbook had argued in its Motion to Dismiss, it is now clear that there <u>is</u> "a factual basis for . . . such claims against Christianbook." *Id.*

Setting aside or altering or amending the Judgment in light of this newly discovered evidence, and to prevent manifest injustice, is warranted under Rule 59(e) and Rule 60(b). *See* Fed. R. Civ. P. 59(e)(2) & (4); Fed. R. Civ. P. 60(b)(2); *see also, e.g.*, *Griggs v. Schmauss*, 2019 WL 111108, at \*1-3 (W.D. N.Y. Jan. 4, 2019) (granting the plaintiff's motion for relief from judgement brought pursuant to Rule 60(b)(2) based on newly discovered evidence and permitting filing of amended complaint).

The Motion should be granted, and the Order and Judgment should be amended or set aside.

## II.     Justice Requires Permitting Plaintiff to File His Proposed SAC

After setting aside or amending the Judgment, justice also requires granting Plaintiff leave to file the proposed SAC pursuant to Rule 15(a).

Rule 15(a) mandates that leave to amend a pleading be "freely given when justice so requires," *Hahn*, 190 F.3d at 715 (quoting Rule 15(a)), setting forth a

"liberal policy of permitting amendments to ensure the determination of claims on their merits." *Thiel*, 2013 WL 5913394, at *2. "[I]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Id.* (quoting *Foman*, 371 U.S. at 182). Each of the *Foman* factors is readily satisfied here.

First, Plaintiff has not unduly delayed, or acted in bad faith or with any dilatory motive, in seeking leave to file the proposed amendment. *See Foman*, 371 U.S. at 182. To the contrary, the instant Motion to amend the FAC comes only days after the Court ruled on Defendant's Motion to Dismiss the FAC, and seeks to add allegations concerning facts that Plaintiff discovered during formal discovery while the aforementioned motion was pending, including as recently as just over a week ago when Plaintiff received documents responsive to his subpoena to Experian.[1] Moreover, allowing the proposed amendment would serve the interests of judicial efficiency: absent the proposed amendment, Plaintiff (or another member of the putative class) would be forced to file a separate case based on allegations derived

---

[1]     While Plaintiff continues to believe the FAC adequately stated a claim for relief, the additional allegations in the proposed SAC not only address the issues addressed by the Court, but also clearly satisfy the pleading requirements of Rule 8.

from Plaintiff's newly discovered evidence, and that new case would simply be reassigned to the Court presiding over the instant, lower-numbered related action. Allowing the proposed amendment would be a far more efficient and prudent course forward.

Second, Plaintiff has not made any prior attempts to cure deficiencies identified by the Court in prior pleadings. *See id.* The Order dismissing the FAC was the first time here that the Court identified any deficiencies with Plaintiff's allegations, and Plaintiff brings this Motion in order to cure those purported deficiencies.

Third, Defendant will not suffer any prejudice, let alone undue prejudice, by Plaintiff's filing of the proposed SAC. *See id.*; *see also Duggins v. Steak N' Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (quoting *Moore v. City of Paducah*, 790 F.2d 557, 562 (6th Cir. 1986)) ("To deny a motion to amend, a court must find 'at least some significant showing of prejudice to the opponent.'"). "'Prejudice' in the context of Rule 15 means more than the inconvenience of having to defend against a claim. It requires something more substantial." *Cutsinger v. Humphrey*, 2015 WL 6750786, at *2 (E.D. Mich. Nov. 5, 2015). Defendant has been aware of all the new facts alleged in the SAC since the outset of this case; indeed, the new allegations in the proposed SAC all concern Defendant's own conduct, and its relationship and data sharing practices with companies that it contracted with and worked with during

the relevant time period. Because none of Plaintiff's new allegations are a surprise to Defendant, Defendant cannot show any "significant prejudice" as a result of Plaintiff's making them in an amended pleading. *See Duggins*, 195 F. at 834.[2]

