## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

PHILLIP LEE; PAMELA WHITE; PATRICIA VANDUSEN; RONALD ALLIX; and RANDY WELCH, individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

BELVOIR MEDIA GROUP, LLC,

*Defendant*.

Case No. 4:22-cv-12153-SDK

Hon. Shalina D. Kumar

## DEFENDANT BELVOIR MEDIA GROUP, LLC'S ANSWER TO PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

Defendant Belvoir Media Group, LLC ("Belvoir") hereby answers Plaintiffs'

First Amended Class Action Complaint ("FAC") as follows:

## INTRODUCTION

1.     Defendant Belvoir Media Group, LLC ("Belvoir") rented, exchanged, and/or otherwise disclosed detailed information about Plaintiffs' Belvoir magazine and newsletter subscriptions to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed their information to aggressive advertisers, political organizations, and non-profit companies. As a result, Plaintiffs have received a barrage of unwanted junk mail. By renting, exchanging, and/or otherwise disclosing Plaintiffs' Private Reading Information

(defined below) during the relevant pre-July 31, 2016 time period, Belvoir violated

Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess.,

P.A. No. 378, §§ 1-4 (Mich. 1988), *id*. § 5, added by H.B. 4694, 85th Leg. Reg.

Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").

**ANSWER:  The allegations contained in Paragraph 1 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 1 of the FAC, including all footnotes.[1] Belvoir denies any remaining allegations contained in Paragraph 1.**

2.      Documented evidence confirms these facts. For example, Belvoir offers, through list broker, NextMark, Inc. ("NextMark"), to provide renters access to the mailing list titled "BELVOIR MEDIA GROUP ELITE MASTERFILE Mailing List", which contains the Private Reading Information of all 736,793 of Belvoir's active U.S. subscribers at a base price of "$110.00/M [per thousand]," (i.e., 11 cents apiece), as shown in the screenshot below:

---

[1] Belvoir denies all of the footnotes in the FAC to the extent they contain any allegations that are inconsistent with the cited and referenced materials, and denies any remaining allegations contained in those footnotes. Belvoir also denies all allegations contained in the subheadings throughout the FAC.



*See* Exhibit A hereto.

**ANSWER: The allegations in Paragraph 2 of the FAC contain legal conclusions, to which no response is required. To the extent a response is required, Belvoir denies the allegations in Paragraph 2 of the FAC. Belvoir denies any remaining allegations contained in Paragraph 2.**

3.     A similar "data card," with the same rates shown above, was also publicly advertised by Belvoir during the relevant pre-July 31, 2016 time period, with a slightly different title. For the entire duration of the relevant pre-July 31, 2016 time period, Belvoir offered, through NextMark and other list brokers, including SRDS, Inc., to provide renters access to the mailing list titled "Belvoir Health Wiland Direct Modeling Masterfile," which contained the Private Reading Information of all subscribers to all of Belvoir's health newsletters, at a base price of $110.00/M per thousand, (i.e., 11 cents apiece). During the relevant pre-July 31, 2016 time period, Belvoir made the following statement, among others, on its "Belvoir Health Wiland Direct Modeling Masterfile" data card: "Wiland Direct members can apply their models to the Belvoir Health Newsletter Masterfile names allowing them to reach their ideal target audience."

**ANSWER: The allegations in Paragraph 3 of the FAC contain legal conclusions, to which no response is required. To the extent a response is required, Belvoir refers to the cited documents, to the extent they even exist, for their actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir denies any remaining allegations contained in Paragraph 3 of the FAC, including all footnotes.**

4.     The term "Wiland" (appearing in the title of the data card in effect throughout the relevant pre-July 31, 2016 time period) refers to Wiland, Inc. – a data

cooperative and data appending company that offers, *inter alia*, list "enhancement" and "prospecting" services to its clients. Wiland's clients, such as Belvoir, use these services, and used these services during the relevant pre-July 31, 2016 time period, by transmitting their entire subscriber files to Wiland, who in turn "appends" additional demographic and personal data about each subscriber to the file, thereby "enhancing" it (i.e., making it more valuable, and allowing the publisher to rent its lists to third parties for more money and to exchange its lists to other third parties on more favorable terms), and also provides the publisher client with the Personal Reading Information of other individuals who are not existing subscribers to its publications but who fit certain pre-determined criteria that render them likely to be interested in purchasing subscriptions to its publications, i.e., "prospects" who the publisher then markets its publications to. Plaintiffs are informed and believe, and thereupon allege, that, throughout the relevant pre-July 31, 2016 time period, Belvoir (as a data "enhancement" and "prospecting" client of Wiland's) was contractually obligated to provide Wiland the Personal Reading Information of all of the subscribers (as well as all of the recently expired subscribers) to all of its publications, on a periodic and regular basis (at least as frequently as once a month), which Wiland then used to facilitate its list enhancement and prospecting services. Thus, because Belvoir was a client of Wiland's throughout the relevant pre-July 31, 2016 time period (as evidenced by Belvoir's advertising of its "Belvoir Health

Wiland Direct Modeling Masterfile" throughout that time period), Belvoir necessarily transmitted all of its subscribers' Personal Reading Information (including Plaintiffs' and all Class members' Personal Reading Information) to Wiland on at least as frequently as a monthly basis over the same time period.