Finally, Plaintiff's filing of the proposed SAC is not futile. *See Foman*, 371 U.S. at 182. Defendant previously argued that Plaintiff's FAC failed to sufficiently allege facts that plausibly entitled Plaintiff to relief under the PPPA. ECF Nos. 18-19. The additional evidence Plaintiff just recently discovered serves as the basis for the numerous additional, detailed factual allegations that Plaintiff has added to his proposed SAC, which, taken together, far surpass the "plausibility" bar to stating a claim set by the Supreme Court in *Iqbal* and *Twombly*. These new allegations address each and every one of the issues identified by the Court in its Order dismissing Plaintiff's FAC.

The Motion should be granted, and Plaintiff should be granted leave to file his proposed SAC pursuant to Rule 15(a).

## **CONCLUSION**

For the foregoing reasons, the Motion should be granted.

---

[2]     Moreover, no new claims are added in the proposed SAC. *See, e.g.*, *Kittle*, 2019 WL 6496596, at *1 (finding no prejudice to defendant where plaintiff sought "to add two new named Plaintiffs" and the "factual and legal allegations in the proposed Amended Complaint are largely the same as those included in the original Complaint").

Dated: March 14, 2023

Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com

Joseph I. Marchese
Philip L. Fraietta (P85228)
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
jmarchese@bursor.com
pfraietta@bursor.com

Frank S. Hedin
Arun G. Ravindran
**HEDIN HALL LLP**
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
fhedin@hedinhall.com
aravindran@hedinhall.com

*Counsel for Plaintiff and the Putative Class*

## CERTIFICATE REGARDING WORD COUNT

Plaintiff, in compliance with both LCivR 7.2(b)(i)-(ii) and 7.3(b)(i)-(ii), used 3,996 words in Plaintiff's foregoing brief. Microsoft Word for Office 365 Business version 1910 is the word processing software used to generate the word count in the attached brief.

Dated: March 14, 2023        Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 14, 2023, I electronically filed the foregoing documents using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

/s/ E. Powell Miller
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com

# EXHIBIT 1

Proposed Second Amended Complaint

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| TIMOTHY BOZUNG, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CHRISTIANBOOK, LLC f/k/a CHRISTIAN BOOK DISTRIBUTORS CATALOG, LLC, <br><br> Defendant. | Case No. 1:22-cv-00304-HYJ-RSK <br><br> Honorable Hala Y. Jarbou <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Timothy Bozung ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based on personal knowledge as to facts pertaining specifically to himself.

### INTRODUCTION

1.     Defendant Christianbook, LLC f/k/a Christian Book Distributors Catalog, LLC ("Christianbook") rented, exchanged, and/or otherwise disclosed detailed information about Plaintiff's *The Drop Box - The DVD* video purchase to data aggregators, data appenders, data cooperatives, and list brokers, among others – including, without limitation, to Experian Marketing Solutions, Inc. and Experian Information Solutions, Inc. (together, "Experian"), I-Behavior, Inc. ("I-Behavior"),

NextAction, Wiland, Inc. ("Wiland"), Alterian, InfoGroup Media Solutions ("Infogroup"), and Datalogix/Oracle ("Oracle") (collectively, the "Data Companies"), to Atlantic List Company, Inc. ("ALC") and Millard Group, Inc. ("Millard") (collectively, the "List Managers"), and to various downstream renters and exchangers of such data – which in turn disclosed Plaintiff's information to aggressive advertisers, political organizations, and non-profit companies. As a result, Plaintiff has received a barrage of unwanted junk mail. By renting, exchanging, and/or otherwise disclosing Plaintiff's Private Reading, Listening, and Viewing Information (defined below) during the relevant pre-July 31, 2016 time period,[1] Christianbook violated Michigan's Preservation of Personal Privacy Act,

---

[1]     The statutory period for this action is six years, which is 2,190 days. *See* M.C.L. § 600.5813.