**ANSWER: The allegations in Paragraph 4 of the FAC contain legal conclusions, to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 4 of the FAC.**

5.     The lists advertised for sale in the "data cards" referenced above in paragraphs 2 and 3 (and all of the other "data cards" advertised by Belvoir between the commencement of the relevant pre-July 31, 2016 time period and the present) include, *inter alia*, the full names and addresses of each person who purchased a subscription to a Belvoir publication and the title of the publication that each of them subscribed to; indeed, the postal-mail envelope logo in the "channels" field of the data card (which appeared on all of the data cards referenced herein) indicates that the advertised mailing list contains the necessary information (i.e., name and address) for the renters,  exchangers, and purchasers of the list to contact the subscribers whose information appears on it via postal mail. And the Personal Reading Information contained on the mailing lists advertised in the data cards referenced herein originates, and throughout the relevant pre-July 31, 2016 time period originated, directly from Belvoir prior to being disclosed to the renters,

purchasers, and exchangers of this data; indeed, all of the data cards referenced in this First Amended Complaint (and in existence between the commencement of the relevant pre-July 31, 2016 time period and the present) contained Belvoir's trademarked logo, which Belvoir expressly authorized to be affixed thereon.

**ANSWER: Belvoir refers to the cited documents, to the extent they even exist, for their actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir denies any remaining allegations contained in Paragraph 5 of the FAC.**

6.     Thus, for the entire duration of the pre-July 31, 2016 time period, Belvoir was continuously and systematically (at least as frequently as once a month) renting, selling, exchanging, and otherwise disclosing all of its customers' Private Reading Information (including Plaintiffs' and all Class members' Private Reading Information) to Wiland and numerous other third parties for appending, enhancement, prospecting, and rental purposes.

**ANSWER: The allegations in Paragraph 6 of the FAC contain legal conclusions, to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 6 of the FAC.**

7.     As a result of Belvoir's practices of disclosing Plaintiffs' Private Reading Information during the relevant pre-July 31, 2016 time period, as alleged

herein, Plaintiffs saw a dramatic uptick of junk mail in their mailboxes over the same time period.

**ANSWER:  Belvoir denies the allegations contained in Paragraph 7 of the FAC.**

8.     By renting, exchanging, or otherwise disclosing the Private Reading Information of all of its Michigan-based subscribers during the relevant pre-July 31, 2016 time period, Belvoir violated the PPPA. Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials ... shall not disclose to any person, other than the customer, a record or information concerning the purchase ... of those materials by a customer that indicates the identity of the customer.

PPPA § 2.

**ANSWER: The allegations contained in Paragraph 8 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir refers the Court to the Michigan Preservation of Personal Privacy Act ("PPPA"), M.C.L. § 445.1711, *et seq*., and the 2016 amendment thereto, S.B. 490, 98th Leg., Reg. Sess. P.A. No. 92 (Mich. 2016) for a complete and accurate statement of its contents. Belvoir denies the remaining allegations contained in Paragraph 8 of the FAC.**

9.     Accordingly, Plaintiffs bring this First Amended Class Action Complaint against Belvoir for its intentional and unlawful disclosure of its customers' Private Reading Information in violation of the PPPA.

**ANSWER: Belvoir admits that Plaintiff purports to bring this FAC against Belvoir as a putative class action, but denies that the claims alleged can properly proceed as a class action and denies that Plaintiffs or any putative class member have any claim against Belvoir. Belvoir denies any remaining allegations contained in Paragraph 9 of the FAC.**

## NATURE OF THE CASE

10.    To supplement its revenues, Belvoir rents, exchanges, or otherwise discloses all of its customers' information—including their full names, titles of publications subscribed to (or purchased, in the case of books), and home addresses (collectively "Private Reading Information"), as well as myriad other categories of individualized data and demographic information such as gender—to data aggregators, data appenders, data cooperatives, and other third parties without the written consent of its customers. Belvoir continuously and systematically engaged in these same practices (disclosing its entire database of its subscribers' Private Reading Information to Wiland and numerous other third parties, at least as frequently as once a month) throughout the entire relevant pre-July 31, 2016 time period.

**ANSWER: Belvoir denies the allegations contained in Paragraph 10 of the FAC.**

11.     By renting, exchanging, or otherwise disclosing – rather than selling – its customers' Private Reading Information, Belvoir is able to disclose the information time and time again to countless third parties.

**ANSWER: Belvoir denies the allegations contained in Paragraph 11 of the FAC.**

12.     Belvoir's disclosure of Private Reading Information and other individualized information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.

**ANSWER: Belvoir denies the allegations contained in Paragraph 12 of the FAC.**

13.     While Belvoir profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Private Reading Information and other individualized information, it does so at the expense of its customers' statutory privacy rights (afforded by the PPPA) because Belvoir does not obtain its customers' written consent prior to disclosing their Private Reading Information.

**ANSWER: Belvoir denies the allegations contained in Paragraph 13 of the FAC.**

## PARTIES

14.     Plaintiff Lee is a natural person and citizen and resident of the State of Michigan. Plaintiff Lee was a subscriber to multiple publications, including health

newsletters, published and sold by Belvoir prior to July 31, 2016. While residing in, a citizen of, and present in Michigan, Plaintiff Lee purchased his subscriptions to such Belvoir publications directly from Belvoir. Prior to and at the time Plaintiff Lee purchased his subscriptions, Belvoir did not notify Plaintiff Lee that it discloses the Private Reading Information of its customers, and Plaintiff Lee has never authorized Belvoir to do so. Furthermore, Plaintiff Lee was never provided any written notice that Belvoir rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out. During the relevant pre-July 31, 2016 time period, Belvoir disclosed, without the requisite consent or prior notice, Plaintiff Lee's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplemented that information with data from their own files. Moreover, during that same period, Belvoir rented or exchanged mailing lists containing Plaintiff Lee's Private Reading Information to third parties seeking to contact Belvoir subscribers, without first obtaining the requisite written consent from Plaintiff Lee or even giving him prior notice of the rentals, exchanges, and/or other disclosures.