The applicable six-year limitation period was tolled for 102 days pursuant to Executive Orders issued by the Governor of Michigan during the COVID-19 pandemic. *See* Mich. Executive Order No. 2020-58 ("[A]ll deadlines applicable to the commencement of all civil and probate actions and proceedings, including but not limited to any deadline for filing an initial pleading . . . are suspended as of March 10, 2020 and shall be tolled until the end of the declared states of disaster and emergency.") (emphasis added); Mich. Supreme Court Administrative Order No. 2020-3 ("For all deadlines applicable to the commencement of all civil and probate case types, including but not limited to the deadline for the initial filing of a pleading … any day that falls during the state of emergency declared by the Governor related to COVID-19 is not included.") (emphasis added); Mich. Executive Order No. 2020-122 (ending tolling period on June 20, 2020); Mich. Supreme Court Administrative Order No. 2020-18 (same); *see also Straus v. Governor*, 592 N.W.2d 53, 57 (Mich. 1999) (under Michigan law "the Governor's action [in issuing an Executive Order] has the status of enacted legislation"); *Blaha v. A.H. Robins & Co.*, 708 F.2d 238, 239 (6th Cir. 1983) ("Pursuant to the *Erie* doctrine, state statutes of limitations must be applied by federal courts sitting in diversity.").

2

H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added

by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[2]

    2.      Documented evidence confirms these facts.  For example, a list broker,

NextMark, Inc. ("NextMark"), acting on Defendant's behalf (or on behalf of one or

more of the List Managers serving as Defendant's representative(s)), offers to

provide renters access to the mailing list titled "Christianbook Catalog Buyers

Mailing List", which contains the Private Reading, Listening, and Viewing

Information of 3,264,000 of Christianbook's U.S. customers at a base price of

"$95.00/M [per thousand]," (i.e., 9.5 cents apiece), as shown in the screenshot

below:

---

    Thus, the applicable statutory period (i.e., the "relevant pre-July 31, 2016 time period") for this action is December 20, 2015 (2,293 days prior to the commencement of the instant action on March 31, 2022) through July 30, 2016.

[2]    In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case.  *See Horton v. GameStop, Corp.*, 380 F. Supp. 3d 679, 683 (W.D. Mich. Sept. 28, 2018).



*See* **Exhibit A** hereto.

3.  Notably, the Nextmark data card confirms that the persons on the mailing list "are active Christians . . . from many denominations." It goes on to state, "[t]hey are actively involved in their churches and are frequent contributors to charitable offers." And, in bold typeface, the data card notes, "**Ethnic & Religious enhancements are available!! Please inquire for segment options.**"

4.  It is standard practice for list brokers and list renters to issue new data cards each year, and to update its data cards from month to month to reflect updated subscriber counts. *See, e.g.*, *Boelter v. Hearst Communications, Inc.*, Case No. 15-cv-03934-AT, ECF No. 1 at Ex. B (S.D.N.Y.) (Hearst Masterfile Mailing List

4

NextMark data card showing "COUNTS THROUGH 04/30/2015"); *Horton v. Gamestop Corp., d/b/a Game Informer*, Case No. 18-cv-00596-GJQ-PJG, ECF No. 1 at Ex. B (W.D. Mich.) (Game Informer Magazine Mailing List Nextmark data card showing "COUNTS THROUGH 04/09/2018"). Consistent with this standard practice, another "data card," substantially similar to the one shown above, with the same rates as shown above, was also publicly advertised by various list brokers acting on Defendant's behalf (or on behalf of one or more of the List Managers serving as Defendant's representative(s)) during the relevant pre-July 31, 2016 time period, with a slightly different title. Throughout the relevant pre-July 31, 2016 time period, NextMark and other list brokers, including SRDS, Inc., offered (on Defendant's behalf, or on behalf of one or more of the List Managers serving as Defendant's representative(s)) to provide renters and exchangers access to the mailing list titled "Christian Book Distributors (CBD) Catalog Buyers," including customers from 2015-2016, which contained the Private Reading, Listening, and Viewing Information of approximately 1.4 million customers of Christianbook (which at the time was known as Christian Book Distributors, LLC, as explained further below in paragraph 21) at a base price of $95.00/M per thousand, (i.e., 9.5 cents apiece).[3]

---

[3]     This data card titled "Christian Book Distributors (CBD) Catalog Buyers" was accessible during the relevant pre-July 31, 2016 time period at

5.      Even during the relatively brief period of discovery taken to date in this litigation, Plaintiff has obtained documents, ESI, and information from Christianbook and various third parties that firmly support the allegations set forth herein.