**ANSWER: Belvoir lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 14 of the FAC and denies them on that basis. Belvoir denies that Plaintiff Lee was a subscriber to any publications owned by Belvoir prior to July 31, 2016. Any**

**remaining allegations state legal conclusions to which no response is required.
To the extent a response is required, Belvoir denies the allegations contained in
Paragraph 14 of the FAC.  Belvoir further incorporates herein by reference the
Declaration of Thomas E. Canfield (ECF No. 18-1), dated January 25, 2023,
attached as Tab A hereto.**

15.     Plaintiff White is a natural person and citizen and resident of the State of
Michigan. Plaintiff White was a subscriber to multiple publications, including health
newsletters, published and sold by Belvoir prior to July 31, 2016. While residing in,
a citizen of, and present in Michigan, Plaintiff White purchased her subscriptions to
such Belvoir publications directly from Belvoir. Prior to and at the time Plaintiff
White purchased her subscriptions, Belvoir did not notify Plaintiff White that it
discloses the Private Reading Information of its customers, and Plaintiff White has
never authorized Belvoir to do so. Furthermore, Plaintiff White was never provided
any written notice that Belvoir rents, exchanges, or otherwise discloses its
customers' Private Reading Information, or any means of opting out. During the
relevant pre-July 31, 2016 time period, Belvoir disclosed, without the requisite
consent or prior notice, Plaintiff White's Private Reading Information to data
aggregators, data appenders, and/or data cooperatives, who then supplemented that
information with data from their own files. Moreover, during that same period,
Belvoir rented or exchanged mailing lists containing Plaintiff White's Private

Reading Information to third parties seeking to contact Belvoir subscribers, without first obtaining the requisite written consent from Plaintiff White or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

**ANSWER: Belvoir lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 15 of the FAC and denies them on that basis. Belvoir denies that Plaintiff White was a subscriber to any publications owned by Belvoir prior to July 31, 2016. Any remaining allegations state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 15 of the FAC. Belvoir further incorporates herein by reference the Declaration of Thomas E. Canfield (ECF No. 18-1), dated January 25, 2023.** *See* **Tab A.**

16.     Plaintiff VanDusen is a natural person and citizen and resident of the State of Michigan. Plaintiff VanDusen was a subscriber to multiple publications, including health newsletters, published and sold by Belvoir prior to July 31, 2016. While residing in, a citizen of, and present in Michigan, Plaintiff VanDusen purchased her subscriptions to such Belvoir publications directly from Belvoir. Prior to and at the time Plaintiff VanDusen purchased her subscriptions, Belvoir did not notify Plaintiff VanDusen that it discloses the Private Reading Information of its customers, and Plaintiff VanDusen has never authorized Belvoir to do so. Furthermore, Plaintiff

VanDusen was never provided any written notice that Belvoir rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out. During the relevant pre-July 31, 2016 time period, Belvoir disclosed, without the requisite consent or prior notice, Plaintiff VanDusen's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplemented that information with data from their own files. Moreover, during that same period, Belvoir rented or exchanged mailing lists containing Plaintiff VanDusen's Private Reading Information to third parties seeking to contact Belvoir subscribers, without first obtaining the requisite written consent from Plaintiff VanDusen or even giving her prior notice of the rentals, exchanges, and/or other disclosures.

**ANSWER: Belvoir lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 16 of the FAC and denies them on that basis. Belvoir denies that Plaintiff VanDusen was a subscriber to any publications owned by Belvoir prior to July 31, 2016. Any remaining allegations state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 16 of the FAC. Belvoir further incorporates herein by reference the Declaration of Thomas E. Canfield (ECF No. 18-1), dated January 25, 2023. *See* Tab A.**

14

17.     Plaintiff Allix is a natural person and citizen and resident of the State of Michigan. Plaintiff Allix was a subscriber to multiple publications, including health newsletters, published and sold by Belvoir prior to July 31, 2016. While residing in, a citizen of, and present in Michigan, Plaintiff Allix purchased his subscriptions to such Belvoir publications directly from Belvoir. Prior to and at the time Plaintiff Allix purchased his subscriptions, Belvoir did not notify Plaintiff Allix that it discloses the Private Reading Information of its customers, and Plaintiff Allix has never authorized Belvoir to do so. Furthermore, Plaintiff Allix was never provided any written notice that Belvoir rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out. During the relevant pre-July 31, 2016 time period, Belvoir disclosed, without the requisite consent or prior notice, Plaintiff Allix's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplemented that information with data from their own files. Moreover, during that same period, Belvoir rented or exchanged mailing lists containing Plaintiff Allix's Private Reading Information to third parties seeking to contact Belvoir subscribers, without first obtaining the requisite written consent from Plaintiff Allix or even giving him prior notice of the rentals, exchanges, and/or other disclosures.

**ANSWER: Belvoir lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 17**

15

**of the FAC and denies them on that basis. Belvoir denies that Plaintiff Allix was a subscriber to any publications owned by Belvoir prior to July 31, 2016, except to the extent that it does have a record that someone named Ronald Allix was a subscriber to *Kitplanes*, but that subscription expired in 2008. That subscriber ordered and paid for that subscription through a third-party subscription agent. Accordingly, the subscription was not purchased "at retail" and is thus not covered by the PPPA. Any remaining allegations state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 17 of the FAC. Belvoir further incorporates herein by reference the Declaration of Thomas E. Canfield (ECF No. 18-1), dated January 25, 2023 (Tab A) and the Reply Declaration of Thomas E. Canfield, dated March 9, 2023 (ECF No. 23-1), which is attached as Tab B hereto.**

18.    Plaintiff Welch is a natural person and citizen and resident of the State of Michigan. Plaintiff Welch was a subscriber to multiple publications, including health newsletters, published and sold by Belvoir prior to July 31, 2016. While residing in, a citizen of, and present in Michigan, Plaintiff Welch purchased his subscriptions to such Belvoir publications directly from Belvoir. Prior to and at the time Plaintiff Welch purchased his subscriptions, Belvoir did not notify Plaintiff Welch that it discloses the Private Reading Information of its customers, and

Plaintiff Welch has never authorized Belvoir to do so. Furthermore, Plaintiff Welch was never provided any written notice that Belvoir rents, exchanges, or otherwise discloses its customers' Private Reading Information, or any means of opting out. During the relevant pre-July 31, 2016 time period, Belvoir disclosed, without the requisite consent or prior notice, Plaintiff Welch's Private Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplemented that information with data from their own files. Moreover, during that same period, Belvoir rented or exchanged mailing lists containing Plaintiff Welch's Private Reading Information to third parties seeking to contact Belvoir subscribers, without first obtaining the requisite written consent from Plaintiff Welch or even giving him prior notice of the rentals, exchanges, and/or other disclosures.