6.      Discovery has already revealed that Christianbook transmitted data files to Experian, I-Behavior, NextAction, and Wiland at least as frequently as once a month throughout the relevant pre-July 31, 2016 time period for, *inter alia*, data appending, modeling, data exchange (including prospecting via data cooperatives), and list rental purposes, pursuant to contracts between Christianbook and each of these Data Companies.  The data files that Christianbook transmitted at least as frequently as once a month (throughout the relevant pre-July 31, 2016 time period) to Experian, I-Behavior, NextAction, and Wiland contained, *inter alia*, the following information for each of Christianbook's customers: the customer's name and address and the individual transaction records reflecting the customer's transaction histories (transactional information and product-level data), i.e., records showing the name of each product that the customer purchased from Christianbook, and the dates on which, the means by which, and the amounts for which each product was purchased.

---

http://www.srds.com/directnet/dnet?action=recoListDetail&mid=611115&unit=0, and was assigned the ID number 611115 by SRDS.

7. By way of example, discovery has thus far already revealed that Christianbook ███████████████████████████████████████████████ ███████████████████████████████████ during the relevant pre-July 31, 2016 time period. In response to a subpoena issued by Plaintiff's counsel, ██████████████ ██████████████████████████████████████████████ ████████████████████████████████████████ including during the relevant pre-July 31, 2016 time period. ██████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████ during the relevant pre-July 31, 2016 time period, Christianbook ██████████████████████ ██████████████████████████████████████████████ ███████████████████

8. In addition to obtaining the personal and transactional data of prospective customers from the Data Companies in return for transmitting all of its customers' Private Reading, Listening, and Viewing Information to the Data Companies, Christianbook also received back from the Data Companies "enhanced"

7

lists to which additional personal, demographic, and behavioral information had been appended by the Data Companies pertaining to each customer appearing on Christianbook's lists.  Christianbook then "rented" or "exchanged" these lists on the open market, to anyone interested in renting them (for money) or exchanging for them (whereby Christianbook would receive lists of prospective customers from the entities on the other side of the transaction).  During the relevant pre-July 31, 2016 time period, Christianbook ████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████  During the relevant pre-July 31, 2016 time period, the ██████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████  including throughout the pre-July 31, 2016 time period.

9.     During the relevant pre-July 31, 2016 time period, ████████████

███████████████████████████████████████████████████████████████

8

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████ still during the relevant pre-July 31, 2016 time period, ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████ during the relevant time period, ██████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

10.     Discovery thus far has also revealed that, pursuant to ███████████ ████████████████████████████████████████████ in effect during the relevant pre-July 31, 2016 time period, ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

including throughout the pre-July 31, 2016 time period, for ███████████ ██████████████████████████████

11.     Christianbook also ███████████████████████████ ████████████████████████████████████████ during the relevant pre-July 31, 2016 time period for █████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

12.     Notably, the initial disclosures Defendant made to Plaintiff in this litigation pursuant to Rule 26(a)(1) ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████████

13.     Christianbook's data sharing practices were consistent with industry-wide data sharing practices that sellers of written and audio-visual materials engaged in, without their customers' consent, during the relevant pre-July 31, 2016 time period. *See Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172 (S.D.N.Y. 2017) (granting plaintiff's motion for summary judgment and describing similar data sharing practices during the same time period); *Coulter-Owens v. Time, Inc.*, 308 F.R.D 524, 528-29 (E.D. Mich. 2015) (certifying Michigan class under PPPA and describing defendant's similar data sharing practices).