**<u>ANSWER</u>: Belvoir lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 18 of the FAC and denies them on that basis. Belvoir denies that Plaintiff Welch was a subscriber to any publications owned by Belvoir prior to July 31, 2016. Any remaining allegations state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 18 of the FAC. Belvoir further incorporates herein by reference the Declaration of Thomas E. Canfield (ECF No. 18-1), dated January 25, 2023. *See* Tab A.**

17

19.    Defendant Belvoir Media Group, LLC is a Connecticut corporation with its headquarters and principal place of business in Norwalk, Connecticut. Belvoir does business throughout Michigan and the entire United States. Belvoir is the publisher and seller of various consumer-oriented magazines, books, and health and wellness newsletters, including but not limited to *Dogster, CatWatch, Catnip, DOGWatch, Catster, WholeDog Journal, Your Dog, Kitplanes, Practical Sailor, AVweb, Aviation Safety, IFR, The Aviation Consumer, Mary Janes Farm, Women's Health Advisor, Arthritis Advisor, Men's Health Advisor, University Health News, Heart Advisor, Men's Health Watch, Women's Health Watch, Harvard Health Letter, Harvard Heart Letter, Women's Nutrition Connection, Mind, Mood & Memory, Environmental Nutrition, Health & Nutrition Letter,* and *HEALTHY Years.*

**ANSWER:  Belvoir admits the first sentence of Paragraph 19 of the FAC. Belvoir admits it does business in Michigan and denies the remaining allegations in the second sentence of Paragraph 19 of the FAC. Belvoir admits that at certain points in time, it published the magazines identified in Paragraph 19 of the FAC, but denies that it published *Dogster*, *Catster*, *Men's Health Watch*, or *Women's Health Watch* in 2016. Belvoir also denies that it published *AVweb* or *University Health News* in 2016, but admits that it published *AVweb.com* and *HealthNews* in 2016.  Belvoir denies any remaining allegations of Paragraph 19 of the FAC.**

18

## <u>JURISDICTION AND VENUE</u>

20.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

**<u>ANSWER</u>: The allegations contained in Paragraph 20 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies that this action satisfies the requirements of 28 U.S.C. § 1332(d) and/or the Class Action Fairness Act, and denies any remaining allegations contained in Paragraph 20 of the FAC.**

21.     The Court has personal jurisdiction over Belvoir because Plaintiffs' claims arose in substantial part from actions and omissions in Michigan, including from Plaintiffs' purchases of subscriptions to Belvoir publications in Michigan, Belvoir's direction of such subscriptions into Michigan, and Belvoir's failure to obtain Plaintiffs' written consent in Michigan prior to disclosing their Private Reading Information, including their residential addresses in Michigan, to another person, the effects of which were felt from within Michigan by citizens and residents of Michigan. Personal jurisdiction also exists over Belvoir in Michigan because Belvoir conducts substantial business within Michigan, such that Belvoir has significant, continuous, and pervasive contacts with the State of Michigan.

**ANSWER: The allegations contained in Paragraph 21 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 21 of the FAC.**

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the Plaintiffs resides in this judicial District, Belvoir does substantial business in this judicial District, Belvoir is subject to personal jurisdiction in this judicial District, and a substantial part of the events giving rise to Plaintiffs' claims took place within this judicial District.

**ANSWER: Belvoir lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning Plaintiffs contained in Paragraph 22 of the FAC and denies them on that basis. Belvoir admits that it does business in Michigan. The remaining allegations contained in Paragraph 22 of the FAC state legal conclusions, to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 22 of the FAC.**

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

23.    In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and publication materials offer "a window into our loves, likes, and dislikes," and that "the trail of information

generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

**ANSWER**: **Belvoir refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir denies any remaining allegations contained in Paragraph 23 of the FAC.**

24.     Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA to protect "privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information. H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

**ANSWER**: **Belvoir refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir denies any remaining allegations contained in Paragraph 24 of the FAC.**

25.     Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . shall not disclose to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

PPPA § 2 (emphasis added)

**ANSWER: Belvoir admits that the allegations contained in Paragraph 25 of the FAC contain an excerpt from a section of the PPPA, but denies that it is the complete text of the statute. Belvoir denies any remaining allegations contained in Paragraph 25 of the FAC.**

26.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

**ANSWER: Belvoir refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir denies any remaining allegations contained in Paragraph 26 of the FAC.**

27.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988).

**ANSWER**: Belvoir refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir denies any remaining allegations contained in Paragraph 27 of the FAC.

28.     Senator Leahy also explained why choices in movies and reading materials are so private: "These activities . . . reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

**ANSWER**: Belvoir refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir denies any remaining allegations contained in Paragraph 28 of the FAC.

29.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as Exhibit B).

**ANSWER**: Belvoir refers to the cited document for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir denies any remaining allegations contained in Paragraph 29 of the FAC.

30.     Despite the fact that thousands of Michigan residents subscribe to Belvoir's publications, Belvoir disregarded its legal responsibility by systematically violating the PPPA.

**ANSWER: Belvoir denies the allegations contained in Paragraph 30 of the FAC.**

### *The Private Information Market:*
### *Consumers' Private Information Has Real Value*

31.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."