14.     By renting, exchanging, or otherwise disclosing the Private Reading, Listening, and Viewing Information of its Michigan-based customers during the relevant pre-July 31, 2016 time period, Christianbook violated the PPPA. Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

11

PPPA § 2.

15.     Accordingly, Plaintiff brings this Second Amended Class Action Complaint against Christianbook for its intentional and unlawful disclosure of its customers' Private Reading, Listening, and Viewing Information in violation of the PPPA.

## NATURE OF THE CASE

16.     To supplement its revenues, Christianbook rents, exchanges, or otherwise discloses all of its customers' information—including their full names, the titles of written materials, sound recordings, or video recordings purchased, and home addresses (collectively "Private Reading, Listening, and Viewing Information"), as well as myriad other categories of individualized data and demographic information such as age, gender, ethnicity, and religion—to the Data Companies and the List Managers, as well as various other third party renters and exchangers of this data, all without the written consent of its customers.  During the relevant pre-July 31, 2016 time period, Christianbook (then known as Christian Book Distributors, LLC) likewise rented, exchanged, or otherwise disclosed all of its customers' Private Reading, Listening, and Viewing Information to the Data Companies and the List Managers, as well as various other third party renters and exchangers of this data, all without the written consent of its customers.

17.     By renting, exchanging, or otherwise disclosing – rather than selling –

12

its customers' Private Reading, Listening, and Viewing Information, Christianbook is able to disclose the information time and time again to countless third parties.

18.     Christianbook's disclosure of Private Reading, Listening, and Viewing Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.

19.     While Christianbook profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Private Reading, Listening, and Viewing Information and other individualized information, it does so at the expense of its customers' statutory privacy rights (afforded by the PPPA) because Christianbook does not obtain its customers' written consent prior to disclosing their Private Reading, Listening, and Viewing Information.

## PARTIES

20.     Plaintiff Timothy Bozung is a natural person and citizen of the State of Michigan and resides in Hudsonville, Michigan. Plaintiff was a purchaser of *The Drop Box - The DVD* video, including prior to July 31, 2016. *The Drop Box* video is sold by Christianbook. While residing in, a citizen of, and present in Michigan, Plaintiff purchased *The Drop Box - The DVD* directly from Christianbook. Prior to and at the time Plaintiff purchased *The Drop Box - The DVD*, Christianbook did not notify Plaintiff that it discloses the Private Reading, Listening, and Viewing

Information of its customers, and Plaintiff has never authorized Christianbook to do so. Furthermore, Plaintiff was never provided any written notice that Christianbook rents, exchanges, or otherwise discloses its customers' Private Reading, Listening, and Viewing Information, or any means of opting out. Since purchasing *The Drop Box - The DVD*, and during the relevant pre-July 31, 2016 time period, Christianbook disclosed, without the requisite consent or prior notice, Plaintiff's Private Reading, Listening, and Viewing Information to data aggregators, data appenders, and/or data cooperatives, including to the Data Companies, who then supplement that information with data from their own files. Moreover, during that same period, Christianbook (either directly or through one or more intermediaries, including the List Managers) rented or exchanged mailing lists containing Plaintiff's Private Reading, Listening, and Viewing Information to third parties seeking to contact Christianbook customers, without first obtaining the requisite written consent from Plaintiff or even giving him prior notice of the rentals, exchanges, and/or other disclosures.

21. Defendant Christianbook, LLC is a Delaware corporation with its headquarters and principal place of business in Peabody, Massachusetts. Christianbook does business throughout Michigan and the entire United States. Christianbook is the seller of various book titles such as *The Holy Bible*, as well as various video titles such as *The Drop Box - The DVD*. During the relevant pre-July

31, 2016 time period, Defendant did business under the name "Christian Book Distributors Catalog, LLC". On or about January 25, 2019, Christian Book Distributors Catalog, LLC merged into Christianbook, LLC. *See* **Exhibit B** hereto (filing with the Secretary of the Commonwealth for the Commonwealth of Massachusetts dated January 25, 2019 indicating that Christian Book Distributors Catalog, LLC "has merged out of existence into Christianbook, LLC (with Christianbook, LLC being the survivor)").