**ANSWER: Belvoir refers to the cited document in the footnote accompanying Paragraph 31 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir denies any remaining allegations contained in Paragraph 31 of the FAC.**

32.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.

**ANSWER: Belvoir refers to the cited document in the footnote accompanying Paragraph 32 of the FAC for its actual and complete contents and denies any**

**allegations or characterizations inconsistent therewith. Belvoir lacks knowledge and information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 32 of the FAC and denies them on that basis.**

33.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.

**ANSWER: Belvoir refers to the cited document in the footnote accompanying Paragraph 33 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 33 of the FAC and denies them on that basis.**

34.     In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers. Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.

**ANSWER**: **Belvoir refers to the cited document in the footnote accompanying Paragraph 34 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 34 of the FAC and denies them on that basis.**

35.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."

**ANSWER**:  **Belvoir refers to the cited document in the footnote accompanying Paragraph 35 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 35 of the FAC and denies them on that basis.**

36.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."

**ANSWER:**  **Belvoir refers to the cited document in the footnote accompanying Paragraph 36 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 36 of the FAC and denies them on that basis.**

37.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.

**ANSWER:**  **Belvoir refers to the cited document in the footnote accompanying Paragraph 37 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 37 of the FAC and denies them on that basis.**

38.     In their letter, the co-Chairmen recognized that "[b]y combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer," which "raises a number of serious privacy concerns."

**ANSWER:** Belvoir refers to the cited document in the footnote accompanying Paragraph 38 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 38 of the FAC and denies them on that basis.

39.   Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams, including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like Belvoir share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.

**ANSWER:** Belvoir denies the allegations contained in Paragraph 39 of the FAC regarding its actions and the effect of such actions. Belvoir refers to the cited documents in the footnotes accompanying Paragraph 39 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir lacks knowledge and information sufficient to

form a belief as to the truth of any remaining allegations contained in Paragraph 39 of the FAC and denies them on that basis.

40.     Information disclosures like those made by Belvoir are particularly dangerous to the elderly. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide." The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers." Indeed, an entire black market exists where the private information of vulnerable elderly Americans is exchanged.

**ANSWER: Belvoir denies the allegations contained in the first sentence of Paragraph 40 of the FAC. Belvoir refers to the cited documents in the footnotes accompanying Paragraph 40 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 40 of the FAC and denies them on that basis.**

41.     Thus, information disclosures like Belvoir's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a

specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."

**ANSWER: Belvoir denies the allegations contained in Paragraph 41 of the FAC regarding its actions and the effect of such actions. Belvoir refers to the cited document in the footnote accompanying Paragraph 41 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations contained in Paragraph 41 and denies them on that basis.**

42.     Belvoir is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

**ANSWER: Belvoir denies the allegations contained in Paragraph 42 of the FAC.**

43.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

**ANSWER: Belvoir lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 43 of the FAC and denies them on that basis.**

*Consumers Monetary Value on their Privacy and*
*Consider Practices When Making Purchases*

44.    As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their information.

**ANSWER:  Belvoir lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 44 of the FAC and denies them on that basis.**

45.    A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online. As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.

**ANSWER:  Belvoir refers to the cited document in the footnotes accompanying Paragraph 45 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 45 and denies them on that basis.**

46.    Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy-protective competitors.

**ANSWER:  Belvoir lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 46 of the FAC and denies them on that basis.**

47.    In fact, consumers' private information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their information themselves.

**ANSWER:  Belvoir refers to the cited document in the footnote accompanying Paragraph 47 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 47 of the FAC and denies them on that basis.**

48.    These companies' business models capitalize on a fundamental tenet underlying the consumer information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to

pay a premium to purchase services from companies that adhere to more stringent policies of protecting their data.

**ANSWER:  Belvoir refers to the cited document in the footnote accompanying Paragraph 48 of the FAC for its actual and complete contents and denies any allegations or characterizations inconsistent therewith. Belvoir lacks knowledge and information sufficient to form a belief as to the truth of the allegations contained in Paragraph 48 of the FAC and denies them on that basis.**

49.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.

**ANSWER: Belvoir lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 49 of the FAC and denies them on that basis.**

### *Belvoir Unlawfully Rents, Exchanges, and Discloses Its Customers' Private Reading Information*

50.     Belvoir maintains a vast digital database comprised of its customers' Private Reading Information. Belvoir discloses its customers' Private Reading Information to data aggregators and appenders, who then supplement that information with additional sensitive private information about each Belvoir customer, including his or her gender. (*See, e.g.*, Exhibit A).

**ANSWER: Belvoir admits that a database exists that contains certain information. Belvoir denies any remaining allegations in Paragraph 50 of the FAC.**

51.     Belvoir then rents and/or exchanges its mailing lists—which include subscribers' Private Reading Information identifying which individuals purchased subscriptions to particular publications, and can include the sensitive information obtained from data aggregators and appenders—to other data aggregators and appenders, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* Exhibit A).

**ANSWER: The allegations contained in Paragraph 51 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 51 of the FAC. Belvoir denies any remaining allegations in Paragraph 51 of the FAC.**

52.     Belvoir also discloses its customers' Private Reading Information to data cooperatives, who in turn give Belvoir access to their own mailing list databases.

**ANSWER:  The allegations contained in Paragraph 52 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 52 of the FAC. Belvoir denies any remaining allegations in Paragraph 52 of the FAC.**

53.     As a result of Belvoir's data compiling and sharing practices, companies can purchase and/or obtain mailing lists from Belvoir that identify Belvoir's customers by their most intimate details such as their gender. Belvoir's disclosures of such sensitive and private information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.

**ANSWER: Belvoir denies the allegations contained in Paragraph 53 of the FAC.**

54.     Belvoir does not seek its customers' prior consent, written or otherwise, to any of these disclosures and its customers remain unaware that their Private Reading Information and other sensitive information is being rented and exchanged on the open market.