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

23. The Court has personal jurisdiction over Christianbook because Plaintiff's claims arose in substantial part from actions and omissions in Michigan, including from Plaintiff's purchase of *The Drop Box - The DVD* in Michigan, Christianbook's direction of such *The Drop Box - The DVD video* into Michigan, and Christianbook's failure to obtain Plaintiff's written consent in Michigan prior to disclosing his Private Reading, Listening, and Viewing Information, including his residential address in Michigan, to another person, the effects of which were felt

from within Michigan by a citizen and resident of Michigan.  Personal jurisdiction also exists over Christianbook in Michigan because Christianbook conducts substantial business within Michigan, such that Christianbook has significant, continuous, and pervasive contacts with the State of Michigan.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this judicial District, Christianbook does substantial business in this judicial District, and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

25.     In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of written materials, sound recordings, and video recordings offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance."  S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

26.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from

16

disclosing certain types of sensitive consumer information.  H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

27.     Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2 (emphasis added).

28.     Michigan's protection of reading and audiovisual information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection.  This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

29.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

17

30.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities . . . reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id.*

31.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter."  *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit C**).

32.     Despite the fact that thousands of Michigan residents have purchased Christianbook's written materials and video recordings, Christianbook disregarded its legal responsibility by systematically violating the PPPA.

### The Private Information Market: Consumers' Private Information Has Real Value

33.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being

defined by the existing data on themselves."[4]

34.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[5]

35.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[6]

36.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.  Data aggregators then profit by selling this "extraordinarily intrusive"

---

[4]     **Exhibit D**, The Information Marketplace:  Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited July 30, 2021).

[5]     *See* **Exhibit E**, Web's Hot New Commodity: Privacy, WSJ (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited July 30, 2021).

[6]     **Exhibit F**, Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2, *available at*: https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited July 30, 2021).

information in an open and largely unregulated market.[7]

37.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[8]

38.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[9]

39.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive

---

[7]     *See* **Exhibit G**, Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 30, 2021).

[8]     **Exhibit H**, Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* https://www.immagic.com/eLibrary/ARCHIVES/GENERAL/GENPRESS/N12061 6S.pdf (last visited July 30, 2021).

[9]     **Exhibit I**, Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 30, 2021).

collections of consumer data.[10]

40.     In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."[11]

41.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[12] including fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Christianbook share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within

---

[10]     *See* **Exhibit J**, *Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 30, 2021).

[11]     *Id.*

[12]     *See* **Exhibit K**, *Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

the reach of fraudulent telemarketers" and other criminals.[13]

42.     Information disclosures like those made by Christianbook are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[14]  The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[15] Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

43.     Thus, information disclosures like Christianbook's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers

---

[13]     **Exhibit L**, Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at*: http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

[14]     *Id.*

[15]     **Exhibit M**, *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at*   https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 1, 2022).

from a host of scam artists."[16]

44.     Christianbook is not alone in jeopardizing its customers' privacy and well-being in exchange for increased revenue: disclosing customer's purchase information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry and other direct-to-consumer industries, and was an especially widespread practice in those industries during the relevant pre-July 31, 2016 time period.

45.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

46.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

47.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[17]  As a result,

---

[16]     *See id.*

[17]     *See* **Exhibit N**, *2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-

81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[18]

48.    Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

49.    In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.[19]

50.    These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace:   consumers recognize the economic value of their private data.  Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent

---

[18]    *Id.*

[19]    *See* **Exhibit O**, Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 30, 2021).

content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited July 30, 2021).

policies of protecting their data.[20]

51.    Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[21]

### *Christianbook Unlawfully Rents, Exchanges, and Discloses Its Customers' Private Reading, Listening, and Viewing Information*

52.    Christianbook maintains a vast digital database comprised of its customers' Private Reading, Listening, and Viewing Information.  Christianbook discloses its customers' Private Reading, Listening, and Viewing Information to data aggregators and appenders, including the Data Companies, who then supplement that information with additional sensitive private information about each Christianbook customer, including his or her age, gender, ethnicity, and religion.  (*See, e.g.*, **Exhibit A**).