**ANSWER: Belvoir denies the allegations contained in Paragraph 54 of the FAC.**

55.     Belvoir was actively engaged in these practices throughout the relevant pre-July 31, 2016 time period. During that time period, Belvoir systematically rented, sold, exchanged, or otherwise disclosed all of its subscribers' Private Reading Information to various data aggregators and appenders, data brokers, list managers, and other third parties, including but not limited to Wiland.

**ANSWER: Belvoir denies the allegations contained in Paragraph 55 of the FAC.**

56.     Consumers can sign up for subscriptions to Belvoir's publications through numerous media outlets, including the Internet, telephone, or traditional mail. Regardless of how the consumer subscribes, Belvoir has never required the individual to read or affirmatively agree to any terms of service, privacy policy, or information-sharing policy during the relevant pre-July 31, 2016 time period. Consequently, during the relevant pre-July 31, 2016 time period, Belvoir uniformly failed to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Private Reading Information.

**ANSWER**: **Belvoir admits that there are various ways and outlets through which an individual may subscribe to a Belvoir publication. Belvoir denies the remaining allegations contained in Paragraph 56 of the FAC.**

57.     As a result, Belvoir disclosed its customers' Private Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns" – to anybody willing to pay for it.

**ANSWER**: **Belvoir denies the allegations contained in Paragraph 57 of the FAC.**

58.     By and through these actions, Belvoir has intentionally disclosed to third parties its Michigan customers' Private Reading Information without consent, in direct violation of the PPPA.

**ANSWER:** Belvoir denies the allegations contained in Paragraph 58 of the FAC.

## CLASS ACTION ALLEGATIONS

59.     Plaintiffs seek to represent a class defined as all Michigan residents who, at any point during the relevant pre-July 31, 2016 time period, had their Private Reading Information disclosed to third parties by Belvoir without consent (the "Class"). Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

**ANSWER: Belvoir admits that Plaintiffs purport to bring this action as a class action on behalf of the alleged putative class, but Belvoir denies that a class can be certified in this case. The allegations contained in Paragraph 59 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 59 of the FAC.**

60.     Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the thousands. The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

**ANSWER:  The allegations contained in Paragraph 60 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 60 of the FAC.**

61.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether Belvoir is a "retailer or distributor" of magazines, newsletters, and books; (b) whether Belvoir obtained consent before disclosing to third parties Plaintiffs' and the Class's Private Reading Information; and (c) whether Belvoir's disclosures of Plaintiffs' and the Class's Private Reading Information violated the PPPA.

**ANSWER: The allegations contained in Paragraph 61 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 61 of the FAC.**

62.     The claims of the named Plaintiffs are typical of the claims of the Class in that the named Plaintiffs and the Class suffered invasions of their statutorily protected right to privacy (as afforded by the PPPA) as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiffs' and the Class's Private Reading Information.

**ANSWER:  The allegations contained in Paragraph 62 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 62 of the FAC.**

63.    Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

**ANSWER: The allegations contained in Paragraph 63 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 63 of the FAC.**

64.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single

adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**ANSWER: The allegations contained in Paragraph 64 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 64 of the FAC.**

## CAUSE OF ACTION

### Violation of Michigan's Preservation of Personal Privacy Act
### (PPPA § 2)

65.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

**ANSWER:  Belvoir incorporates its responses to Paragraphs 1-64 as if fully set forth herein.**

66.    Plaintiffs bring this claim individually and on behalf of members of the Class against Defendant Belvoir.

**ANSWER: Belvoir admits that Plaintiffs purport to bring this claim in a putative class action lawsuit against Belvoir, but denies that any individual or class-wide relief is appropriate and denies the remaining allegations contained in Paragraph 66 of the FAC.**

67.     As a magazine, book, and newsletter publisher that sells magazine and newsletter subscriptions and books to consumers, Belvoir is engaged in the business of selling written materials at retail. *See* PPPA § 2.

**ANSWER:  Belvoir refers to the PPPA for its complete contents and denies any allegations or characterizations contained in Paragraph 67 of the FAC that are inconsistent therewith. The allegations contained in Paragraph 67 of the FAC state legal conclusions to which no response is required. To the extent that a response is required, Belvoir denies the allegations contained in Paragraph 67 of the FAC.**

68.     By purchasing subscriptions to Belvoir's publications, each of the Plaintiffs purchased written materials directly from Belvoir. *See* PPPA § 2.

**ANSWER:  Belvoir refers to the PPPA for its complete contents and denies any allegations or characterizations contained in Paragraph 68 of the FAC that are inconsistent therewith. The allegations contained in Paragraph 68 of the FAC state legal conclusions to which no response is required. To the extent that a response is required, Belvoir denies the allegations contained in Paragraph 68 of the FAC.**

69.     Because Plaintiffs purchased written materials directly from Belvoir, they are each a "customer" within the meaning of the PPPA. *See* PPPA § 1.

**ANSWER:  Belvoir refers to the PPPA for its complete contents and denies any allegations or characterizations contained in Paragraph 69 of the FAC that are inconsistent therewith. The allegations contained in Paragraph 69 of the FAC state legal conclusions to which no response is required. To the extent that a response is required, Belvoir denies the allegations contained in Paragraph 69 of the FAC. Belvoir denies any remaining allegations in Paragraph 69 of the FAC.**

70.    At various times during the pre-July 31, 2016 time period, Belvoir disclosed Plaintiffs' Private Reading Information, which identified each of them as a customer who purchased particular Belvoir publications, in at least three ways.

**ANSWER: The allegations contained in Paragraph 70 of the FAC state legal conclusions to which no response is required. To the extent that a response is required, Belvoir denies the allegations contained in Paragraph 70 of the FAC. Belvoir denies any remaining allegations in Paragraph 70 of the FAC.**

71.    First, Belvoir disclosed mailing lists containing Plaintiffs' Private Reading Information to data aggregators and data appenders, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Belvoir.