53.    Christianbook (either directly or through one or more intermediaries acting at its direction, including the List Managers) then rents and/or exchanges its

---

[20]    *See* **Exhibit P**, Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 30, 2021).

[21]    *See* **Exhibit Q**, Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 30, 2021) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

mailing lists—which include its customers' Private Reading, Listening, and Viewing Information identifying which individuals purchased particular written materials and particular audiovisual materials, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations and contributions, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibit A**).

54.     Christianbook also discloses its customers' Private Reading, Listening, and Viewing Information to data cooperatives, including the Data Companies, who in turn give Christianbook access to their own (and their other clients') mailing list databases.

55.     As a result of Christianbook's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from Christianbook that identify Christianbook's customers by their most intimate details such as their age, gender, ethnicity, and religion.  Christianbook's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

56.     Christianbook does not seek its customers' prior consent, written or otherwise, to any of these disclosures and its customers remain unaware that their

Private Reading, Listening, and Viewing Information and other sensitive information is being rented, exchanged, and otherwise trafficked on the open market.

57.    Consumers can purchase Christianbook's written and audiovisual materials through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer makes a purchase, Christianbook never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period.  Consequently, during the relevant pre-July 31, 2016 time period, Christianbook uniformly failed to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Private Reading, Listening, and Viewing Information.

58.    As a result, Christianbook disclosed its customers' Private Reading, Listening, and Viewing Information – including their reading, listening, and viewing habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[22] – to anybody willing to pay for it.

---

[22]    **Exhibit R**, *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 30, 2021).

59.     By and through these actions, Christianbook has intentionally disclosed to third parties its Michigan customers' Private Reading, Listening, and Viewing Information without consent, in direct violation of the PPPA.

## CLASS ACTION ALLEGATIONS

60.     Plaintiff seeks to represent a class defined as all Michigan residents who, at any point during the relevant pre-July 31, 2016 time period, had their Private Reading, Listening, and Viewing Information disclosed to third parties by Christianbook without consent (the "Class"). Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

61.     Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and/or relevant third parties, including the Data Companies and List Managers.

62.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether Christianbook is a "retailer or distributor" of written materials or sound or video recordings; (b)

whether Christianbook obtained consent before disclosing to third parties Plaintiff's and the Class's Private Reading, Listening, and Viewing Information; and (c) whether Christianbook's disclosure of Plaintiff's and the Class's Private Reading, Listening, and Viewing Information violated the PPPA.

63.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the PPPA) as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Private Reading, Listening, and Viewing Information.

64.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

65.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex

29

legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSE OF ACTION
### Violation of Michigan's Preservation of Personal Privacy Act
### (PPPA § 2)

66. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

67. Plaintiff brings this claim individually and on behalf of members of the Class against Defendant Christianbook.

68. As a company that sells written materials and sound and video recordings directly to consumers, Christianbook is engaged in the business of selling written materials, sound recordings, or video recordings at retail. *See* PPPA § 2.

69. By purchasing *The Drop Box - The DVD* video and other videos, Plaintiff purchased video recording directly from Christianbook. *See* PPPA § 2.

70. Because Plaintiff purchased a video recording directly from Christianbook, he is a "customer" within the meaning of the PPPA. *See* PPPA § 1.

71.     At various times during the pre-July 31, 2016 time period, Christianbook disclosed Plaintiff's Private Reading, Listening, and Viewing Information, which identified him as a purchaser of *The Drop Box - The DVD* video and other video recording titles, in at least three ways.