**ANSWER: The allegations contained in Paragraph 71 of the FAC state legal conclusions to which no response is required. To the extent a response is**

required, **Belvoir denies the allegations contained in Paragraph 71 of the FAC.**
**Belvoir denies any remaining allegations in Paragraph 71 of the FAC.**

72.   Second, Belvoir disclosed mailing lists containing Plaintiffs' Private
Reading Information to data cooperatives, who in turn gave Belvoir access to their
own mailing list databases.

**ANSWER: The allegations contained in Paragraph 72 of the FAC state legal**
**conclusions to which no response is required. To the extent a response is**
**required, Belvoir denies the allegations contained in Paragraph 72 of the FAC.**
**Belvoir denies any remaining allegations in Paragraph 72 of the FAC.**

73.   Third, Belvoir rented and/or exchanged its mailing lists containing
Plaintiff's Private Reading Information—enhanced with additional information
from data aggregators and appenders—to third parties, including other consumer-
facing companies, direct-mail advertisers, and organizations soliciting monetary
contributions, volunteer work, and votes.

**ANSWER: The allegations contained in Paragraph 73 of the FAC state legal**
**conclusions to which no response is required. To the extent a response is**
**required, Belvoir denies the allegations contained in Paragraph 73 of the FAC.**
**Belvoir denies any remaining allegations in Paragraph 73 of the FAC.**

74.     Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and Belvoir was able to increase its profits gained from the mailing list rentals and/or exchanges.

**ANSWER:   Belvoir denies the allegations contained in Paragraph 74 of the FAC.**

75.     By renting, exchanging, or otherwise disclosing its customer lists, during the relevant pre-July 31, 2016 time period, Belvoir disclosed to persons other than Plaintiffs records or information concerning their purchases of written materials from Belvoir. *See* PPPA § 2.

**ANSWER:   Belvoir refers to the PPPA for its complete contents and denies any allegations or characterizations contained in Paragraph 75 of the FAC that are inconsistent therewith. The allegations contained in Paragraph 75 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 75 of the FAC.**

76.     The information Belvoir disclosed indicates Plaintiffs' names and addresses, as well as the fact that each of them subscribed to particular Belvoir publications. Accordingly, the records or information disclosed by Belvoir indicated Plaintiffs' identities. *See* PPPA § 2.

**ANSWER:  Belvoir refers to the PPPA for its complete content and denies any allegations or characterizations contained in Paragraph 76 of the FAC that are inconsistent therewith. The allegations contained in Paragraph 76 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 76 of the FAC.**

77.    Plaintiffs and the members of the Class never consented to Belvoir disclosing their Private Reading Information to anyone.

**ANSWER:  The allegations contained in Paragraph 77 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 77 of the FAC.**

78.    Worse yet, Plaintiffs and the members of the Class did not receive notice before Belvoir disclosed their Private Reading Information to third parties.

**ANSWER:  The allegations contained in Paragraph 78 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 78 of the FAC.**

79.    Belvoir's disclosures of Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made pursuant to a court order, search warrant, or grand jury subpoena.

**ANSWER:  The allegations contained in Paragraph 79 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir states that the allegations in the FAC do not appear to pertain to disclosures pursuant to a court order, search warrant, or grand jury subpoena. Belvoir denies that it has disclosed information in violation of the PPPA, and denies any remaining allegations contained in Paragraph 79 of the FAC.**

80.    Belvoir's disclosures of Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period were not made to collect payment for their subscriptions.

**ANSWER:   The allegations contained in Paragraph 80 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir states that the allegations in the FAC do not pertain to disclosures made to collect payment for subscriptions. Belvoir denies that it has disclosed information in violation of the PPPA, and denies the remaining allegations contained in Paragraph 80 of the FAC.**

81.    Belvoir's disclosures of Plaintiffs' Private Reading Information during the relevant pre-July 31, 2016 time period were made to data aggregators, data appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase

Belvoir's revenue. Accordingly, Belvoir's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiffs and the members of the Class.

**ANSWER:  The allegations contained in Paragraph 81 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 81 of the FAC.**

82.    By disclosing Plaintiffs' and the Class's Private Reading Information during the relevant pre-July 31, 2016 time period, Belvoir violated Plaintiffs' and the Class's statutorily protected right to privacy in their reading habits. *See* PPPA § 2.

**ANSWER: Belvoir refers to the PPPA for its complete contents and denies any allegations or characterizations contained in Paragraph 82 of the FAC that are inconsistent therewith. The allegations contained in Paragraph 82 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 82.**

83.    As a result of Belvoir's unlawful disclosure of their Private Reading Information, Plaintiffs and the members of the Class have suffered invasions of their statutorily protected right to privacy (afforded by the PPPA). On behalf of themselves and the Class, Plaintiffs seek: (1) $5,000.00 to each of the Plaintiffs and

each Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

**ANSWER:   Belvoir refers to the PPPA for its complete contents and denies any allegations or characterizations contained in Paragraph 83 of the FAC that are inconsistent therewith. The allegations contained in Paragraph 83 of the FAC state legal conclusions to which no response is required. To the extent a response is required, Belvoir denies the allegations contained in Paragraph 83.**

## BELVOIR's DEFENSES

Belvoir asserts the following affirmative and other defenses to Plaintiffs' FAC:

## FIRST DEFENSE

Plaintiffs' and/or other alleged putative class members' information was not disclosed in violation of the PPPA.

## SECOND DEFENSE

Plaintiffs and/or other alleged putative class members have not been harmed, have incurred no cognizable damages, and have not suffered an injury-in-fact traceable to Belvoir and, therefore, lack standing.

## THIRD DEFENSE

Any complained of disclosures of the Plaintiffs' and/or other alleged putative class members' information meet the PPPA's marketing exception contained in M.C.L. § 455.1713.