72.     First, Christianbook disclosed customer files and lists containing Plaintiff's Private Reading, Listening, and Viewing Information to data aggregators and data appenders, including to the Data Companies, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the files and lists back to Christianbook.

73.     Second, Christianbook disclosed customer files and lists containing Plaintiff's Private Reading, Listening, and Viewing Information to data cooperatives, including the Data Companies, who in turn gave Christianbook access to their own (and their clients') customer mailing list databases.

74.     Third, Christianbook (either directly or by one or more intermediaries acting on its behalf and at its direction, including the List Managers) rented and/or exchanged its mailing lists containing Plaintiff's Private Reading, Listening, and Viewing Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and non-profit organizations soliciting monetary donations and contributions, volunteer work, and votes.

75.     Because the mailing lists included the additional information from the data aggregators and appenders, including from the Data Companies, the lists were more valuable, and Christianbook was able to increase its profits gained from the mailing list rentals and/or exchanges.

76.     By renting, exchanging, or otherwise disclosing its customer lists, during the relevant pre-July 31, 2016 time period, Christianbook disclosed to persons other than Plaintiff records or information concerning his purchase of video recordings from Christianbook.  *See* PPPA § 2.

77.     The information Christianbook disclosed indicates, *inter alia*, Plaintiff's name, address, and e-mail address, as well as the fact that he purchased video recording products, including the *The Drop Box - The DVD*, from Christianbook.  Accordingly, the records or information disclosed by Christianbook indicated Plaintiff's identity.  *See* PPPA § 2.

78.     Plaintiff and the members of the Class never consented to Christianbook disclosing their Private Reading, Listening, and Viewing Information to anyone.

79.     Worse yet, Plaintiff and the members of the Class did not receive notice before Christianbook disclosed their Private Reading, Listening, and Viewing Information to third parties.

80.     Christianbook's disclosures of Plaintiff's and the Class's Private Reading, Listening, and Viewing Information during the relevant pre-July 31, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

81.     Christianbook's disclosures of Plaintiff's and the Class's Private Reading, Listening, and Viewing Information during the relevant pre-July 31, 2016 time period were not made to collect payment for their purchases.

82.     Christianbook's disclosures of Plaintiff's Private Reading, Listening, and Viewing Information during the relevant pre-July 31, 2016 time period were made to data aggregators, data appenders, data cooperatives, list managers, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes (including to the Data Companies and the List Managers)—all in order to increase Christianbook's revenue and to obtain lists of prospective customers.   Accordingly, Christianbook's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

83.     By disclosing Plaintiff's and the Class's Private Reading, Listening, and Viewing Information during the relevant pre-July 31, 2016 time period, Christianbook violated Plaintiff's and the Class's statutorily protected right to privacy in their reading habits.  *See* PPPA § 2.

84.     As a result of Christianbook's unlawful disclosure of their Private Reading, Listening, and Viewing Information, Plaintiff and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the PPPA).  On behalf of himself and the Class, Plaintiff seeks: (1) $5,000.00 to Plaintiff and to each Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A.     For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

B.     For an order declaring that Defendant's conduct as described herein violated the Preservation of Personal Privacy Act;

C.     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.     For an award of $5,000 to Plaintiff and each Class member, as provided by the Preservation of Personal Privacy Act, PPPA § 5(a);

E.     For prejudgment interest on all amounts awarded; and

F.     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

34

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: March 14, 2023

Respectfully submitted,

**TIMOTHY BOZUNG**,

/s/ *E. Powell Miller*
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: 248-841-2200
epm@millerlawpc.com

Frank S. Hedin
Arun G. Ravindran
**HEDIN HALL LLP**
1395 Brickell Avenue, Suite 1140
Miami, Florida 33131
Tel: 305.357.2107
fhedin@hedinhall.com
aravindran@hedinhall.com

Joseph I. Marchese
Philip L. Fraietta
**BURSOR & FISHER, P.A**.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
jmarchese@bursor.com
pfraietta@bursor.com

*Counsel for Plaintiff and the Putative Class*