## **FOURTH DEFENSE**

Plaintiffs and/or other alleged putative class members consented to the complained of disclosures pursuant to M.C.L. § 455.1713.

## **FIFTH DEFENSE**

Plaintiffs and/or alleged putative class members provided written permission for the complained of disclosures pursuant to M.C.L. § 455.1713.

## **SIXTH DEFENSE**

The PPPA is inapplicable to the complained of disclosures to the extent that the Plaintiffs' and/or other members of the putative class's magazine subscriptions were not sold or purchased "at retail" pursuant to M.C.L. § 455.1712.

## **SEVENTH DEFENSE**

As set forth in the Declaration of Thomas E. Canfield (ECF No. 18-1), dated January 25, 2023, and the Reply Declaration of Thomas E. Canfield, dated March 9, 2023 (ECF No. 23-1) (Tabs A and B hereto), which are incorporated herein by reference, none of the named Plaintiffs subscribed to a Belvoir-owned publication during the relevant time period, except to the extent that Belvoir does have a record that someone named Ronald Allix was a subscriber to *Kitplanes*, but that subscription expired in 2008. That subscriber ordered and paid for that subscription through a third-party subscription agent. Accordingly, the subscription was not

purchased "at retail". Thus, none of the named Plaintiffs' claims are covered by the PPPA.

## EIGHTH DEFENSE

Any complained of disclosures of the Plaintiffs' and/or other alleged putative class members' information were and are permissible under the PPPA. M.C.L. § 455.1712.

## NINTH DEFENSE

To the extent Plaintiffs and/or other putative class members voluntarily disclosed their Private Reading Information and/or consented to the disclosure of such information, their claims are barred in whole or in part by the doctrines of consent, waiver, estoppel, laches, unclean hands, and/or other equitable doctrines.

## TENTH DEFENSE

Plaintiffs' and/or other alleged putative class members' claims are barred, in whole or in part, by the applicable statute of limitations and/or statute of repose.

## ELEVENTH DEFENSE

Plaintiffs and/or other alleged putative class members have failed to state a claim upon which relief can be granted under the PPPA.

**TWELFTH DEFENSE**

Plaintiffs and/or other alleged putative class members lack statutory standing under the PPPA to assert the claims in the FAC and to seek some and/or all of the relief requested.

**THIRTEENTH DEFENSE**

Plaintiffs and/or other alleged putative class members lack Article III standing under the PPPA to assert the claims in the FAC and to seek some and/or all of the relief requested.

**FOURTEENTH DEFENSE**

Plaintiffs' and/or other alleged putative class members' claims for alleged statutory damages without proof of any actual damages is unconstitutionally excessive and barred by the Fifth and/or Eighth Amendments to the United States Constitution and Article I, Section 16 and 17 of the Michigan Constitution, and violates substantive and procedural due process.

**FIFTEENTH DEFENSE**

Both on its face and as sought to be applied by Plaintiffs, the PPPA is unconstitutional under the First Amendment to the United States Constitution and Article I, Section 5 of the Michigan Constitution.

## SIXTEENTH DEFENSE

Awarding aggregated damages to a class would violate Belvoir's rights to due process of law under the United States Constitution because the Michigan State Legislature did not authorize the collection of aggregated statutory damages through class actions. To the contrary, Michigan law proscribes plaintiffs from bringing class actions under the PPPA in Michigan state courts, preventing the collection of aggregated class damages.

## SEVENTEENTH DEFENSE

This action cannot properly be brought as a class action because the requirements of Fed. R. Civ. P. 23 for certification of a class are not met and cannot be met in this action.

## EIGHTEENTH DEFENSE

Plaintiffs' claims and those of the putative class are untimely because their original Complaint in this action was filed after the expiration of the longest-possible (six-year) statute of limitations.

## NINETEENTH DEFENSE

Plaintiffs and the putative class are not entitled to any tolling of the statute of limitations.

### TWENTIETH DEFENSE

Even if tolling applied, Plaintiffs' claims and those of the putative class are barred to the extent they cannot prove a disclosure of their Private Reading Information during the relevant timeframe.

### TWENTY-FIRST DEFENSE

This Court lacks requisite jurisdiction to hear Plaintiffs' claims pursuant to Michigan Court Rule 3.501(A)(5).

### TWENTY-SECOND DEFENSE

This Court lacks subject matter jurisdiction pursuant to Class Action Fairness Act. 28 U.S.C. § 1332(d).

### TWENTY-THIRD DEFENSE

The FAC contains insufficient information to permit Belvoir to raise all appropriate defenses and, therefore, Belvoir reserves its right to amend and/or supplement this answer and these defenses and to assert additional defenses.

**WHEREFORE**, Belvoir Media Group, LLC respectfully requests that this Court enter judgment in its favor and against Plaintiffs on their First Amended Complaint, award Belvoir its costs, and enter such other relief as this Court deems necessary and proper.

Dated: October 10, 2023                    Respectfully submitted,


                                          /s/ *Deborah H. Renner*
                                          Kristen C. Rodriguez
                                          Deborah H. Renner
                                          DENTONS US LLP
                                          1221 Avenue of the Americas
                                          New York, New York 10020
                                          (212) 768-6700
                                          kristen.rodriguez@dentons.com
                                          deborah.renner@dentons.com

                                          Peter B. Kupelian (P31812)
                                          Carol G. Schley (P51301)
                                          CLARK HILL PLC
                                          151 South Old Woodward Ave., Suite 200
                                          Birmingham, MI 48009
                                          (248) 530-6336
                                          pkupelian@clarkhill.com
                                          cschley@clarkhill.com

                                          *Counsel for Defendant*
                                          *Belvoir Media Group, LLC*

## **Certificate of Service**

I hereby certify that on October 10, 2023, a copy of the foregoing document was filed electronically and served by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

/s/ *Deborah H. Renner*
Deborah H. Renner